1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                          No. 1:09-cr-10243-MLW

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    RYAN HARRIS

10

11                    * * * * * * * * *

12

13                   For Jury Trial Before:
                     Chief Judge Mark L. Wolf
14

15

16                   United States District Court
                     District of Massachusetts (Boston.)
17                   One Courthouse Way
                     Boston, Massachusetts 02210
18                   Wednesday, February 22, 2012

19

20                    * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23              United States District Court
         One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com

25

```
 1                 A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
         United States Attorney's Office
 4       John Joseph Moakley Federal Courthouse
         One Courthouse Way, Suite 9200
 5       Boston, Massachusetts 02210
         (617) 748-3112
 6       E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
         U.S. Department of Justice
 8       601 D. Street, N.W.
         Washington, D.C. 20530
 9       (202) 353-4304
         Email: Mona.sedky@usdoj.gov
10       For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
         Federal Public Defender Office
13       District of Massachusetts
         51 Sleeper Street, 5th Floor
14       Boston, Massachusetts 02210
         (617) 223-8080
15       E-mail: Charles_mcginty@fd.org
         For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
 1                     I N D E X

 2

 3        Preliminary Matters.....................    4

 4        Judge's Opening Instructions to Jury....   19

 5        Reading of Indictment...................   25

 6        Opening Statement by Ms. Sedky..........   47

 7        Opening Statement by Mr. McGinty........   83

 8

 9

    WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
10

11  CRAIG PHILLIPS

12     By Mr. Bookbinder:   99

13     By Mr. McGinty:

14

15

16

17                    E X H I B I T S

18        EXHIBIT 1............................... 132

19        EXHIBITS B1 through B3..................    7

20        EXHIBITS C1 and C2.....................   15

21        EXHIBITS D1 through D8.................. 117

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (Begins 9:00 a.m.)
3              THE CLERK:  Criminal Number 09-10243, the
4    United States of America versus Ryan Harris.  The Court
5    is in session.  You may be seated.
6              THE COURT:  Good morning.  Would counsel
7    please identify themselves for the record.
8              MR. BOOKBINDER:  Good morning, your Honor.
9    Adam Bookbinder and Mona Sedky for the United States.
10             MR. McGINTY:  And Charles McGinty and
11   Christine Demaso for Ryan Harris, your Honor.  Thank
12   you.
13             THE COURT:  And Mr. Harris is present.
14        Last evening, late, we received the redacted
15   superseding indictment removing the references to "GA,"
16   I believe.
17        Has the defendant received it?
18             MR. McGINTY:  Um, I have not downloaded it,
19   your Honor.  I have not seen it.  I'm sorry.  But I
20   could review it quickly.
21             THE COURT:  Um, why don't you do that.
22             MR. McGINTY:  If this is substantially -- if
23   this is what it was the government provided to me, then
24   I have reviewed it already, your Honor.
25             MR. BOOKBINDER:  Yeah, it's the same.  But
```

1   there was one place where the indictment still referred

2   to 11 counts rather than 9, so I fixed that, and I took

3   out the forfeiture language, which I don't believe is

4   something the Court needs to read to the jury.

5   Otherwise it's the same as the one that I gave to

6   Mr. McGinty.

7            MR. McGINTY:  We have gone through it

8   carefully, your Honor.

9            THE COURT:  Okay.  So Mr. Hohler will, at the

10  appropriate time, read it to the jury, and all the

11  jurors are here.

12       All right.  Do we have any signed stipulations?

13            MR. McGINTY:  I'm sorry, your Honor, I

14  neglected to -- we will have that by the end of today.

15            THE COURT:  Okay.  Has the government resolved

16  or made progress on the issue of highlighting the

17  exhibits?

18            MR. BOOKBINDER:  Yeah, your Honor, we've

19  spoken to the IT person who is working with us and he

20  thinks, um, that he ought to be able to take the

21  highlighting out, generate a juror's disk, so that what

22  the jurors see doesn't have it, generate new printed

23  versions which we can make as the originals that don't

24  have it, and for the purposes of the today's examination

25  and in the future I understand that for even court

1    examination there is a problem with the highlighting.

2              THE COURT:  That's my view because if you put

3    the plain document on there and then wanted to use the

4    technology to highlight if you could.  So we'll proceed

5    that way, Mr. McGinty, and I expect before the documents

6    get to the jury, we'll have these issues resolved.

7              MR. BOOKBINDER:  Yes, your Honor.

8              THE COURT:  All right.

9         I would tell you what I've drafted for preliminary

10   instructions.  After Mr. Hohler -- why don't you move

11   the easel out of the way for the moment.

12             MR. BOOKBINDER:  Your Honor, is that an

13   appropriate way to have it during the opening?

14             THE COURT:  If you have it there I won't be

15   able to see what's on it, but that's -- what are you

16   going to put on there?

17             MR. BOOKBINDER:  There are three chalks that

18   look like this.  We can give them to the defense.

19   Actually they have them.  These are good quotes from

20   Ryan Harris that we provided earlier.

21             (Shows.)

22             THE COURT:  Okay.  I can't see it.  You're

23   going to have to hold it up.

24             MR. BOOKBINDER:  Okay.  I may have copies of

25   them.

 1                THE COURT:  That would be fine.

 2                (Pause.)

 3                THE COURT:  And, Mr. McGinty, you've seen

 4      these and I understand there's no objection.

 5                MR. McGINTY:  Yes, that's right, your Honor.

 6                THE COURT:  All right.  I'll just mark these

 7      Exhibits B1, B2 and B3 for identification so the record

 8      will be clear what you're showing the jury.  All right?

 9                (Exhibits B1, B2 and B3, marked.)

10                THE COURT:  All right.  Here are the

11      preliminary instructions that I propose to do.  And

12      notwithstanding all the discussion we've had, they're

13      pretty bare-bones.

14           I'll tell the jury, after the indictment's read,

15      that:

16           "I'm now going to give you an overview of the law

17      to help you understand the evidence that you'll be

18      hearing.  I'll be giving you much more detailed

19      instructions at the end of the case.  If there's

20      anything I say now that sounds different than what I

21      tell you at the end of the case, you have to follow the

22      law as I explain it at the end of the case.

23           Count 1 charges the defendant with conspiracy to

24      commit wire fraud.  A conspiracy is an agreement to

25      commit a crime, it need not be an expressed agreement,

1    it could be a tacit understanding and proven by

2    circumstantial evidence.

3         To prove the conspiracy charged in this case the

4    government must prove beyond a reasonable doubt, first,

5    that the agreement specified in the indictment and not

6    some other agreement or agreements existed between at

7    least two people to commit wire fraud.  Second, that the

8    defendant willfully joined in that agreement.  And

9    third, that one of the co-conspirators committed an

10   overt act in Massachusetts in an effort to further the

11   purpose of the conspiracy."

12        And actually I recognize that ultimately whether

13   an overt act is -- occurred in Massachusetts relates to

14   venue and that only has to be proven by a preponderance

15   of the evidence, but I don't want to get into that now,

16   we'll see whether you want me to get into it at the end

17   of the case.

18        But basically -- and then I'm going to tell them:

19        "To act willfully means to do something

20   intentionally, not by accident or mistake, and with

21   knowledge that what is being done is unlawful."

22        Anybody have any comments or concerns so far?

23             (Silence.)

24             THE COURT:  No.  All right.

25        I had thought, you know, about giving *Portella*

1   language on single and multiple conspiracy, but I think

2   it would be too much in a preliminary instruction and

3   we'll keep working on that.

4        So the next thing I now intend to tell them is:

5        "That the object of the alleged conspiracy is to

6   commit wire fraud.  Counts 2 to 9 also charge that the

7   defendant committed wire fraud.

8        To prove an individual has committed wire fraud,

9   the government must prove beyond a reasonable doubt,

10  first, the defendant devised or participated in a scheme

11  to defraud or to obtain something of value from an

12  internet service provider.  Second, the scheme involved

13  a material falsehood.  Third, the defendant acted

14  knowingly, meaning intentionally, not by accident or

15  mistake, willfully, and with an intent to deceive and

16  defraud.  And fourth, that an interstate wire

17  communication was used in furtherance of the scheme."

18       So that's what I intend to tell them at the moment

19  about wire fraud.  Okay?

20       Finally, I intend to tell them -- and this

21  actually relates to something we haven't discussed.  I'm

22  going to tell them a little something about buyer/seller

23  and *Direct Sales,* and at the moment I intend to say:

24       "For both conspiracy and wire fraud, it would not

25  be enough for the government to prove that Harris only

1    sold a product to someone he knew would use it to commit

2    a crime.  However, the nature of the product sold and

3    any knowledge Harris had as to how it would be used are

4    evidence that you could consider, along with all the

5    other evidence, in deciding whether the government has

6    proven any or all of the conspiracy and wire fraud

7    charges beyond a reasonable doubt."

8          And what I said we haven't discussed before, we've

9    been discussing **Direct Sales** in the context of

10   conspiracy, not in the context of wire fraud.  But I

11   can't say I've thought it all the way through.  I don't

12   think there's a distinction because of the required

13   intent to defraud, or the wire fraud, the aiding and

14   abetting the wire fraud.

15         Does anybody want to be heard on that?  That's the

16   last thing that I propose to say at the moment.

17               (Silence.)

18         THE COURT:  Okay, the government has no

19   comment.  Mr. McGinty?

20         MR. McGINTY:  I had hoped for a more

21   comprehensive structure.  I think the difficulty the

22   jury is going to have is, um, trying to, at the end of

23   the case, relate back to the evidence they had sorted,

24   based on a conceptual framework, brought in, um, I would

25   say, too late.  The jury ought to know that on a sale

1    blown, it's not sufficient and the Court says --

2              THE COURT:  I just told them that.

3              MR. McGINTY:  -- and the Court says that.  But

4    additionally there are components of this that are of

5    consequence.  There's the issue of the CoaxThief and

6    whether a device that can find and use MACs is unlawful

7    --

8              THE COURT:  I couldn't possibly cover that in

9    a preliminary instruction.  I haven't heard the evidence

10   myself.

11             MR. McGINTY:  Well, in that case, your Honor,

12   as these things come up, I would perhaps suggest that we

13   make -- that the Court make instructions as the evidence

14   comes in on those, perhaps, to address those sort of

15   concepts.

16             THE COURT:  If you request it, I'll consider

17   it.  I'm always interested in assuring the jury properly

18   comprehends what's going on.  But, um, there are always

19   going to be questions about this.

20             MR. McGINTY:  And I continue to express my

21   reservation about the Court's interpretation of *Direct*

22   *Sales.*  When the Court talks about the nature of the

23   object, again, the defense's position is that there are

24   restricted and nonrestricted items.  That's the

25   dichotomy that controls for *Direct Sales.*  And we fall

```
 1    in the latter category, which is a consequential
 2    category in terms of what a person is responsible for.
 3              THE COURT:  Well, I will continue to consider
 4    that, but so far I've told you what I believe are the
 5    legal implications of *Direct Sales* and the related cases
 6    are.  And I am admonishing them to listen carefully at
 7    the end of the case and follow the instructions I give
 8    them at the end of the case and if they sound different
 9    than what I say today, that they should rely on what I
10    say at the conclusion of the case.
11         All right.  Now, when we finish Phillips, um, the
12    next witness, as I understand it, would be Kohler, and I
13    believe there are no issues to be ruled on with regard
14    to Kohler, right?
15              MR. BOOKBINDER:  I think there are not, your
16    Honor.  There are simply two chalks that we intend to
17    use with him, which I have given to defense counsel, and
18    I don't believe there are any objection to those.
19              THE COURT:  All right.  Well, you can give
20    them to me tomorrow and confirm there's no objection.
21         And then after Kohler is Lindquist, right?
22              MR. BOOKBINDER:  Yes.
23              THE COURT:  All right.  And Lindquist, I want
24    to speak to her and her lawyer briefly to see if she
25    intends to assert -- outside the presence of the jury,
```

1    to see if she intends to assert a Fifth Amendment

2    privilege.  If she does, I'll enter the immunity order.

3              MR. BOOKBINDER:  And I expect she will, your

4    Honor.  I don't believe that her attorney -- she does

5    have an attorney, but I don't believe that her attorney

6    will be there.

7              THE COURT:  All right.  And I think the only

8    objection concerning her is whether she should be able

9    to testify about the daily operations of the company and

10   essentially it's the analysis I've given with regard to

11   Phillips.  We can talk about this at the end of the day.

12        And I think the only exhibit associated with

13   Lindquist is Exhibit 6 and I found part of that chat

14   admissible and I assume that the redactions have been

15   done appropriately.

16        Let me just review to make sure I have it clearly

17   in mind, the government's -- the government, on February

18   7th, gave me a list of people with regard to whom it's

19   going to ask for *Petrozziello* rulings and I want to see

20   if this is accurate and complete still.

21        Phillips.  Lindquist.  Mr. T.  MooreR.  LB

22   Neptune.  Joe Port, also known as GA212.  Sean Davidson,

23   or Sean 19661.  Andrew Spear.  Boris Blinderman, live-

24   it-up 278.  And Jason P, who is also known as Board

25   714.

1          Is the government still going to be looking for

2     *Petrozziello* rulings on all of those people?

3              MR. BOOKBINDER:  We are, your Honor, although

4     obviously if the Court -- and this may be in the context

5     of the *Petrozziello* ruling, but to the extent that the

6     Court is not going to rule out some of the posts, then

7     that will result in -- as co-conspirator statements,

8     that would --

9              THE COURT:  Yeah, you'll have to -- I told you

10    yesterday -- I guess -- these are not going to come up

11    today, but you're going to have to let me know when

12    those posts come up and what the evidence is and I'll

13    decide whether to conditionally admit it, because I

14    still have a sense that I haven't read everything or

15    seen everything that I want to see.

16             MR. BOOKBINDER:  Your Honor, the posts we

17    would be using them with Special Agent Russell and they

18    will be read at the end of trial.

19             THE COURT:  All right.  Very well.

20             MR. BOOKBINDER:  And, your Honor, I have

21    actually copies of the Chris Kohler chalks right here,

22    your Honor.

23             THE COURT:  All right.  Why don't we mark them

24    as Exhibit C and then we'll get there.

25             (Pause.)

1              THE COURT:  Okay.  We'll make these C1 and C2.

2              (Exhibits C1 and C2, marked.)

3              MR. BOOKBINDER:  Your Honor, when we're

4    talking about exhibits, I just want to make sure I'm

5    clear about the procedure the Court would like for

6    actually using them with the witness and offering them

7    into evidence.  What I gleaned from talking to

8    Mr. Hohler about this is that the way it was done in, I

9    think, in *DiMasi*, and it probably makes some sense is

10   that we will, before the witness testifies, we will give

11   the original exhibits to Mr. Hohler, that we will just

12   be showing them to the witnesses on the monitor, and

13   that the Court will have the witness monitor on and then

14   when the exhibit is admitted, we'll turn the jury

15   monitor.  Is that -- does that make sense to your

16   Honor?

17             THE COURT:  Yes.

18             MR. BOOKBINDER:  Okay, that's fine.  But

19   there's one exception, where maybe we can do things a

20   little differently, and that's actually with

21   Mr. Phillips because as I think I mentioned, there are

22   about six, I think, of those chat exhibits, that we want

23   him just to look at very briefly and say, "Yes, I copied

24   these," and we're not going to be seeking to admit them

25   at that point, and so I thought the easiest way to do

1    that would be to actually give him the originals, he

2    would just look at them quickly rather than having to,

3    you know, show them on the screen and --

4         THE COURT:  That's fine, and then they'll be

5    given a letter and when you move them into admission, if

6    they're admitted, they'll be given a number.  Okay?

7         MR. BOOKBINDER:  Yes, your Honor.

8         THE COURT:  All right.  I don't intend to give

9    the jurors their notebooks until after the openings.

10   Since the openings aren't evidence, they should be

11   taking notes on the evidence, I think, rather than on

12   the arguments or the instructions.

13        And finally I'll say -- I read **Veradackis** again.

14   It's a different situation.  **Veradackis** was the verdict

15   of a car that wasn't -- it was admitted and it wasn't a

16   charge in this case.  It was 404(b).  It was extrinsic.

17   Here, to the extent the government is seeking to

18   introduce Mr. Harris's own acts during the period of the

19   conspiracy, it's intrinsic, it's not subject to a 404(b)

20   analysis, but it is subject to a 403 analysis.  But 403

21   rarely operates to exclude otherwise admissible

22   evidence.  And I don't find that the probative value of

23   Mr. Harris's own conduct, as it's been represented to

24   me, the evidence of his own conduct was substantially

25   outweighed by any of the Rule 403 factors.

1          MR. BOOKBINDER:  Your Honor, one thing I just

2     want to clarify is that I believe that Mr. Phillips will

3     testify that the first time he saw Mr. Harris use an

4     uncapped modem was probably in approximately 2002, so

5     before the conspiracy started.  Um, I would suggest that

6     it's exactly the kind of conduct we're talking about

7     here, but just temporally, it would before they actually

8     started working together on the company.  I want to make

9     that clear for the Court.

10          THE COURT:  Well, I think, as I said

11    yesterday, that, you know, evidence -- is there

12    ultimately going to be evidence that he saw them use,

13    um, essentially steal internet service, you know, uncap

14    something during the period?

15          MR. BOOKBINDER:  Oh, absolutely, it's just the

16    first time was before.

17          THE COURT:  Based on what I know, that's

18    admissible.

19          MR. McGINTY:  Well, your Honor, again we

20    object to this and have made consistent objection to

21    this use of personal conduct as bearing in some way on

22    the conspiratorial agreement, um, and the 403 factor, I

23    think, also cautions the Court.

24          THE COURT:  Yeah.  The earlier might be

25    404(b), arguably, it's not in the period of the

1    conspiracy, although the indictment charges the

2    conspiracy began in about, it doesn't charge that it --

3    doesn't it?

4            (Pause.)

5            THE COURT:  Yes, from approximately 2003.  So

6    2002 is approximately 2003.  I continue to regard it as

7    extrinsic but -- I'm sorry, intrinsic, but, um, if it

8    goes to sort of the genesis of the relationship that

9    Mr. Phillips is talking about, there is going to be, as

10   represented, other testimony that Mr. Phillips saw

11   Mr. Harris use uncapped service during the period of the

12   conspiracy, I think for coherence sake and to explain

13   the relationship, including the trust between the

14   parties, the first instance can come into evidence, too.

15           MR. McGINTY:  Your Honor, may I note that the

16   conspiracy charge in 2003 and on, here the disclosure

17   this morning of the conversation yesterday, which

18   addresses the use of the Surfboard 2100 --

19           THE COURT:  I'm sorry.  I don't know what

20   you're talking about.  What was disclosed today?

21           MR. McGINTY:  This is disclosure of the use of

22   the Surfboard 2100 modem in 2001 two years preceding the

23   alleged conception of the conspiracy, um, the use of the

24   modem at a party, um, and this was disclosed, um, as far

25   as I know this morning.  So if this is as the Court

1   referred to it, among other things, as 404(b), it's late

2   disclosure of 404(b) and I've asked that it be

3   excluded.

4           MR. BOOKBINDER:  There's nothing knew about

5   that, that's actually been disclosed in reports that

6   have gone back months and months with Mr. Phillips and

7   isn't when we spoke to him last night and the agent

8   wrote up a report and it is included.  There's nothing

9   new about this.

10          THE COURT:  Okay.  Have I be given these?

11          MR. BOOKBINDER:  You've been given everything

12  except for the one that the agent wrote up last night,

13  your Honor.  I apologize for that.  I gave a copy to

14  Mr. McGinty.  I have a copy here for the Court.

15          THE COURT:  Well, the jurors are waiting.

16  Let's get through the openings and if there's more to

17  discuss, before Mr. Phillips.  But I'd like a copy of

18  that disclosure and I'll look at it at the break.  All

19  right?

20       Is there anything else before we get the jury?

21          (Silence.)

22          THE COURT:  Apparently not.  Then we will.

23          (Moved podium over.)

24          (Jury enters, 9:30 a.m.)

25          THE COURT:  Ladies and gentlemen, good

1    morning.  Welcome back.

2         I've been working with the lawyers after you left

3    yesterday and earlier this morning.  We're ready to

4    proceed.  And I trust things will go smoothly now that

5    you're in the jury box.

6         As you know, you were sworn in as the jury

7    yesterday.  As I told you I'll now explain to you your

8    functions as jurors.

9         There are 13 of you in the jury box.  Only 12 can

10   deliberate and decide the case.  We have one alternate

11   in the last seat in the back row.  But it's very

12   important that all of you pay careful attention to

13   everything.  Frequently one of the first twelve jurors

14   has an illness or an emergency, the juror's excused and

15   the alternate becomes a deliberating juror.  So I know

16   and need all of you to pay careful attention to

17   everything.

18        As the jury in this case, it's going to be your

19   job to find the facts based on the evidence, apply the

20   law as I'll describe it in detail at the end of the

21   case, and reach a verdict.  You should not interpret, or

22   to be more precise, you should not misinterpret anything

23   I say or do in the course of the case as a suggestion of

24   what I think your verdict should be.  That's entirely up

25   to you.

1          You heard me say yesterday, and now I've repeated

2     it, that you'll find the facts based on the evidence.

3     The evidence will come to you in several ways.  It will

4     come through the testimony of witnesses who will

5     testify, it will come to you in the form of documents

6     that would be admitted as exhibits, um, it may come to

7     you in the form of other exhibits, and I expect that

8     there will be some stipulations, certain facts that the

9     parties will agree are true and that you may accept as

10    true.

11         You are also going to be exposed to some things

12    that are not evidence.  Anything the lawyers say is not

13    evidence.  When I finish my instructions you will hear

14    the opening statements of the parties.  That is not

15    evidence.  You will hear, after that, the lawyers

16    question the witnesses.  The questions are not evidence,

17    the answers are evidence.  And at the end of the case

18    the attorneys will have an opportunity to make closing

19    arguments reminding you of the evidence and urging you

20    to make certain inferences.  But what they say is not

21    evidence.

22         In addition, in the course of the case I am

23    confident that you'll hear some objections to certain

24    questions or proposed evidence and that's necessary and

25    appropriate.  In federal court we operate under a set of

1    rules, the Federal Rules of Evidence, which are

2    essentially laws that establish standards for

3    determining what kind of information is sufficiently

4    relevant and reliable for you to hear and consider in

5    deciding the case.

6         If an attorney thinks that a question is asking

7    for information that is not admissible under the rules

8    or that a document is not admissible under the rules of

9    evidence, the attorney will object.  If it is clear to

10   me -- and they won't speak to their objections, the

11   reasons for the objections in front of you.

12        If it's clear to me why they're objecting, or I

13   can get that very quickly from them in response to a

14   question, I'll rule on the objection, and I'll either

15   say "sustained," which means that was a meritorious

16   objection and the question can't be answered or the

17   document can't be admitted or I'll say "overruled,"

18   which means I've decided that under the rules of

19   Evidence you should hear this and then you'll hear it.

20   If it's not clear to me why the objection is being made

21   or how I should rule on it, I'll see the parties at the

22   sidebar and we'll turn on the music and I'll discuss it

23   with you.  You shouldn't try to hear that.  It's not an

24   effort to keep anything particularly interesting or

25   important away from you, it's just a way for me to get

1    the information necessary to make proper decisions.

2         It's possible that I will admit some evidence only

3    for a limited purpose and if I do that I'll tell you

4    that "this evidence is being admitted for this limited

5    purpose and you may consider it only for that limited

6    purpose."  And anything you may see or hear outside the

7    railing of this courtroom is not evidence and you

8    shouldn't be influenced by anything you observe outside

9    the rail, you should be influenced only by the evidence.

10        The evidence will come to you in two forms,

11   there's direct evidence and there's circumstantial

12   evidence.  Direct evidence is direct proof of a fact

13   such as the testimony of a witness who says "I was

14   there, this is what I saw, this is what I heard."

15   Circumstantial evidence is proof of certain facts from

16   which you may infer or conclude that other facts exist.

17   Now that may sound like some complicated legal concept,

18   circumstantial evidence, but really you reason based on

19   circumstantial evidence all the time.

20        So if you were to go to sleep tonight and the

21   ground was green in front of your house and when you got

22   up tomorrow morning it was covered with snow, you would

23   infer that during the night, while you were sleeping, it

24   snowed, although you didn't see it and nobody told you

25   that happened.  That's reasoning from circumstantial

1    evidence.

2        Circumstantial evidence and direct evidence are

3    equal in the law.  You don't -- you can give -- you

4    know, you decide what you believe, as I'll explain, and

5    then what weight to give the believable or credible

6    evidence.

7        In this case, part of your job as jurors is going

8    to be to decide the credibility, the believability of

9    certain testimony and other evidence.  At the end of the

10   case I'll give you a list of sort of common sense

11   considerations that you might want to use in making

12   credibility judgments that you need to make.

13       When I questioned you yesterday I told you about

14   certain fundamental principles that apply in every

15   criminal case like this one.  I want to remind you of

16   them now.

17       First among them is that the defendant, Ryan

18   Harris, is presumed innocent and in a moment I'm going

19   to have Mr. Hohler read you the indictment in this

20   case.  The indictment contains the charges.  But it is

21   only an accusation, it is not evidence or proof that the

22   defendant is guilty.

23       The defendant starts with a clean slate.  The

24   burden is on the government throughout the case.  The

25   defendant does not have to prove his innocence or

1    present any evidence nor does the defendant have to

2    testify, and if he chooses not to testify, you may not

3    draw any suggestion that he's guilty from his decision

4    not to testify and you may not consider that fact in

5    deciding the case.

6         Finally, the government has to prove the elements,

7    the essential elements of the crimes charged beyond a

8    reasonable doubt.  At the end of the case I'll explain

9    to you this concept of reasonable doubt.  But you should

10   know, since some of you have served on juries before,

11   that it's a higher standard than that used in civil

12   cases where the proof has to be by a preponderance of

13   the evidence.

14        All right.  Now I'm going to have Mr. Hohler read

15   you the 12-page indictment in this case, the charges,

16   and don't think you have to memorize this.  At the end

17   of the case, when you're deliberating, you'll have this

18   document back in the jury room.  But it's going to be

19   read to you now so you'll have a sense of what the

20   charges are.

21             THE CLERK:  The United States District Court,

22   the District of Massachusetts, Case Number 09-10243-MLW,

23   the United States of America versus Ryan Harris, aka

24   DerEngel, 18 U.S.C. Section 371, conspiracy, 18 U.S.C.

25   Sections 1343 and 1342, wire fraud.

```
1              THE COURT:  No, actually, that's 1342 and
2     Section 2.
3              THE CLERK:  And Section 2.  Sorry, Judge.
4         Superseding indictment.  The grand jury charges:
5     Introduction.  At all times relevant to the charges in
6     this indictment, Number 1, Ryan Harris, aka DerEngel,
7     lived in California and Hong Kong.  He was founder,
8     owner, and president of, and a software developer for,
9     TCNISO, a company incorporated in California with its
10    principal place of business in the San Diego area.
11    TCNISO's primary business was to develop, distribute,
12    and sell, quote, "cable modem hacking," unquote,
13    software and hardware products.  These products were
14    designed to modify cable modems so that users could
15    obtain internet service from internet service providers
16    without paying for the service and without disclosing
17    their true identities.  Additionally, Harris created and
18    administered forums on the TCNISO website that offered
19    ongoing customer support to assist users with their
20    cable modem hacking.
21         Paragraph 2.  IL, an unindicted co-conspirator,
22    lived in Kentucky and was a software developer for
23    TCNISO.
24         Paragraph 3.  CP, an unindicted co-conspirator,
25    lived in California and was the vice-president of TCNISO
```

1    from approximately 2003 to approximately 2007.

2         Paragraph 4.  NH, an unindicted co-conspirator,

3    lived in Worcester, Massachusetts and acquired and

4    repeatedly used TCNISO's cable modem hacking products

5    and services in Massachusetts.

6         Paragraph 5.  WM, an unindicted co-conspirator,

7    lived in Everett, Massachusetts and acquired and

8    repeatedly used TCNISO's cable modem hacking products

9    and services in Massachusetts.

10        Paragraph 6.  JL, an unindicted co-conspirator,

11   lived in Mattapan, Massachusetts and acquired and

12   repeatedly used TCNISO's cable modem hacking products

13   and services in Massachusetts.

14        Paragraph 7.  Certain internet service providers,

15   ISPs, provide internet service through cable networks

16   which are the same systems that deliver cable television

17   signals.  ISPs charge subscribers a monthly fee for this

18   internet access and typically charge an additional

19   premium if subscribers want faster Internet access.

20        Paragraph 8.  In order to access the internet

21   through a cable network, a subscriber installs a cable

22   modem which connects the subscriber's computer to the

23   ISP's cable network.  ISPs offer the modems to the

24   subscriber and charge a rental fee.  Each cable modem is

25   assigned a theoretically unique MAC or a Media Access

1    Control at an address that identifies the specific modem

2    to the ISP.  This unique MAC address is designed to

3    allow the ISP to associate the particular cable modem

4    with a particular paying cable subscriber and to insure

5    that only paying subscribers are accessing the ISP's

6    cable network.

7        Paragraph 9.  When a computer user seeks to access

8    the internet, the user's modem will report its MAC

9    address to the ISP, and if the ISP recognizes the

10   modem's MAC address as belonging to a paying subscriber,

11   the ISP will allow the user to access the internet via

12   the ISP's network.  The ISP will also deliver a unique

13   configuration file to the modem that determines the

14   speed with which the internet access will be delivered.

15       Paragraph 10.  Cable modem hacking includes the

16   alteration of the modem's software for the purposes of

17   obtaining internet service without an account and

18   without paying for that service.  In order to steal

19   internet service, the computer user's modem is modified

20   so that it uses, without authorization, a MAC address

21   that belongs to the cable modem of a legitimate paying

22   internet service subscriber.  This is often referred to

23   as "MAC address cloning" or "spoofing."

24       Paragraph 11.  Cable modem hacking also includes

25   the modification of a modem to use, without

1    authorization, a configuration file with the ISP, but to

2    provide it only to a legitimate paying subscriber.  By

3    modifying a modem to use and a configuration file

4    associated with a premium higher speed service, a user

5    can increase or uncap the speed at which the internet

6    service is provided without paying the required

7    premiums.

8         Paragraph 12.  Additionally, cable modem hacking,

9    particularly MAC address cloning or spoofing, can be

10   used to mask the user's on-line identity.

11        Count 1, conspiracy, 18 U.S.C. Section 371.

12        Paragraph 13.  The grand jury realleges and

13   incorporates by reference the allegations made in

14   Paragraphs 1 through 12 of this indictment and further

15   charges that:

16        Paragraph 14.  From approximately 2003 through

17   approximately August 2009, in the District of

18   Massachusetts and elsewhere, Ryan Harris, and others

19   known and unknown to the grand jury, did knowingly

20   conspire to commit wire fraud by devising a scheme to

21   defraud and to obtain money and property by means of

22   false or fraudulent pretenses, representations of

23   promises, and transmitting and causing to be transmitted

24   in interstate commerce wire communications, including

25   writings, signals, and sounds, for the purposes of

1    executing the scheme to defraud.

2          Manner and means of the conspiracy.

3          Paragraph 15.  Harris and his co-conspirators

4    developed cable modem hacking products and services,

5    including Sigma, BlackCat, and Dream OS that enabled

6    computer users to obtain internet service without making

7    the required payment.  Among other techniques, Harris's

8    products and services enabled users to disguise their

9    cable modem by mimicking or cloning the unique

10   identifiers, including the MAC address, of the modem of

11   a legitimate paying internet subscriber.  The user

12   thereby received internet service without paying for it.

13         Paragraph 16.  Harris's products and services also

14   enabled users to obtain faster upgraded or uncapped

15   internet service without paying the premiums charged by

16   the ISP.  These products and services enabled users to

17   use without authorizations configuration files that the

18   ISP would otherwise only provide to a legitimate

19   subscriber paying for premium access.  The user

20   therefore received the type of faster internet service

21   for which a legitimate user was paying a premium.

22         Paragraph 17.  Harris's products and services also

23   enabled users to disguise their true on-line identities

24   which in turn allowed them to remain anonymous when

25   engaged in on-line activities such as downloading,

1    infringing, or pirating movies onto their computers.

2         Paragraph 18.  Harris and his co-conspirators

3    developed additional software tools that users could use

4    to steal or sniff the MAC addresses and configuration

5    files belonging to legitimate paying subscribers and use

6    these identifiers in conjunction with Harris's other

7    products to obtain free or faster internet access

8    without authorization.

9         Paragraph 19.  Harris and his co-conspirators

10   developed additional product features that would help

11   users evade detection by ISPs, for example, by disabling

12   the ISP's ability to probe the cable modem to obtain

13   information about it

14        Paragraph 20.  Harris and his co-conspirators

15   distribute their cable modem hacking products and

16   services on their website, TCNISO.net, as well as at the

17   TCNISO store in San Diego, California.  Harris charged

18   users for some of the products and made others,

19   particularly older versions, available for free.  Harris

20   sold both the software and hardware as standalone

21   products and also sold the software preloaded onto cable

22   modems.

23        Paragraph 21.  Harris and his co-conspirators also

24   provided ongoing support to assist their users with

25   cable modem hacking primarily through their website,

1   TCNISO.net.  The website offered video tutorials and

2   other instruction manuals.  It also contained forums or

3   a bulletin board that allowed Harris, his

4   co-conspirators and users, to exchange information about

5   product updates and provide tutorials and advice about

6   installing and using Harris's cable modem hacking

7   products.  Harris and several co-conspirators moderated

8   and personally participated in these on-line discussion

9   forums.

10          Paragraph 22.  Through these forums users

11  discussed with Harris, his co-conspirators, and each

12  other, acquiring and exchanging stolen MAC addresses and

13  configuration files.

14          Paragraph 23.  Additionally, the forums hosted

15  discussions about techniques that certain ISPs employed

16  to detect and block the use of Harris's cable modem

17  hacking products on the ISP's networks.  In response to

18  these discussions, Harris and his co-conspirators

19  developed and distributed updates to their products and

20  services that were designed to work around the ISP's

21  detection and blocking techniques.

22          Paragraph 24.  Harris also offered for sale a book

23  entitled "Hacking the Cable Modem," which Harris wrote

24  under his alias "DerEngel," and for which IL was the

25  technical reviewer.

1      Paragraph 25.  Harris and his co-conspirators knew

2   that users successfully used Harris's products and

3   services to obtain internet service and faster internet

4   access without paying.

5      Paragraph 26.  This scheme injured numerous ISPs

6   around the country and through approximately 2003

7   through 2009 generated more than $1 million in revenue

8   for TCNISO.

9      Overt acts.  Harris and his co-conspirators

10  committed the following overt acts within the District

11  of Massachusetts and elsewhere.  The development and

12  distribution of TCNISO products.

13     Paragraph 27.  Beginning in approximately 2003,

14  Harris, IL, and CP, developed and distributed Sigma, a

15  cable modem hacking software application.

16     Paragraph 28.  Beginning in approximately 2004,

17  Harris, IL, and CP, developed and distributed BlackCat,

18  a combination of hardware and software that enabled

19  users to modify newer more secure cable modems.

20     Paragraph 29.  Beginning at approximately 2005,

21  Harris, IL and CP, developed and distributed Sigma X, a

22  more sophisticated version of the Sigma software, which

23  had the ability to block ISPs from probing a modem to

24  determine whether it was hacked.

25     The TCNISO.net forums.

1          Paragraph 30.  From in or about 2006 to in or

2     about 2008, Harris and his co-conspirators posted on the

3     TCNISO.net forums comments from users who stated that

4     they were using or attempting to use TCNISO's products

5     to steal internet access from various ISPs.

6          Paragraph 31.  From in or about 2006 to in or

7     about 2008, Harris and his co-conspirators posted on the

8     TCNISO.net forums comments from users who stated that

9     they were using or attempting to use TCNISO's products

10    to obtain faster internet access from various ISPs

11    without paying for the faster service.

12         Paragraph 32.  From in or about 2006 to in or

13    about 2008, Harris and his co-conspirators posted on the

14    TCNISO.net forums comments from users who stated that

15    they had stolen or sniffed for the MAC addresses of

16    legitimate paying internet subscribers and were looking

17    to trade these stolen MAC addresses with other users.

18         Paragraph 33.  From approximately 2006 to 2008,

19    Harris and his co-conspirators posted on a TCNISO.net

20    forums comments from users who stated that their ISPs

21    were detecting and blocking them from the ISP's networks

22    and who sought assistance about how to work around these

23    detection and blocking techniques.

24         Paragraph 34.  On or about March 27, 2007, Harris,

25    identifying himself by his alias "DerEngel," posted on

1    the TCNISO.net forum a comment asking for any, quote,

2    "verified MAC addresses and/or config files," unquote,

3    for a major metropolitan area promising that, quote,

4    "rewards will follow," unquote.

5        NH's acquisition and use of Harris's products and

6    services.

7        Paragraph 35.  From approximately 2005 through

8    2008, Harris, IL, and CP, communicated repeatedly

9    on-line with NH about cable modem hacking.

10       Paragraph 36.  In approximately 2005, NH

11   downloaded the Sigma software to his home computer in

12   Massachusetts.  He then accessed TCNISO's website forums

13   and used them, along with other means, to trade for

14   stolen MAC addresses belonging to legitimate Charter

15   Communications to charter internet subscribers.  NH used

16   Sigma to change his modem's MAC address to a new Charter

17   MAC address.  NH was then able to connect to the

18   internet via Charter without paying.

19       Paragraph 37.  NH also used Sigma to change his

20   modem's configuration file and in doing so, quote,

21   "uncap," unquote, his modem.  This increased his

22   internet access speeds approximately tenfold.  NH did

23   not pay the premium for this faster service.

24       Paragraph 38.  In approximately 2007, NH

25   downloaded to his home computer a new version of the

1    Sigma program, Sigma X.  NH used Sigma X to modify a new

2    cable modem and obtain free uncapped internet access

3    from Charter.

4         Paragraph 39.  NH and CP discussed hacking into

5    another ISP, Roadrunner, in order to obtain free

6    internet access service -- I'm sorry, free internet

7    service.

8         Paragraph 40.  On or about January 15, 2007, NH

9    accessed the internet using Harris's products and

10   services in a cloned MAC address and participated in an

11   on-line chat in which he discussed hacking into

12   Motorola's computer servers.

13        Paragraph 41.  On or about December 5th, 2007, NH

14   accessed the internet using Harris's products and

15   services and a cloned MAC address and participated in

16   the on-line chat in which he discussed hacking into

17   Charter's computer servers.

18        JL's acquisition and use of Harris's products and

19   services.

20        Paragraph 42.  In or about June 2008, JL, using a

21   computer in Massachusetts, visited the TCNISO website,

22   placed one or more orders for one or more modified cable

23   modems and ancillary products and made one or more

24   on-line payments to Harris.

25        Paragraph 43.  Harris then sent the modems and

1    ancillary products to JL in Massachusetts.

2         Paragraph 44.  JL used TCNISO's website and forums

3    to obtain information that he used to change his modem's

4    MAC address and configuration file.

5         Paragraph 45.  From in or about June 2008 through

6    in or about June 2009, JL was then able to connect to

7    the internet via Comcast without paying.

8         Paragraph 46.  JL also got from TCNISO

9    approximately 20 additional cable modems, which he

10   provided to his friends and family members, many of whom

11   were also located in the District of Massachusetts.

12        WN's acquisition and use of Harris's products.

13        Paragraph 47.  In or about June 2009, WM, using a

14   computer in the District of Massachusetts, visited the

15   TCNISO website, placed an order for a modified cable

16   modem and ancillary products and made an on-line payment

17   to Harris.

18        Paragraph 48.  Harris then sent the modem and

19   ancillary products to WM in Massachusetts.

20        Paragraph 49.  WM used TCNISO's website and forums

21   to obtain configuration files and other information

22   which he used to change his modem's MAC address and

23   configuration file.

24        Paragraph 50.  From in or about June 2009 through

25   in or about August 2009, WM was then able to connect to

1   the internet via Comcast without paying.

2        FBI undercover buys.

3        Paragraph 51.  On or about November 24, 2008,

4   Harris, through the TCNISO.net website, sold two

5   Motorola SB-5100 BlackCat USB cable modems, three

6   Motorola SB-4200 Sigma cable modems, and one, quote,

7   "Hacking the Cable Modem," unquote, book to an

8   undercover FBI agent in Boston, Massachusetts.

9        Paragraph 52.  On or about November 24th, 2008, an

10  undercover FBI agent in Boston called TCNISO at the

11  phone number provided on the TCNISO.net website.

12  Harris, or a TCNISO employee, answered the phone and

13  helped process the purchase of the modems and the book.

14       Paragraph 53.  On or about December 14, 2008,

15  Harris sent the purchased modems and the book to the

16  undercover FBI agent in Boston.  These modems were

17  capable of obtaining free and faster internet service

18  from a cable network, all in violation of 18 U.S.C.

19  Section 371.

20       Counts 2 through 9, wire fraud, 18 U.S.C. Sections

21  1343 and 2.

22       Paragraph 54.  The grand jury realleges and

23  incorporates by reference the allegations in Paragraphs

24  1 through 12 and 15 through 53 of this indictment and

25  further charges that:

1            Paragraph 55.  On or about the dates set forth

2       below in the District of Massachusetts and elsewhere,

3       Ryan Harris, having knowingly devised a scheme to

4       defraud and to obtain money and property by means of

5       material false and fraudulent pretenses, representations

6       and promises, transmitted and caused to be transmitted

7       in interstate commerce wire communications including

8       writings, signals, and sounds, for the purpose of

9       executing a scheme to defraud, and aided and abetted

10      others in doing so as set forth below.

11           Count 2, approximate date, 2005, wire

12      transmission.  NH accessed the internet from

13      Massachusetts and downloaded Harris's Sigma capability

14      hacking product.

15           Count 3, approximate date, 2007, NH accessed the

16      internet from Massachusetts and downloaded Harris's

17      Sigma X cable modem hacking product.

18           Count 4, January 15, 2007.  NH accessed the

19      internet from Massachusetts using Harris's products and

20      a firm MAC address and participated in an on-line chat

21      discussing his hacking activities.

22           Count 5, December 5, 2007.  NH accessed the

23      internet from Massachusetts using Harris's products and

24      a cloned MAC address and participated in an on-line chat

25      discussing his hacking activities.

1          Count 6, approximate date, June 2008.  JL accessed

2     Harris's TCNISO website from Massachusetts and bought a

3     modified cable modem and ancillary products.

4          Count 7, approximate date, July 2008.  JL accessed

5     the internet from Massachusetts using Harris's products

6     and a cloned MAC address and obtained free internet

7     access.

8          Count 8, approximate date, June 2009.  WM accessed

9     Harris's TCNISO website from Massachusetts and bought a

10    modified cable modem and ancillary products.

11         Count 9, approximate date, July 2009.  Wire

12    transmission of WM accessed the internet from

13    Massachusetts using Harris's products and a cloned MAC

14    address and obtained free internet access.

15         All in violation of 18 U.S.C. Sections 1343 and 2.

16            THE COURT:  Ladies and gentlemen, those are

17    the charges in the case.  At the end of the case I'll

18    tell you in detail what the government has to prove to

19    establish each of those charges.  I'm now going to give

20    you a very short overview of the law, um, however,

21    because I think it will help you listen to and

22    understand the evidence.  But, as I said, at the end of

23    the case I'm going to give you a much longer, more

24    detailed instructions on the law.  And if anything I say

25    at the end of the case sounds different than what I'm

1    telling you now, you follow the law as I describe it at

2    the end of the case.

3         Count 1, in this case, charges the defendant with

4    a conspiracy to commit wire fraud.  A conspiracy is an

5    agreement to commit a crime.  It does not need to be an

6    express agreement, it can be a tacit understanding

7    proven by circumstantial evidence.

8              (Juror coughing.)

9         THE COURT:  We're full service here.

10   Mr. Hohler will give you a glass of water.

11             (Pause.)

12        THE COURT:  Let me do that again.

13        Count 1 charges Mr. Harris with a conspiracy.  A

14   conspiracy is an agreement to commit a crime.  It need

15   not be an express agreement, it can be a tacit

16   understanding that is proven by circumstantial evidence.

17        To prove the conspiracy charged in this case, the

18   government must prove beyond a reasonable doubt, first,

19   that the agreement specified in the indictment, and not

20   some other agreement or agreements, existed between at

21   least two people to commit wire fraud.  Second, that the

22   defendant willfully joined in that agreement.  And

23   third, that one of the conspirators committed an overt

24   act in Massachusetts, an act in Massachusetts in an

25   effort to further the purpose of the conspiracy.

1        To act willfully means to do something knowingly,

2   that is, intentionally, not by accident or mistake, and

3   with knowledge that what is being done is unlawful.  The

4   object of the alleged conspiracy is to commit wire

5   fraud.  In addition, Counts 2 and 9 also charge that the

6   defendant committed wire fraud.

7        To prove an individual committed wire fraud, the

8   government must prove beyond a reasonable doubt, first,

9   in this case the defendant, devised or participated in a

10   scheme to defraud or pay something of value from an

11   internet service provider.  Second, the scheme involved

12   a material falsehood.  Third, the defendant acted

13   knowingly, willfully, and with an intent to deceive and

14   defraud.  And fourth, that an interstate wire

15   communication was used in furtherance of the scheme.

16        And finally, for the purposes of these preliminary

17   instructions I'll tell you that for both conspiracy and

18   wire fraud it would not be enough for the government to

19   prove that Harris only sold the product to someone he

20   knew would use it to commit a crime.  However, the

21   nature of the crime and any knowledge Harris had as to

22   how it would be used are evidence that you can consider

23   along with all the other evidence in deciding whether

24   the government has proven any or all of the conspiracy

25   and wire fraud charges beyond a reasonable doubt.

1       So hopefully that will be helpful to you, but as I
2   said, I'm going to give you much more detailed
3   instructions at the end of the case.
4       Now I'm going to tell you something about your
5   duties as jurors.  One is to listen very carefully to
6   the evidence.  Although my stenographer, Mr. Romanow, is
7   writing it all down, we won't have a transcript at the
8   end of the case, so you're going to have to rely on your
9   memories.  And actually after the opening statements I'm
10  also going to give you notebooks, so you can take notes
11  if you want.
12      As I told you yesterday, it's very important that
13  you keep an open mind until it's time to deliberate and
14  decide the case.  There are several reasons for that.
15  First, as I said yesterday, the evidence will come like
16  bits and pieces of a jigsaw puzzle and the government
17  has the burden of proof, it will call the witnesses
18  first, it will question them first, and things may sound
19  one way when the government's asking the questions and
20  differently, another way when the defense lawyer is
21  asking the questions, and your view of the facts may
22  change as you hear more witnesses questioned, as you get
23  more evidence.  In addition, until I give you my
24  detailed instructions at the end of the case, you can't
25  really know what the questions are and what standards

 1     you have to apply in answering those questions.  So it's
 2     very important that you keep an open mind until the end
 3     when you have all the information that you need to begin
 4     reaching a decision.
 5          As I also told you yesterday, you may not discuss
 6     this case among yourselves or with anybody else.  The
 7     reason you may not discuss it with anybody who is not on
 8     the jury, I think is obvious even before I mentioned it
 9     yesterday, you have to decide the case based on the
10     evidence, you're the only ones hearing the evidence, and
11     if you discuss what you're hearing with anybody else or
12     communicate with anybody about what you're hearing,
13     there's a risk that they'll say or communicate something
14     that will influence you and that's not evidence.  You
15     also can't discuss the case among yourselves until it's
16     time to deliberate and decide because if you start
17     discussing it, you'll start making up your mind before
18     you have all the information you need to do that.
19          As I told you yesterday, you may not read or
20     listen to or watch anything in the media about the
21     case.  Everything that you need and everything you're
22     permitted to consider in deciding the case will be
23     presented here in court.
24          This is a recent addition to what I tell jurors.
25     You may not communicate about this case through the

1   internet or social media.  You can't blog about the

2   case, you can't post anything on Facebook or something

3   like that, again because of the confidentiality of your

4   thinking and eventually your deliberations.  Don't do

5   any research relating to the case.  As I said,

6   everything you're entitled to rely on and everything you

7   need will be presented here in court.

8        Now, sometimes I get a question, "Who are all

9   these people in the courtroom?"  Well, you know the

10  stenographer, you've met Mr. Hohler, the Deputy Clerk, I

11  have three law clerks, they're recent law graduates,

12  they work and help me a lot and at least one of them

13  will be here all the time, and I have some law students

14  who work for me, too, and you may see some of them at

15  that table from time to time.

16       Let me tell you this about the architecture of the

17  case.  In a moment you'll hear the parties's opening

18  statements, the government will go first because it has

19  the burden of proof.  As I told you, anything the

20  lawyers say is not evidence, but that's the opportunity

21  the parties have to orient you to what they expect the

22  evidence will be and explain it to you.  Then, because

23  the government has the burden of proof, it calls the

24  witnesses first.  The government will question the

25  witnesses, the defendant will have an opportunity to

1    cross-examine the government's witnesses, the government

2    has an opportunity for what's called redirect, there's

3    an opportunity for recross, and absent something very

4    unusual, the parties will only have those two rounds of

5    questioning for any witnesses.  After the government's

6    presented all of its evidence, the defendant, if he

7    wants to, can call witnesses and present evidence, but

8    as I told you, the defendant has no obligation to prove

9    his innocence or any obligation to present evidence or

10   testify himself.  If the defendant presents evidence,

11   the government may present some rebuttal evidence and

12   the defendant, if he wishes, can present some evidence

13   to respond to that.  Then we'll come to the closing

14   arguments where the lawyers will argue the evidence as

15   they remember it and urge you to draw certain

16   inferences, then I will give you detailed instructions

17   regarding the law, and then it will be time for you to

18   deliberate and decide the case.

19        As I mentioned earlier, once we start with the

20   evidence, after the parties's opening statements,

21   Mr. Hohler will give you notebooks and you can take

22   notes, but there's a couple of things that I urge you to

23   keep in mind.  First, it's important that you listen to

24   the witnesses and watch them as well.  It may affect

25   your assessment of credibility.  So don't get so

1   absorbed in taking notes that you're missing any of the

2   testimony.  But second, when you get back in the jury

3   room, some of you may have detailed notes, some of you

4   may have no notes at all.  But the notes aren't

5   transcripts.  You probably remember this from school,

6   your notes are not always accurate, they're not ever

7   complete, and so if somebody remembers something and

8   somebody else has got something in a note, it doesn't

9   mean that your memory is wrong and that that note is

10  right.  But I do think, in this case, it's appropriate

11  to let you take notes.

12          So unless the parties have something, we'll

13  proceed to the openings.

14          Ladies and gentlemen, I've given the parties up to

15  40 minutes each for their opening.  I think we'll hear

16  the government's opening and we'll probably take a brief

17  break, get you something to eat back there, and then

18  we'll hear the defendant's opening.

19          MS. SEDKY:  Thank you, your Honor.

20

21  OPENING STATEMENT BY MS. SEDKY:

22          Good morning.  I didn't introduce myself

23  yesterday.  My name's Mona Sedky and I work for the

24  Department of Justice and my co-counsel, Adam

25  Bookbinder, and I represent the United States in this

```
 1   prosecution.
 2         During the course of this trial we will present
 3   the evidence that will prove to you that that man, Ryan
 4   Harris, sitting next to his lawyer, built a $1 million
 5   business helping people steal, and with his pivotal
 6   assistance these people stole and they stole and they
 7   stole.  In short, he facilitated theft.  And we will
 8   further prove that he knew exactly what he was doing.
 9   He did it on purpose.  We will prove to you that he knew
10   full well that these people were stealing and he
11   intended to help them succeed.
12         Now, we'll also show that Mr. Harris has a
13   background in computers and in fact he called himself a
14   "professional computer hacker," and with that background
15   He taught people how to steal internet service from
16   local internet service providers.  And we'll hear terms
17   like ISPs, cable company's providers, they're all the
18   same thing, they all refer to the company that provides
19   cable service -- cable internet service to your house or
20   businesses.  Charter is a big one in Worcester.  Comcast
21   is a big one in Boston.  And with Mr. Harris's help,
22   these people lied to their providers about who they
23   were, they masqueraded as legitimate paying subscribers
24   when they weren't and they masqueraded as premium
25   subscribers of faster and more expensive service when
```

they weren't.  And in the end, they were able to trick
the cable companies into providing them internet service
that they never paid for.

Now, Mr. Harris, as we will prove, played an
essential role in this theft operation.  In his own
words he called himself "the creator."  What did
Mr. Harris, "the creator," create?  Well, basically what
he did was he created and then sold a comprehensive tool
kit that provided his customers with everything they
needed to steal internet service and he had put a lot of
different tools in this tool kit, but the two key tools
that you'll hear a lot about during the course of this
trial, is he made a customized cable modem and then he
wrote, with some help, some customized software to help
run that cable modem.  And a cable modem, as you'll hear
more during the course of the trial, is basically just a
black box or a white metal box that's a connector.  It's
a pretty simple device and it doesn't really serve much
purpose other than to connect a computer to the coaxial
cable wires that come to somebody's house or business.
It just attaches the two things.

Well, Mr. Harris devised a customized software
program that would reprogram the cable modem so that it
was connected to the internet and it would get service
without paying.  And he provided in his tool kit not

1    just the cable modem and the software, but he provided

2    another key ingredient in this tool kit, he provided

3    access to stolen account numbers that belonged to

4    legitimate paying subscribers from other places all over

5    the country.  And what his customers did was they took

6    one of these stolen numbers that they got -- that they

7    accessed with Mr. Harris's help and they input it into

8    his customized cable modem and then they put that modem

9    in their cable jack in the wall and they disguised

10   themselves as that legitimate paying subscriber.  They

11   essentially created an exact duplicate.  That cable

12   modem, the customized modem that they got from

13   Mr. Harris, became an exact copy or a clone of the modem

14   that belonged to whoever's stolen subscriber information

15   was.

16        And Mr. Harris had a name for this whole process,

17   he called it "cable modem hacking," and you'll probably

18   hear that term used a lot during the trial.  Other

19   people refer to it as "modem cloning," "modem spoofing,"

20   and it's all basically the same thing, it's a way to lie

21   to the provider and trick them about who you are and get

22   them to provide service that you don't pay for.

23        Now, Mr. Harris, his customers were quite

24   successful in stealing service.  We'll prove that they

25   stole service for week after week and in some cases year

1    after year after year.  And one of the reasons that his

2    clients were so successful is that Mr. Harris didn't

3    just create this tool kit and sell it and walk away, he

4    stayed very involved in this operation.  This was his

5    full-time job.  He kept sharpening the tools in his tool

6    kit, refining them, improving them to make sure they

7    worked.  They needed to be cutting edge state of the art

8    in order to work successfully and he made sure that

9    happened.  And he also taught people how to use his

10   products, he created a website that had full video

11   tutorials, written instructions, he operated what was

12   essentially an on-line help desk to answer questions for

13   how to get these people to be able to use his tool kit

14   effectively.

15        Now, this case is not about a man who sold a

16   harmless product like a screwdriver and then found out

17   later that maybe someone that he sold it to happened to

18   use it to rob a bank.  We'll prove that is not this case

19   at all.  This case is about how that man knowingly and

20   intentionally facilitated theft.  He knew exactly what

21   his customers were doing and he wanted to make sure they

22   were successful.  And he played a key role in this theft

23   operation.  In his own words, he was "the creator."

24        And at the end of this trial, through testimony

25   and documents and other evidence, we will prove to each

1    one of you beyond a reasonable doubt that Ryan Harris is

2    guilty of the crimes charged in the indictment.  And the

3    Court read to you the indictment, which describes these

4    various charges in some amount of detail.  So I wanted

5    to spend the next half an hour unpacking sort of four

6    points.

7         First, I'd like to talk about who Ryan Harris is

8    and get a little bit of background about him.  Then I'd

9    like to talk about what is his cable modem hacking

10   operation, what was the business, how did the products

11   work?  Third, I'd like to talk about what did Harris

12   know and intend in this whole cable modem hacking

13   operation?  And last, I'll talk to you about how it all

14   ended, what happened in the end?

15        So first let's talk about who is Ryan Harris?

16   Well, as you've heard in the indictment, Ryan Harris,

17   and as we'll prove, used the alias "DerEngel," which

18   you'll hear is German for "The Angel," and he was also,

19   as we mentioned, the creator, he called himself "the

20   creator."  So -- and we've, um, produced a few posters

21   where we've excerpted some quotes that Harris made in

22   various internet on-line communications with people and

23   you'll see these during the course of the trial in

24   various exhibits, and we've excerpted a few of these and

25   then blown them up so you can see them.

```
 1                    (Puts on easel.)
 2              MS. SEDKY:  Woops.  I'm better with computers
 3       than easels.
 4          So here's a sample quote.  He says:  "I created
 5       the entire cable modem hacking scene.  If I didn't
 6       exist, there would be no cable modem hacking."
 7                    (Takes off easel.)
 8              MS. SEDKY:  Well, what was he doing before he
 9       became the creator?  Well, he was an avid gamer.  And
10       many of you may know what a "gamer" is, but I didn't,
11       and it's someone who is an avid player of on-line
12       computer games involving the computer.  So you would
13       play with people all over the country or all over the
14       world over the internet.  And he spent hours in his
15       apartments -- and he lived in San Diego, Phoenix,
16       Portland, he spent some period in Hong Kong, playing
17       computer games, and he thrived on getting faster and
18       faster internet service for his games.
19          Now, you'll learn that faster internet service
20       costs more, providers have to spend more money to
21       provide faster service, so they charge higher fees, and
22       we'll talk more about that later.  Well, we'll prove
23       that Mr. Harris, he didn't want to pay these higher
24       fees, he wanted a faster service for free, and since he
25       has this technology background, we'll prove that he came
```

1    up with a way himself to steal it, and then once he

2    devised this technology for how to steal the internet

3    service, to get faster and faster service without

4    paying, he used it for himself, he played his games and

5    downloaded modems, he did what he did, and then he

6    decided that he could package it up and he could sell it

7    to other people and make money charging other people to

8    steal.  Essentially what he did, the evidence will show,

9    is that instead of having his customers pay their

10   monthly fees to their subscriber, he decided he would

11   have them pay them to him, they'd pay him a one-time fee

12   and then he would give them this -- the tool kits that

13   they would steal service with it.

14        Now, although Mr. Harris called himself "the

15   creator," he actually had some help and he had help from

16   two people in particular.  He recruited a computer

17   programmer by the name of Isabella Lindquist, and she

18   was living in Kentucky at the time, and he also

19   recruited his roommate and friend, a man by the name of

20   Craig Phillips, who was living in San Diego.  Now, both

21   Ms. Lindquist, the programmer, and Mr. Harris -- and, by

22   the way, Craig Phillips was more involved in the

23   business side of the operation, he helped to set up some

24   of the bank accounts and do things like that.  So you'll

25   hear from Ms. Lindquist, who was the programmer, and

1   you'll hear from Mr. Phillips, who was helping out with

2   the business, they're going to come in and they're going

3   to sit on the witness stand and they're going to testify

4   to you about what was going on in this cable modem

5   hacking operation.

6        Now, as you'll learn, Mr. Phillips pled guilty to

7   committing crimes associated with this cable modem

8   hacking operation, and as you'll also learn, as part of

9   his guilty plea, he has agreed to cooperate in this

10  prosecution.  And so we will corroborate his evidence

11  with evidence from the testimony of other witnesses,

12  documents and other evidence.  And Ms. Lindquist, as

13  you'll also hear, she was granted immunity from

14  prosecution, so that means that she cannot be prosecuted

15  as long as she tells the truth for anything that she

16  says on the witness stand, and we'll be corroborating

17  her testimony as well with other witnesses, documents,

18  and other types of evidence.  And there will be another

19  witness who will come in and he's one of the computer

20  users, he actually acquired these products and then he

21  lived in Worcester and he used the products, as he'll

22  testify, he used them for several years and he was able

23  to get ten times faster internet service without paying

24  a nickel for it.

25       Now, he will come in and he will testify that he

1    stole service, but he'll also testify about other pretty

2    nasty hacking crimes that he committed, and you'll learn

3    that he pled guilty to a whole series of hacking crimes,

4    one of which included his use of this stolen internet

5    service.  Now, he's already served his sentence in

6    connection with that guilty plea, but he did have a

7    cooperation term in it and we too will be corroborating

8    his testimony with the testimony of other witnesses and

9    documents and other evidence.  So that's Harris's cable

10   modem hacking sort of group.

11       And now I'd like to talk about what his cable

12   modem hacking operation was all about, and I've got sort

13   of two themes, the first is just to give you a sense of

14   the business overview and then I'd like to unpack the

15   tool kit a little bit for you and explain, hopefully in

16   not too horrible detail, how the different tools worked

17   to steal service.

18       Well, let's take look at his business generally.

19   Harris ran a full service soup-to-nuts operation.  He

20   provided everything his customers needed, he provided

21   all of the necessary hardware, you'll see the cable

22   modems and cables, he provided all of the necessary

23   software to run it, he provided access to a steady

24   supply of these stolen subscriber numbers that his

25   customers needed, and then he taught his users how to

1    use all of these products.  He had these video tutorials

2    on his website.  We'll prove that he had these

3    instructions and manuals.  In fact, he wrote a book

4    under his alias, DerEngel, called "Hacking the Cable

5    Modem," to help his customers figure out how to use all

6    of his products.  And he also ran sort of like an

7    on-line help desk on his website, so users could post

8    questions about, "How do I get this to work?  Would

9    somebody help me?" and then you'll hear Lindquist, the

10   programmer, testify that she would then go try to answer

11   their questions, and there was this ongoing dialogue to

12   help people figure out how to use these devices he was

13   selling.

14        In the end what we'll prove is this was a turnkey

15   theft kit, all his customers had to do in the end was

16   plug in the customized cable modem they got from Harris,

17   go to the websites or use the software they provided to

18   help them get the stolen subscriber account numbers,

19   input those numbers in the cable modem, and turn it on,

20   and then you got free service, unless and until one of

21   the ISPs, the cable companies, was able to catch them

22   and knock them off.  And we'll prove that even

23   sometimes, when his customers got knocked off, he was

24   able to help them get back on, back on the network.

25        Now, we'll prove that Mr. Harris, as we mentioned,

 1    stayed very involved in this operation.  This was his

 2    full-time job.  He kept sharpening the tools.  He needed

 3    to keep them cutting edge.  And we'll prove that he

 4    played what was essentially a game of cat-and-mouse with

 5    these ISPs.  We'll have testimony from one of the

 6    providers, Charter, who will come in and he'll tell you

 7    that Harris's operation was a big problem for Charter

 8    and they spent a lot of time trying to figure out and

 9    detect who of Harris's customers were on their network

10    and try to kick them off.  So the cable companies, the

11    providers, were coming up with these security measures

12    that they were putting in place to try to detect and

13    block Harris's customers from their network, and Harris

14    had to stay one step ahead of the ISPs, so he kept on

15    top of all the info he could get about what the ISPs

16    were doing and tried to figure out their security

17    measures, and then what he would do, we'll prove, is he

18    would tweak his products in response.  He would tell

19    Isabella Lindquist, and she'll testify, she's the

20    programmer, that he would tell her, "Hey, one of these

21    ISPs came up with this new security measure, go

22    reprogram the software so that we could defeat it."  And

23    so she did it, she did what she was told, and she came

24    up with these new work-arounds and then she would give

25    the code to Mr. Harris and he would issue a new update

1    to his software program so that all of his customers

2    were up-to-date and cutting edge, and then the process

3    would continue, like cat-and-mouse, the ISPs would then

4    try to come up with another security measure and the

5    game would continue.  So he stayed very involved in this

6    process and he also stayed involved trying to teach his

7    customers how to use his products.

8          He ran this website, and you heard about it in the

9    indictment, TCNISO.net, and the website had all of these

10   video tutorials and instructions on it to help his

11   customers figure out how to do this thing, and his

12   website also provided what was essentially, um, an area

13   of the website that was dedicated to providing access to

14   the stolen numbers.  So that's sort of --

15                 MR. McGINTY:  Objection, your Honor.

16                 MS. SEDKY:  So that's sort of --

17                 THE COURT:  I'm sorry.  The objection is

18   overruled.  The jury's been instructed that this is not

19   evidence, but it's essentially a preview of what the

20   government says will come into evidence and what it will

21   prove.  So the objection is overruled.

22                 MS. SEDKY:  Well, let's unpack the tool kit a

23   little bit.

24          So there are three terms -- we need to take a

25   short technical detour before we talk about the tools.

1    And bear with me.  We'll all get on the same page.  And

2    if you already know all of this, then I apologize in

3    advance.  Three terms that you're going to need to know

4    during this trial, "ISP," "cable modem," and "MAC

5    address."

6        So "ISP," we've already heard about, those are the

7    cable companies, the providers that provide the service

8    to people's homes and businesses.  "Cable modems," those

9    are the black devices or white devices that have

10   blinking lights on them, they attach one end to the

11   computer, and another end to the coaxial cable wire that

12   comes to people's houses.  And in each -- as you'll hear

13   from our witnesses, every single modem that has ever

14   been manufactured at the manufacturing plant is given a

15   unique 12-digit number and it's called a "MAC address,"

16   "Media Access Control."  It has nothing to do with Apple

17   MacIntosh.  A MAC address.  And you're going to hear a

18   lot about MAC addresses because they play a key role in

19   how an internet subscriber, an ISP, identifies who its

20   legitimate valid paying subscribers are.

21       And so this MAC address, it's like a serial

22   number, and it's never supposed to change.  And so when

23   a person decides, "I want internet service," and they

24   move into their apartment and they call up the cable

25   company and they say, "I'd like to subscribe to

1    service," we'll have testimony that the cable companies

2    send out a technician usually, they bring the modem out,

3    and they already know the modem's MAC address because

4    it's their modem that they're renting to the customer,

5    and so they've recorded that this MAC address belongs to

6    this new subscriber.  So then later, when the new

7    subscriber turns on their modem and their computer,

8    their modem actually sends through the internet its MAC

9    address and the cable company, on the other end of the

10   network, looks at the MAC address, checks their records,

11   and says, "Oh, I recognize this MAC address, this belong

12   to this new subscriber, I am going to now provide the

13   level of service that this person has paid for."  And

14   if, conversely, they do not recognize the MAC address,

15   then no service.  So no valid MAC address, no service.

16        So that's basically "ISP," "cable modem," "MAC

17   address," those are the three terms that you need to

18   know.  So how do these terms all come together, what

19   role does this play in cable modem hacking?

20        Well, Mr. Harris, as we'll prove, devised a way to

21   help his customers steal MAC addresses that belong to

22   legitimate paying subscribers and then take that stolen

23   MAC address and reprogram it into the customized modem.

24   So essentially what they did was they made the

25   customized modem look like an exact duplicate or a clone

1     of the modem that belonged to the paying subscriber.

2          So there were two core functions of Harris's tool

3     kit, the MAC stealing and the MAC changing, and I'd like

4     to talk about each of those.  So we'll prove that Ryan

5     Harris devised a software program that would eavesdrop

6     on his neighbors -- so his customers would get this

7     program and it would eavesdrop on their neighbor's

8     internet connections and it would find out their MAC

9     addresses and take a copy of it, and it would store the

10    copy, the copy of the stolen MAC address, for the

11    customer to use later.  And Mr. Harris, as we'll prove,

12    he came up with a very clever name for the software

13    program, he called it "CoaxThief."  Now, "coax" stands

14    for the coaxial cable that comes to your house and

15    "thief," well that pretty much stands for itself.  So

16    that's the cable stealing -- the MAC stealing part of

17    this.

18         And he didn't just help with the MAC stealing, he

19    also helped with MAC trading or MAC swapping, and you'll

20    hear a lot about that, too.  And I talked earlier about

21    how he had this website, TCNISO.net, and we'll prove

22    that on the website there were different forums that are

23    sort of like a bulletin board where people could have a

24    certain topic and post certain information under that

25    topic heading, and a bunch of these forums essentially

```
 1    operated as a black market for people to trade stolen
 2    MAC addresses.  And this black market had two important
 3    benefits.  One, for people who didn't want to bother
 4    with CoaxThief -- by the way, I forgot to mention that's
 5    also called a "sniffer program."  You may hear witnesses
 6    and other evidence during the course of this trial talk
 7    about "MAC sniffing."  That's the same thing as the MAC
 8    stealing, it's sniffing the wire and eavesdropping and
 9    taking a copy of the MAC address.  So that's just
10    another little term.
11         Okay.  So for people who didn't want to sniff
12    their own MAC addresses, they didn't want to bother with
13    CoaxThief, they could go to Mr. Harris's website and try
14    to get one there.  And it had another advantage, um,
15    because as it turns out, you can't use a MAC address
16    that you've stolen from your own neighborhood.  It just
17    won't work.  And we'll prove that internet providers,
18    they won't provide service to two MAC addresses that are
19    being used at the same time in the same neighborhood.
20    So if I'm one of Harris's customers and I have stolen a
21    copy of my neighbor's MAC address, and I'm on the
22    network using that stolen MAC address, that neighbor --
23    if that neighbor tries to get on, the neighbor's going
24    to get knocked off.  Or if the neighbor's on first and I
25    try to get on, it's not going to work, I'm going to get
```

1    knocked off.  Or what might happen is we'll both get

2    knocked off.  But either way it won't work.

3         And so Ryan Harris knew this.  He knew, and we'll

4    prove, that his customers needed to get out-of-town MAC

5    addresses and the way they were going to get out-of-town

6    MAC addresses is on this black market, these forums, and

7    they also needed to get replacement MAC addresses

8    because sometimes the MAC addresses that they had

9    stolen, whether they had sniffed them themselves or

10   they've already got them on the website, they stopped

11   working, and they might have stopped working because the

12   cable companies figured it out, they figured out it was

13   a cloned modem, and we'll prove that sometimes they

14   would blacklist a particular MAC, but in any case they

15   needed a steady diet of fresh stolen MAC addresses.  So

16   he kept this website up and running to make sure that

17   people could have this swapping, this on-line swap meet.

18           MR. McGINTY:  Again, your Honor, objection.

19           THE COURT:  Overruled.

20           MS. SEDKY:  So we've talked about the MAC

21   stealing and the MAC trading, now let's talk about the

22   second functionality, which is the MAC changing.

23         So once -- Step 1 is you get your out-of-town

24   stolen MAC address and Step 2 is you've got to get it on

25   the modem.  So Mr. Harris had this customized modem and

1    this customized software program and the customer took

2    the stolen MAC address and input it into the customized

3    modem and it became essentially the customized modem's

4    new MAC address and that's how the modem was cloned.

5    And in doing that, that's how his customers were able to

6    trick the cable companies and steal service from them

7    because the cable companies saw the MAC address, the

8    stolen MAC address, and they thought it was a valid

9    legitimate subscriber and so they provided the service.

10          Now, we'll prove that Mr. Harris actually helped

11   two different kinds of computer users steal service in

12   two different ways.  He helped some users who were not

13   subscribers at all, they subscribed to no internet

14   service, and with his help they were able to steal free

15   service without paying anything, and he called that

16   "theft of service," and that was the term that he used.

17          Now, there was a second type of stealing that

18   we'll prove he did and there were some of his customers

19   who actually were paying subscribers, they paid for the

20   slowest, cheapest, bare-boned service, usually, and with

21   Mr. Harris's help they were able to get much faster,

22   sometimes ten times faster, as we'll show, service

23   without paying any of the extra premiums, and he had a

24   name for this, too, he called this "uncapping."  And

25   you'll hear people talking about "uncapping" and "theft

1    of service" as if they're different, but it's basically

2    that they were getting much faster service without

3    paying any of the extra premiums that they were supposed

4    to pay.

5         And you might be wondering well why -- what's with

6    this whole uncapping, why do the cable companies charge

7    more money for faster service?  Well, we will have some

8    testimony about that and they will explain that cable

9    companies have to charge more money to provide faster

10   service because there's only a finite amount of internet

11   service that can go to any given neighborhood.  It's

12   fixed.  It's like a pipe.  And so if there's somebody on

13   that pipe who's taking up a whole lot of internet

14   service and needs a lot of fast service, it's going to

15   slow other people in the pipeline in the neighborhood

16   down.

17        It's sort of like -- and I was thinking about this

18   the other day, it's like my water pressure in my house.

19   So if it's dinner time and I'm standing at my kitchen

20   sink and I've got my kitchen faucet on, I've got my

21   dishwasher running, I've got my load of laundry in the

22   basement, and my 13-year-old daughter decides this is a

23   good time for her half-an-hour-shower ritual.  So she

24   goes up and she starts taking her half-an-hour shower.

25   Well, the water pressure in my sink is going to go down

```
 1    or her shower water pressure is not going to be so
 2    great.  But something's got to give.  And internet
 3    service is the same way.  So if somebody needs faster
 4    and faster service, in order to keep everybody else on
 5    the network from slowing down, the internet companies
 6    have to come out, as we'll prove, and lay more cable and
 7    add more equipment, and that costs them money and so
 8    they charge higher rates for faster service, and that's
 9    the background behind "uncapping."
10         So, exhale, the technology piece is over.  And
11    this case is actually, as we'll prove, it's not a
12    complicated case, it's actually about two things.  We
13    will prove that that man essentially he knowingly and
14    intentionally facilitated theft.  That's what he did.
15    He helped people steal by lying to the cable companies
16    about who they were.
17         So we've talked about who Harris is and we've
18    talked about his cable modem hacking operation, the
19    business generally, and now we've unpacked the tool kit
20    quite a bit, and now let's talk about Mr. Harris's
21    knowledge and intent.
22         We will prove, during the course of this trial,
23    that Mr. Harris knew exactly what his customers were
24    doing, he knew that they were stealing service, and he
25    fully intended to help them succeed.  We'll have
```

1   testimony from insiders, Lindquist and Phillips, who

2   will come in and they will testify about the cable modem

3   hacking operation, they were involved in it, and they

4   will say that it was common knowledge that people were

5   stealing service and that they were worried about

6   getting caught, and they will tell you that they talked

7   to Harris openly about the fact that the customers were

8   stealing service.  In fact -- and I'm going to put up my

9   second blow-up here.

10              (On easel.)

11              MS. SEDKY:  We'll show you an excerpt of a

12  conversation between Ryan Harris and Craig Phillips --

13  and that's the roommate who was on the business side of

14  the operation, and Phillips is excited because he's

15  proposing to Harris, he's telling him about this deal

16  he's about to break, he's trying to cut a deal to sell

17  10,000 copies of this cable modem hacking software to

18  one person, and he's telling Harris about it and so

19  Phillips says, "They want to use these," and I put in

20  this part, "the 10,000 Sigma software licenses," um, and

21  you'll see that later when you see the actual document.

22  "They want to use these to steal service.  We have to

23  show them how to steal service, too."  And Harris

24  responds, "Sounds good to me."  And they come up with

25  this $2 apiece price elsewhere in the conversation.  He

 1    says, "For 20k, man, I'll give them unlimited

 2    licenses."  So they talked openly about the fact that

 3    their customers were stealing services.

 4         And we'll also prove that Harris, himself, he used

 5    these products.  His roommate will come in and testify

 6    that while they were living together and before, his

 7    software, they were using it together.  They got ten

 8    times faster service without paying a nickel.  And he

 9    tells -- and he talks about his own use.  You'll be

10    reading chats where he's very up front about telling

11    people, "I'm on an uncapped modem" and "Isn't this free

12    service great."  So you can look at Harris's personal

13    use.

14         And then let's get back to the tool kit.  What do

15    we have in that tool kit?  Well, let's look at the tools

16    in it.  There's the MAC sniffer, CoaxThief.  There's the

17    black market, the forums where you trade the MAC

18    addresses from out of town.  There are these other

19    features that help -- well, we'll talk about those

20    later.  But so you've got the black market, you've got

21    all these instructions, you've got his book, and taken

22    together we'll prove to you that there is no other

23    legitimate use that's commercially viable for this tool

24    kit other than to steal service.

25         The other thing is take a look, not just at the

1    tool kit, but Harris's continued involvement.  We will

2    prove to you that Harris stayed very, very involved in

3    this operation.  As I mentioned earlier, he kept

4    tweaking and sharpening the tools in his tool kit.  He

5    stayed abreast of the ISPs's security measures and kept

6    tweaking his products to come up with these work-arounds

7    and he ran his website so that he could make sure that

8    it was up and running to allow people to trade their MAC

9    addresses.  And so he kept sharpening the tools, keeping

10   them on the cutting edge, making sure that they worked.

11        So Harris not only used the products for himself

12   and helped people to sort of stay involved with it, but

13   he also helped his customers hide, he helped his

14   customers hide their involvement, and we'll prove that

15   he devised features into his cable modem software that

16   would make sure that the cable companies couldn't detect

17   them.  So he had a program that you'll see called

18   "Stealth Mode," and "Stealth Mode" is what it sounds

19   like, it basically allowed the modem, the customized

20   modem to remain invisible.

21        And Lindquist, the programmer, she'll talk to you

22   about a program that she coded herself, she wrote this

23   program, and it was an antiprobing feature.  And

24   antiprobing, the way that worked, is that the ISPs, they

25   probe, they send out questions over the internet because

1    they want information about who's on their network, they
2    want to see, and when they probe, if they find out that
3    someone's got a cloned modem, they knock that person off
4    the network.  And so Lindquist was told to figure out a
5    way to work around this and she devised an antiprobing
6    feature that she put into these cable modems that would
7    prevent the cable companies from effectively probing and
8    testing and finding these cable modems on their network.
9         Now, we will prove that Harris not only helped his
10   customers hide, he hid himself.  He admitted hiding.
11   You can just take a look at his own words.  In this
12   book, "Hacking the Cable Modem" -- (On easel.)
13        This goes to a different one.  I'm sorry.
14        In his book, "Hacking the Cable Modem," he says --
15   and I didn't bring my reading glasses and now it's going
16   to be hard for me to read.  He says he's living in his
17   clandestine residence.  Oh, I'll find it.  There it is.
18   He says:  "I make my living by pioneering hacking
19   techniques and writing software programs from my
20   clandestine residence in Hong Kong."  And we will prove
21   that he wired $50,000 to Hong Kong.  He had accounts
22   there.  And we will prove that he, in other chats that
23   you'll see, he calls himself, he says, "I'm a
24   professional hacker, so I get paranoid just to check
25   who's at my front door."  And he didn't just talk about

1    being paranoid and not wanting to check his front door,

2    he used an alias in his postings, on his website, in his

3    e-mails with his customers, he always used his alias,

4    "DerEngel."  And you'll hear from Lindquist, the

5    programmer, that she worked with him hand and glove, day

6    in and day out, for over a year before he would tell her

7    his real name.  She only knew him as "DerEngel."

8         So he not only tried to hide himself, but we will

9    also prove that he tried to protect himself.  And what

10   he did was every so often he would sprinkle in his book

11   or on his website these disclaimers and there's a sample

12   of one right in the back there.  (Indicates.)  They

13   usually say the same thing and they say something like

14   "We don't condone theft of service."  That's usually the

15   classic line he used.  What we'll prove -- the insiders

16   will come in and they'll testify that those disclaimers

17   were a joke.  They laughed about them.  They will prove

18   -- the insiders will come in and they will testify that

19   they knew that their customers were not following the

20   disclaimers and we will prove that Ryan Harris himself

21   wasn't following his own disclaimers, he was stealing

22   internet service for years.

23        So why was he doing all of this?  Why on earth --

24   what was motivating Ryan Harris?  Well, we will prove

25   that Ryan Harris was motivated mostly by money.  He was

1    determined to be a millionaire.  Here are a couple of

2    quotes in conversations that he had with Craig

3    Phillips.  In one he says -- and these typographical

4    errors, I have to say this for my mother's sake, because

5    she was very particular about spelling, that those are

6    how I found them.  That's not how I spelled them.  "We

7    will start on our path to becoming millionaires," he

8    says.  And then in another chat he says, "We're going to

9    make so much money and then we're going to buy a really

10   nice house with a pool."  And I think that's a smiley

11   face and a modicon or something.  And we'll actually

12   have some testimony about what these different signs

13   mean and different phrases on the internet mean.

14        So he wanted to make money and he had a whole

15   pricing structure for these -- this tool kit wasn't for

16   free.  He would buy, as we'll prove, he would take $20

17   refurbished modems and he'd sell them for about 80

18   bucks, once he put his software on them.  You could buy

19   the modems -- you could buy the software by itself, if

20   you wanted to use your own modem, he had a different

21   price for his book.  He had a membership fee where if

22   all you wanted was access to those trading MAC

23   addresses, you could pay a separate fee for that.  So he

24   was monetizing this whole tool kit because he wanted to

25   make money.

1      Well, he had another motive, he had a lot of

2  animosity toward the providers, and we'll prove that.

3  In fact, let's take a look at his book again.  He

4  dedicates his book.  On the dedication page, he says:

5  "This book is dedicated to all the righteous hackers

6  that have been silenced by greedy corporations."  And he

7  says later in the book, he talks about why he's doing

8  all of this.  He tells you.  He says:  "My goal was

9  clear" -- I'm sorry.  I really should have brought my

10  reading glasses.  Okay.  "My goal was clear.  I wanted

11  to uncap as many modems as possible.  The war had

12  begun."  In his own words, he's declaring war against

13  the providers.

14      So what happened in the end?  We've talked about

15  who Harris is, we talked about his cable modem hacking

16  operation, we talked about what he knew, what he

17  intended, well, what happened?  Well, we'll prove that

18  in the end he reached his goals.  He reached -- by --

19  through his so-called "war" on the cable companies, he

20  ended up with over 10,000 customers and he grossed over

21  a million dollars in sales over a six-year period.  And

22  that's how this all ended.

23      So during the course of this trial we will present

24  evidence to you in the form of testimony of witnesses,

25  documents, other types of evidence, that will prove to

```
 1    each of you beyond a reasonable doubt that that man,
 2    Ryan Harris, knowingly and intentionally facilitated
 3    theft.  He designed and sold a comprehensive tool kit
 4    and he stayed very involved, day in and day out,
 5    sharpening those tools, refining them, perfecting them,
 6    keeping them at the cutting edge to make sure they
 7    worked.  He knew full well that his customers were
 8    stealing service and he wanted to make sure they were
 9    successful in doing it.  And in the end he played an
10    enormous role in all of this, in his own words, he
11    called himself "the creator."
12         So at the end of the trial, based on the evidence
13    that we present to you, Mr. Bookbinder and I will ask
14    each of you, on behalf of the United States, to return a
15    verdict of guilty, guilty of committing wire fraud,
16    guilty of aiding and abetting other people or helping
17    other people in committing wire fraud, and guilty of
18    conspiring to commit wire fraud.  So thank you very much
19    for your time.
20              THE COURT:  Ladies and gentlemen, that
21    concludes the government's opening statement, the
22    preview of what it expects the evidence will be and
23    show.  Um, I'm going to give you a break now for about
24    15 minutes.  There should be something back there for
25    you to eat.  And then you'll hear, I understand, the
```

1    opening statement from the defendant, and then we'll go

2    to the first witness.

3             The Court is in recess for the jury.

4                  (Jury leaves, 10:50 a.m.)

5                  THE COURT:  Is there anything?

6                  MR. McGINTY:  There is, your Honor.  There's a

7    motion for a mistrial.

8                  THE COURT:  Why is that?

9                  MR. McGINTY:  And the motion for the mistrial,

10   your Honor, is founded on what seemed to have been

11   boundaries that were clearly set by the Court that were

12   exceeded.

13            Yesterday there was a conversation about

14   categories of postings, um, reflected on the website of

15   TCNISO.  There were specific entries for MAC address and

16   MAC address exchanges, there were headings for those,

17   and the Court said that this was not to be -- or the

18   government wasn't to try to put this in, it could be

19   addressed later, the Court was disinclined to permit

20   that, many of those specific headings appeared to be for

21   the truth of the matter and were not, um -- and the

22   Court was going to consider whether ultimately they

23   would be ruled inadmissible.

24            Notwithstanding that, the government has packaged

25   all of those into conclusory statements that go like

1    this.  Um, that Mr. Harris provided access to stolen

2    account numbers.  That there was a black market in MAC

3    addresses.  That Harris ran a forum in a -- I'm sorry, a

4    forum where you trade in MAC addresses.  And that he

5    maintained a black market in it.  That's just a few of

6    the characterizations that synthesize what the Court has

7    ruled --

8                THE COURT:  But I -- and I'll hear from the

9    government, but I understood that the government had

10   evidence, in addition to the posts on which we were

11   focused yesterday, that it was going to rely upon to

12   prove those points.

13               MR. McGINTY:  But the question, your Honor, is

14   whether a third-party hearsay source of what's otherwise

15   inadmissible fuels that?

16               THE COURT:  Well, if it comes from

17   Mr. Phillips or Ms. Lindquist, based on what I've heard,

18   it's not hearsay, it's admissible under 801(d)(2), it's

19   an --

20               MR. McGINTY:  But what's admissible?  I mean,

21   they may know there's a forum.  They're not the sponsors

22   of the content of the forum.  The sponsor of the content

23   of the forum is the person who posts the thing on the

24   forum.  That's the speaker.  That's the declarant.  So,

25   um, what appears to be a forum -- we've made the

1    argument that a forum, um -- that Mr. Harris has

2    statutory protection from the consequences of the

3    content of the forum.

4           THE COURT:  Yeah, and as I've said, that's

5    Section 230.  I haven't been persuaded that that

6    provides any defense in a criminal case.

7           MR. McGINTY:  But irrespective of that,

8    there's a question of whether those are adoptive --

9    whether in any respect there's an adoption of the

10   content of what those contributors put on the posts.

11   And to have someone come in and say that in their sum

12   these appear to reflect the following categories of

13   activity, um, seems to me just another layer of a

14   problematic presentation.

15          THE COURT:  And what does the government say

16   in response?

17          MS. SEDKY:  Your Honor, we have ample

18   testimony from our users who said that they went to the

19   forums and that's how they got their MAC addresses, and

20   they will testify repeatedly that they went back to the

21   forums again because their MAC address stopped working.

22   So where did they go?  They went back to the forum.

23   They got another MAC address.  They will testify about

24   their own personal use of the forums to acquire stolen

25   MAC addresses from out of town.  We have many witnesses

1   who will testify to that.

2           MR. McGINTY:  Can I respond to that?  Because

3   that's simply not the case.

4           THE COURT:  What's not the case?

5           MR. McGINTY:  Let's go through the witnesses.

6   Let's go through the witnesses.

7           MS. SEDKY:  Okay.

8           MR. McGINTY:  Mr. Larosa says, "I purchased

9   multiple modems and products from TCNISO.  I obtained

10  the MAC addresses through persons who I shipped these to

11  who exchanged them with me."  That's Mr. Larosa.

12      Mr. Madeira says -- in a recent debriefing, says

13  that he did not use a MAC address or a configuration

14  file.  He says, "I bought the product.  I attached it.

15  It didn't work.  I took an update from the website,"

16  whatever the update would be, "I took the update and

17  then it worked."  He did not use a MAC address.  He did

18  not change the configuration file.

19      The third person, um -- I'm sorry.

20          THE COURT:  Well, I'll let her sit while you

21  stand and then you'll sit when she stands.

22          MR. McGINTY:  The third person is Mr. Hanshaw

23  and Hanshaw has two charges or two separate accusations

24  that he's made relative to when he's gotten these

25  materials.  One of them is he downloaded software in

```
 1    2005, no one would have known about that, and the second
 2    was that he snookered Isabella Lindquist out of getting
 3    the raw code for a Sigma software, um, which, by the
 4    way, he got from her by offering to pay $100 for it and
 5    she acquiesced to that.  So she made her own separate
 6    deal which he, in turn unsurprisingly, double-crossed
 7    her.  How is that in furtherance of the conspiracy?
 8              So where of the witnesses -- those are the three.
 9    Which of those witnesses is going to say, "I went to the
10    forum.  I posted on the forum.  I got a MAC address from
11    the forum."  So this is --
12              THE COURT:  All right.  Okay.  That gives me
13    the essence of it.  Go ahead.
14              MS. SEDKY:  I'll tell you the two witnesses.
15    Mr. Hanshaw will testify that he went to the forums and
16    that's how he got his MAC address.  And whatever
17    Mr. Harris -- whatever Mr. McGinty has to say about how
18    he acquired the software program or the modem, um, he
19    certainly got the MAC addresses from the web forums
20    repeatedly.  And Mr. Phillips was a personal user of the
21    product himself while and after he was living with
22    Mr. Harris and he will testify that that is how he got
23    his MAC addresses.  He went to the TCNISO website and he
24    got MAC address after MAC address.  That will be his
25    testimony.
```

1              THE COURT:   Okay.   The motion for a mistrial

2     is denied.   The jury's been informed, now multiple

3     times, that what the lawyers say is not evidence.   The

4     opening, which was done in a dispassionate way, um, laid

5     out what the government says the evidence is going to be

6     and what they'll prove.   I didn't discern any reference

7     to matters that I directed the government not to refer

8     to or, um, anything the government had agreed not to

9     mention in its opening.   I had understood, and I now

10    understand better, that the government anticipates it

11    has evidence that is admissible and isn't subject to

12    open, unaddressed or undecided motions in limine to

13    prove those points.

14         So given the limits that have been explained to

15    the jury about the purpose of opening statements and my

16    sense that the government has a good faith basis for

17    believing that it has evidence that will demonstrate

18    what was described, that I don't see a risk of unfair

19    prejudice at this point.

20         I think this is true of every case, um, I have a

21    vague sense, given the nature of this case, that maybe

22    what the witnesses have said before will not perfectly

23    predict what they say in court.   We'll see.   And, you

24    know, if the government doesn't have evidence or

25    evidence sufficient to prove some or what it has

1    represented, I expect that an experienced defense

2    counsel will point that out.  You know, they promised

3    you in their opening that they're going to prove there

4    was a black market.  You've got no evidence of that.

5    We've heard no evidence of that.

6         So the motion for mistrial is denied.  I'm

7    listening to all of this and some of this conceivably

8    could be relevant to a Rule 29 motion for acquittal,

9    although not all of the disputed evidence in this motion

10   for mistrial goes to the elements of the offense, um, or

11   is the only evidence relating to the elements of the

12   offense, as I understand it.

13        All right.  It's now 11:00.  Why don't you all

14   take 10 minutes.  And, Mr. McGinty, you'll get your

15   chance to make an opening statement, not a closing

16   argument.

17        The Court is in recess.

18             (Recess, 11:00 a.m.)

19             (Resumed, 11:10 a.m.)

20             THE COURT:  Okay.  We will get the jury.

21             (Jury enters, 11:10 a.m.)

22             THE COURT:  Ladies and gentlemen, we're now

23   ready to hear the defendant's opening.  Once again, as

24   I've told you, whatever the lawyers say is not

25   evidence.  This is the opportunity they have to either

1   tell you what they expect the evidence will be or to

2   emphasize certain points they hope you will keep in

3   mind.

4            MR. McGINTY:   Thank you, your Honor.

5

6   OPENING STATEMENT BY MR. McGINTY:

7            Good morning, members of the jury.  My name is

8   Charles McGinty.  Also with me is Christine Demaso, who

9   is seated next to Mr. Harris.  And it is our singular

10  duty and our singular privilege to represent Mr. Harris

11  in the course of this case.

12       I want to start by focusing on something the

13  government made much of and it's important for us to put

14  this case into a concrete perspective and focus on

15  what's going to be at issue here.  The government talked

16  about Mr. Harris's help.  All the time, Mr. Harris's

17  help.  What Mr. Harris's did to help people steal cable

18  service.  And when it talked about his help, it had it

19  unhinged, separated from the three witnesses you're

20  going to hear from who are in a position to testify

21  about whether they got help from Mr. Harris or not.  And

22  of those three, two of them didn't know Harris, never

23  communicated with him, and a third of them Harris said

24  to him, in the only communication there's any record of,

25  "I don't know you."  The person offered to be a

1   moderator in connection with the forum and Harris said

2   to him, "I don't know you," and put him off.

3        So of the three that were getting help presumably,

4   for the government to make its case about the three acts

5   of wire fraud, of those three, none of them got help

6   from Mr. Harris.  More specifically, one of them was

7   Mr. Madeira.  Mr. Madeira changed his story recently.

8   He had originally talked about how he had gotten a modem

9   and he uncapped the modem.  What he says now is he got a

10  modem and what he didn't do is to change his MAC or to

11  change his configuration file.  In other words, he

12  didn't get any help, he didn't do anything to change his

13  presentation to the ISP or the cable company.

14       In the government's indictment, the critical

15  element here in its allegation relating to Mr. Madeira

16  is that he had cloned his MAC address.  We now know he

17  didn't.  We now know he did not.  Not only did he not

18  get help, he didn't clone his MAC address.  Of the

19  three, two.

20       The second one is Mr. Larosa.  What we know about

21  Mr. Larosa, from what he has said, is that he bought a

22  number of products from Mr. Harris.  Not once did he

23  communicate with Harris or anyone at TCNISO relating to

24  those products.  To make them work what he did was he

25  distributed products to different parts of the country,

1    to friends of his, and they exchanged identifiers to

2    permit him to do that.  So what happens with Mr. Larosa

3    is that there is no help from Mr. Harris, there's no

4    help from TCNISO.

5          The final person to testify is a young man who

6    will testify that he, on two occasions, got software.

7    One time he got it by downloading it off the internet.

8    He didn't get help from anybody, he simply downloaded it

9    from the TCNISO website.  The second time he got

10   software, he got it not from Harris, not from a call to

11   Harris, he got it from Isabella Lindquist, who was the

12   creator of the software, and he did it by deceiving

13   her.  You see, he had somehow hacked into her web page

14   or had found some other way to get the source code on

15   which she was working on.  She was deceived into

16   believing that he had the source code and she permitted

17   him to get the balance of the source code in exchange

18   for what she wanted for that, which was $100.  Harris's

19   involvement in that, Harris's help with that?  Zero.

20   Zero.  None.

21         So if you take the specific counts -- and the

22   Court said there has to be an overt act in

23   Massachusetts, all of it evaporates.  Where's the help?

24   So when you distill the case and you dissipate the mist,

25   the noise, and you focus on what the concrete facts are

1    going to be, for Harris aiding wire fraud, he has to

2    know what it is that the user is going to be doing with

3    his product.

4         In the indictment the government talks about how

5    the products that Harris provided, quote, "enabled

6    computer users to obtain internet services without

7    making the required payment," that "his products enabled

8    users to obtain faster, upgraded or uncapped internet

9    service without paying the premiums," "enabled users to

10    disguise their true on-line identities."  In each

11    instance what Harris did short of help -- because there

12    is no help, but short of help what he did is he provided

13    the possibility of something happening.

14         When he provides the capability, what's the

15    consequence of that?  The Court instructed you this

16    morning that it is not enough to know that a product may

17    be used unlawfully, but the one thing you may consider

18    is knowledge how it would be used.  How it would be

19    used.  So if I sell to a person over there, do I know

20    how they will use it?  Not how they could use it.

21         Back to the indictment.  The government says it

22    enabled -- it enabled -- "enabled" means "makes

23    possible," makes possible something happening is not the

24    same as knowing it would be used for that purpose.

25         So dispelling the mist here of the help that

1    Harris supposedly provided, dispelling that mist and

2    looking to what happens here, if you listen to the

3    Court's instructions, knowledge of how it would be used,

4    how is the capability enabling computer users to do

5    upgraded service, free service, anonymity, how is the

6    enabling the predicate for a criminal conviction and how

7    in the world is it the predicate for wire fraud?

8         Harris is not charged with making a thing.  He's

9    not charged with having a thing you're not supposed to

10   have.  He's not charged with having the modem.  He's not

11   charged with breaking into the modem.  He's not charged

12   with pulling it to pieces and finding what makes it

13   work.  That's not what he's charged with.  He's charged

14   with this, by virtue of what this guy, over here, does

15   with it, Larosa, Madeira, Hanshaw.  How in the world did

16   he give them help?  And as you watch the evidence go in,

17   "could" or "would"?  "Could" or "would"?  It's not what

18   the product can do, it's whether you knew how he was

19   going to use it.

20        Now, here, you should know about Mr. Harris.  He's

21   28 years old.  He lives with his wife.  He's a smart,

22   creative, innovative person.  He has been intrigued --

23   and maybe that's not a strong enough word, but he's

24   fascinated by cable modems.  For him -- he views a cable

25   modem differently than we do.  I view a cable modem as

1    something that's sitting on my desk and kind of getting

2    in the way, because I don't really know how it works.

3    For him it's a sophisticated piece of equipment.  It's a

4    mini computer.  It has almost all the component parts of

5    a computer.  For those of us who are electronically, or

6    not electronically inclined, it doesn't offer any hope,

7    any draw to find out what makes it work.  But for

8    Mr. Harris there is.

9         Now, if you have cable internet service, you have

10   a cable modem.  If you want to, you could rent one from

11   the cable company or you can go and buy one, and you can

12   buy one at Radio Shack, you could buy it at Best Buy,

13   anywhere you want to get your electronics from, you can

14   buy a cable modem.  But the cable modems come with

15   instructions and the instructions are, "If it doesn't

16   work, turn it off, wait, and then turn it on again.

17   Otherwise call the cable provider."  Because, you see,

18   the modem is a closed box and you're not supposed to

19   open it and you're not supposed to look inside.  It's

20   controlled by cable companies.  It has a protocol that

21   gives them full access to it.  You can tinker with your

22   car, with your computer, you can take your electronics

23   apart in the refrigerator, but the cable company doesn't

24   want you to touch that cable modem and find out what is

25   inside or what it does.

1           But that modem in your house, on your desk, it can

2      limit your speed, it can control your gaming experience,

3      it can handicap your access to peer-to-peer exchanges.

4      It can slow your uploads to a crawl.  If it senses that

5      you are accessing music or content-rich content and

6      you're uploading it, it can slow it down so it barely

7      moves.  The suspicion might be, on the cable company's

8      part, that you're uploading copyrighted material, but

9      they don't know what your content is, but nonetheless

10     through your cable modem they can slow your use, they

11     can crimp it, um, and it can slow to a crawl.

12           "Uncapping," a term you're going to hear quite a

13     bit, "uncapping," is the process of increasing the

14     speed.  So if your cable company allocates a certain

15     speed or it represents to you what that speed is going

16     to be, um, you learn -- and you will learn that when

17     cable companies talk about the speed, what they're

18     frequently talking about is your download speed, the

19     speed with which you access the newspaper or access some

20     kind of content.  What they generally don't talk about

21     is your upload speed, your ability to push-out content

22     onto the net.  If you push out content onto the net,

23     what you frequently find is that the cable company

24     throttles, tightens down, controls that, and sometimes

25     slows it to such a crawl that you can't get that content

1    out.  So for uncappers, for people who are interested in

2    capping and uncapping, the game is not the download

3    speed, the game is the upload speed.  It's the choke of

4    the cable companies on your ability to upload content

5    from your computer and push it out there to someone else

6    who would get it.

7         If you have large videos and you want to send them

8    to somebody, you're frequently going to find that speed

9    drops have arrived.  You're going to find that cable

10   companies trim your service.  There's a word out there,

11   it's called "throttling," they throttle your service,

12   and when they throttle your service, they're not giving

13   you what they say they're going to give you.  "Oh, we

14   promise we'll give you, you know, this speed."  What

15   they don't say is what happens with your upload speed if

16   you're trying to upload something to the net in which

17   you're going to find, during the course of the case, is

18   this throttling, this squeezing down of the pipe that

19   you're paying for, the throttling down of that pipe is

20   what the cable companies do in your computer, on your

21   desk, the closed box that you can't look into, and you

22   can't do anything about it.  It's like learning that if

23   you go and get a pound of vegetables at a store, it's

24   like learning you're only getting three quarters of the

25   pound that you're paying for or like if you put 10

gallons of gas in your car and you find out you're not
getting 10 gallons.  You don't get what you're supposed
to get.

The cable companies reduce your service for
another reason, during peak hours they overbook the node
that you're on.  When you get your cable service, the
node that you're on is frequently overbooked.  It's
similar to airplanes, when you arrive and it turns out
you can't get on your plane.  They overbook it.  Well,
cable companies do that as well and when they do that,
they cut down your speed, they throttle what you're
getting, and collapse that content.

So for Mr. Harris the puzzle is what's in this
modem?  What's does it do?  What it's like?  What can I
find about the CPU on this?  What can I do to take it
apart?  In our interactive world there are lots of
applications, there are things that we use to increase
our experience, our electronic experience.  There are
even aps for Apple products, ever since a 17-year old
found a way to reverse engineer an Iphone.

Any of you bring in an Ipod today?

(Jurors raise hands.)

THE COURT:  Excuse me.  Excuse me.  The jurors
can't -- that's a rhetorical question.  The jurors can't
communicate with the lawyers or anybody else.

1          Go ahead.

2              MR. McGINTY:  Now, that Ipod can be used to

3      upload copyrighted materials.  Do you think Apple knows

4      that?  Do you think it knows what its capability is?  Do

5      you think Apple, when it made it, knew that it was a

6      potential copyright violation machine?  Do you think it

7      matters that they knew that?

8          What about your DVD burner on your computer?  That

9      has all the capability of downloading copyrighted

10     materials and violating the law.  It has that

11     capability.  Every computer manufacturer knows that.

12         What about your WIFI on your computer?  Your WIFI

13     jumps to the nearest vulnerable network.  It goes to

14     networks that don't want you on there, but it defaults

15     there.  That's Dell.  Does Dell know that its computer

16     piggybacks -- I'm sorry, trespasses, trespasses on other

17     systems?  It certainly does.

18         The VCR?  Software can be used, it can be abused.

19     It doesn't become illegal because it can be or it

20     enables or makes possible an abuse.

21         So Mr. Harris looked at a modem and he said, in

22     effect, "I want to find out what makes this tick.  I

23     want to take it apart.  I want to reverse engineer it.

24     I want to see what makes it work."

25         Now, his applications can be used to steal

1    service.  That's a possibility.  Does he know that?

2    Yes, he does know that.  They can be used to upgrade

3    service?  Does he know that?  Yes, he knows that, the

4    same way that Apple knows that its Ipod can be used to

5    take copyrighted materials.  He knows those things.

6        It can also be used to remove filters that are

7    imposed by the cable company that affect the content

8    that you receive on your computer.  It can also be used

9    to open ports where content, if you want to download or

10   upload, particularly in peer-to-peer kinds of

11   communications, to open those ports would permit you

12   access to what the cable company tightened down.  Now,

13   the cable company doesn't tell you it's going to do

14   that, it doesn't say, "By the way, you can't use certain

15   peer-to-peer opportunities," but the cable company

16   reaches into your modem and shuts it down, tightens it,

17   sometimes closes the port and completely prevents you

18   from getting access to that content.

19       Mr. Harris makes possible the exposure of the

20   innards and other choices because you now -- now that

21   it's open, you now have choices with respect to what you

22   do.  Can your choices be bad?  Sure.  Of course.  The

23   Ipod, yes, someone can use it for copyrighted material.

24   But if your choice is bad, it's not the basis for a

25   conviction of Mr. Harris.  The potential of that threat

1    is not a criminal predicate.  And when the government

2    talked about the help, it's because it realized just

3    that, there has to be something more than capability,

4    and Mr. Harris's capability is just that, not the

5    predicate for wire fraud.

6         Another thing.  You're a dissident or you're an

7    employee that wants to be on a web exchange.  If you

8    don't want your home country to know that you're a

9    dissident, you're Chinese, you're Kenyan, if you're

10   concerned about how your country is going to view your

11   expression about its politics, one of the things it does

12   is it provides anonymity.  One of the promises of the

13   internet for many -- maybe not all of us, but for many,

14   was that on the net they would be anonymous.  Oh, yes,

15   some people can abuse that.  But people wanted the

16   privacy of the net, they wanted to communicate on the

17   net privately sometimes because they wanted to convey

18   some political content which can get them killed.  A

19   worthy purpose?

20        So his product, among other things, makes it

21   possible for someone to go on the net, so you can't find

22   out who they are, so you can communicate, you can

23   communicate well, badly, for good or for bad.  You have

24   that capability.  But that's not wire fraud.

25        So all these capabilities are from the broken-open

1  modem, the potential that's there, and the government

2  wants to say the potential is singular and its

3  criminal.  But one question for the government is, even

4  if that were the case, how does that make you having

5  knowledge of how someone would use that?  But if the

6  potential is that you have choice affecting your content

7  and your delivery of services from a provider who is

8  promising you to make certain kinds of content

9  opportunities available to you, but doesn't do it, you

10  have the ability to affect that and you have the ability

11  to communicate past that in a way that makes you able to

12  communicate politically in a way, personally in a way,

13  that you have privacy rights.

14       So all of these things are made possible by

15  Mr. Harris's product.

16       Now, he's not here, as Apple might be, for his

17  copyright, he's here criminally.  He's not here for the

18  redress of a violation.  He's here in jeopardy of his

19  freedom.

20       The government says he hid who he was.  (Picks up

21  the book.)  No, he didn't.  He did quite the opposite.

22  He elevated his profile up here.  And his book is called

23  "Hacking the Cable Modem" and the subtitle, "What Cable

24  Companies don't want you to know."  And in this book,

25  no, it doesn't tell you how to steal service, it

1    acknowledges that it could be used to steal service, but
2    it doesn't tell you to steal service.  What it does is
3    tell you what's in that box on your desk that maybe you
4    don't care about, but maybe other people do, and want to
5    exercise their freedom to shape their experience through
6    that box in a host of different ways.  And when he wrote
7    this, yes, he wrote it under his computer name,
8    "DerEngel," and on the back is his picture and his name,
9    "Ryan Harris," the author and his wife, the copyright,
10   "Ryan Harris."
11        This is not a guy creating some nasty internet
12   poison in some hidden away in a distant part of the
13   internet, this is a guy who put his chin up in the air.
14   And you know what he didn't expect?  He didn't expect
15   them to take a poke at him, to take a poke at him
16   again.
17        So he's here facing the risk of his freedom,
18   having spoken out against powerful cable companies and
19   finding that they bite back, this case is him fighting
20   back, and the people that are coming in to take him down
21   are given immunity.  Immunity.  One is going to come in
22   a jail suit.  Another one, his business partner, pled to
23   a charge.  Oh, he did plead to a charge and do you know
24   what he pled to?  Computer intrusion.  Computer
25   intrusion.  Aiding and betting computer intrusion,

1    including one of the people here, David Hanshaw, a

2    person that he was in communication with and exchanged

3    information on the net about.  So he's charged with

4    computer intrusion.  So a partner of Mr. Harris's, his

5    former partner, and one of them pleads to computer

6    intrusion and Harris is charged with wire fraud.  What's

7    with that?

8          So what you have are accusers, one worse than

9    another, promised their freedom, so long as they

10   understood that the predicate today, tomorrow, and every

11   day, the answer to every question, today, tomorrow, and

12   every day, is going to be, "Him, Harris."  In fact, when

13   the government met with Craig Phillips, the first

14   witness that's going to come in, when it met with him it

15   said, "Well, we're not really interested in you, we're

16   interested in Ryan Harris."  Okay?  So I'm not stupid.

17   I go.  I get it.  Um, what's the answer to Number 1?

18   Um, "Ryan Harris."  The answer to Number 2, I think, is

19   "Ryan Harris" --

20            MR. BOOKBINDER:  Objection, your Honor.

21            MR. McGINTY:  And Number 3 is "Ryan Harris."

22   This motley group is --

23            THE COURT:  Excuse me.  There's an objection.

24   I haven't ruled on it.

25          Well, two things.  This is an opening statement,

1    not a closing argument, but this is within the range of

2    reason.  But I'll take this occasion to tell the jurors

3    what I'm going to tell you at the end of the case.

4         The jury is obliged to decide the case based on

5    the evidence and determine, as I told you, whether the

6    defendant has been proven guilty beyond a reasonable

7    doubt, but you're to disregard what the possible penalty

8    might be and not be -- and not consider or be influenced

9    by that, that's a matter solely for the Court, if the

10   government proves the defendant guilty beyond a

11   reasonable doubt.

12        Go ahead.

13        MR. McGINTY:  What I would ask each of you to

14   do, um, because it's so important in terms of

15   maintaining orientation during trial, is that either

16   party, the government or I, can try to distract you from

17   the task at hand.  It may be a good distraction.  It may

18   be an effective distraction.  Nonetheless.  So hold on

19   to the thing the judge told you at the beginning, hold

20   on to that, and make that the pivot point, the way you

21   look at the evidence as it comes in.

22        It's not enough to know that a product might be

23   used unlawfully.  It's not enough.  Knowledge -- there

24   must be knowledge how a product would be used.  Not

25   could, would.

```
1            I ask you to hold on to those two directions from
2     the Court in the consideration of the evidence.  And I
3     will return at the end of the case and ask each of you,
4     in view of those instructions of the judge, to find Ryan
5     Harris not guilty.  Thank you.
6                THE COURT:  Is there anything before we
7     proceed to the first witness?
8                MR. BOOKBINDER:  No, your Honor.
9                THE COURT:  All right.  Then after the
10    stenographer gets relocated and we move the podium, the
11    government may call the first witness.  Or you may call
12    the first witness now actually.
13                (Pause.)
14                MR. BOOKBINDER:  The United States calls Craig
15    Phillips.
16                (CRAIG PHILLIPS, sworn.)
17
18           * * * * * * * * * * * * * *
19           CRAIG PHILLIPS
20           * * * * * * * * * * * * * *
21
22    DIRECT EXAMINATION BY MR. BOOKBINDER:
23    Q.  Good morning.  Would you state your name and spell
24    your last name for the record?
25    A.  Craig Phillips, P-H-I-L-L-I-P-S.
```

1    Q.  Mr. Phillips, where do you live?

2    A.  California, San Diego.

3    Q.  And what do you do there for work?

4    A.  I work at a grocery store.

5    Q.  What do you do for the grocery store?

6    A.  I'm a manager.

7    Q.  How far did you go in school?

8    A.  My third year of college.

9    Q.  Do you know Ryan Harris?

10   A.  Yes.

11   Q.  Approximately when did you first meet Mr. Harris?

12   A.  Around 2001.

13   Q.  At the time that you met him in 2001 where were you

14   living?

15   A.  Phoenix, Arizona.

16   Q.  Where was he living?

17   A.  Phoenix, Arizona.

18   Q.  How is it that you first met Mr. Harris?

19   A.  Through an acquaintance's acquaintance.

20   Q.  All right.  And what were the circumstances where

21   you met him through those acquaintances?

22   A.  Um, through an on-line gaming called Counter

23   Strike.  One of the acquaintances was Brian Deathridge,

24   who I went to school with, and then we met his friend,

25   who was Derek Rima, and then I met Ryan Harris through

1    him.

2    Q.  Let me just ask you to -- if you could just spell a

3    couple of those things as the Court Reporter needs to

4    get them down.

5         The name of the video game you were playing was

6    what?

7    A.  Counter Strike.  An on-line game.

8    Q.  All right.  And the two people, the acquaintances,

9    one was Brian Deckridge, is that correct?

10   A.  Brian Deathridge.

11   Q.  And the other one is?

12   A.  Derek Rima.

13   Q.  And how do you spell Rima?

14   A.  R-I-M-A.

15   Q.  Thank you.  So you were playing video games, on-line

16   video games, with a group of people, is that right?

17   A.  Yes.

18   Q.  And these are games that lots of people can play at

19   the same time?

20   A.  That's correct.

21   Q.  And how is it that you're playing the video games

22   with these acquaintances led you to meet Ryan Harris?

23   A.  Um, eventually at one point I went over and, um --

24   when I met Brian Deathridge and then Derek Rima, I went

25   to Derek Rima's apartment, started talking about the

1    games, started playing the games on line.

2    Q.  Where was Mr. Harris, was he there as well?

3    A.  He was there also.

4    Q.  And where was he living?  Mr. Harris.

5    A.  He was living with Derek Rima.

6    Q.  And do you see Mr. Harris in the courtroom today?

7    A.  Yes.

8    Q.  Can you point him out and describe what he's

9    wearing?

10   A.  Yes.  He's wearing a gray coat and a colored tie.

11            MR. BOOKBINDER:  Your Honor, may the record

12   reflect the witness has identified the defendant?

13            THE COURT:  Yes.

14   Q.  All right.  So did you and Mr. Harris end up playing

15   this on-line game together?

16   A.  Yes, on multiple occasions.

17   Q.  And when you play these games, do you use a nickname

18   or an on-line name?

19   A.  Me?

20   Q.  Yes.  Did you?

21   A.  Yes.  My on-line name was "yourmomma,"

22   Y-O-U-R-M-O-M-M-A.

23   Q.  Did Mr. Harris have a name that he used as well?

24   A.  Yes.

25   Q.  What was it?

A.   DerEngel, D-E-R-E-N-G-E-L.

Q.   At the time you met Mr. Harris, back in 2001, what were you doing?

A.   Um, I was working at another grocery store full time and going to school full time.

Q.   And did you know whether Mr. Harris was working or what he was doing?

A.   At first I perceived him to be going to the community college, but eventually I found out he was not.

Q.   At some point did you have a conversation with Mr. Harris about cable modem hacking?

A.   Yes.

Q.   And do you remember when approximately you first talked to him about this?

A.   Um, late 2001, somewhere in 2002.

Q.   And what if anything do you remember him saying about that topic?

             MR. McGINTY:   Objection.

             THE COURT:   The objection is overruled.

       And if there's an objection, you should not answer until I rule on the objection.  If I say "sustained," that means you may not answer.  If I say "overruled," that means you may answer.

       I overruled the objection, therefore you may

1    answer the question.

2    A.   At that time we had talked about a previous type of

3    cable modem that was, um, called a LAN City cable modem.

4    Q.   And what did Mr. Harris tell you about these LAN

5    City cable modems?

6    A.   At that time they were capable of getting greater

7    speeds than paid for by the subscriber -- by the company

8    who you purchased it from.

9    Q.   So they're capable of getting faster speeds than

10   you're actually paying your cable company or your ISP

11   for?

12   A.   That's correct.

13   Q.   Had you heard about this -- and what was this

14   called?  Did Mr. Harris tell you what this getting

15   greater speeds thing was called?

16   A.   "Uncapping."

17   Q.   Had you heard about "uncapping" or that concept

18   before Mr. Harris mentioned it to you?

19   A.   No.

20   Q.   Around this time did you see anybody use a hacked

21   cable modem?

22   A.   Um, yes, I saw one at Derek Rima's apartment.

23   Q.   And was that where Mr. Harris lived as well?

24   A.   That's correct.

25   Q.   At some point did -- was there a circumstance where

1   someone brought one of those modems to your apartment?

2   A.  Yes, we were having a Counter Strike party and I had

3   about 20 computers and people over.  I had a regular

4   cable modem there and I was paying for service there.

5   And then we had, um, issues getting all of the people on

6   the internet at the same time.  So we connected all of

7   them together to the internet.  We couldn't all get on

8   because we didn't have enough speed.

9   Q.  Let me stop you right there.  So -- just to be

10  clear, there were 20 people at your house with 20

11  different computers all wanting to play this game?

12  A.  That's correct.

13          MR. McGINTY:  Objection, your Honor.

14          THE COURT:  Leading, I think.

15      Overruled on that point.  There may be some others

16  where leading is not appropriate, but that was okay.

17          MR. BOOKBINDER:  Okay.

18  Q.  Um, so I think you testified that everybody was

19  trying to connect to the internet.  What was the

20  problem?

21  A.  Um, we didn't have enough speed to connect to the

22  internet and play the game with all 20 computers.

23  Q.  What happened then?

24          MR. McGINTY:  Objection, your Honor.

25          THE COURT:  Overruled.

1    A.  At that time Ryan Harris and Derrick Rima came over

2    with a specific model called the Motorola Surfboard

3    2100, and we connected it, and at that time everyone was

4    able to connect to the internet.

5    Q.  So -- and what was it about this particular modem

6    that allowed everyone to get internet access through it?

7    A.  Um, that cable modem was able to get up to 10 times

8    greater speed than the current cable modem that I was

9    paying for.

10   Q.  And what if anything did Mr. Harris say to you about

11   why it was that this cable modem could get such

12   increased speed?

13   A.  Because it was uncapped.

14   Q.  Are you familiar with modems being modified so that

15   people can get internet without paying at all?

16   A.  Yes.

17   Q.  And is that a different kind of cable modem hacking

18   than what you've described?

19   A.  It's similar.

20   Q.  Okay.  All right.  So is that "uncapping" or what

21   would you call that?

22   A.  Um, that would be obtaining free internet service.

23   Q.  All right.  Is that something you discussed with

24   Mr. Harris as well?

25   A.  At a further date, yes.

1  Q.  So later on, not in 2001 or 2002?

2  A.  Yeah, maybe a little later on, 2002, 2003.

3  Q.  And what if anything did Mr. Harris tell you about

4  how it was possible to get this free internet access?

5          MR. McGINTY:  Objection, your Honor.

6          THE COURT:  The objection is overruled, under

7  Rule 801(d)(2)(A).  Go ahead.

8      You may answer.

9  A.  Can you restate the question?

10 Q.  Absolutely.

11     What did Mr. Harris tell you about how it was

12 possible to modify a modem to get free internet service?

13 A.  Um, if you changed the MAC address, you'd be able to

14 obtain free internet access.

15 Q.  Can you very briefly describe what a MAC address is?

16 A.  A MAC address is a unique number that's assigned to

17 each individual cable modem that the cable provider

18 identifies you on their network as a subscriber.

19 Q.  So, um, and --

20          THE COURT:  Actually, could we stop for just a

21 moment.  I said I would give the jurors notebooks once

22 the evidence began and we haven't handed them out yet.

23 Sorry about that.  And we'll probably have pens, too.

24          (Hands out notebooks.)

25          THE COURT:  All right.  Why don't you put the

1   question again, please.

2           MR. BOOKBINDER:  I'll try to do that, your

3   Honor.

4   Q.  We were talking about MAC addresses, and I believe

5   you said something about changing a MAC address.  What

6   did Mr. Harris say was the purpose of changing the MAC

7   address on the modem?

8   A.  It would allow you to obtain service for free.

9   Q.  What would you have to change the MAC address to?

10  A.  To a paying customer or a subscriber's MAC address.

11  Q.  Did Mr. Harris explain to you how it was that

12  someone could get the MAC address of a legitimate

13  subscriber?

14  A.  Um, you could --

15          MR. McGINTY:  Your Honor, I have the same

16  objection.

17          THE COURT:  The objection is overruled.

18  Mr. Harris's statements are admissible under Rule

19  801(d)(2)(A) and to the extent he's asked, um,

20  Mr. Phillips's part of the conversations is admissible

21  conditionally or is admitted conditionally under Rule

22  801(d)(2)(E).  Go ahead.

23  Q.  So the question is --

24          MR. BOOKBINDER:  Well, let me rephrase it,

25  your Honor, or ask it again.

1   Q.   The question is, um, what did Mr. Harris tell you

2   about how someone could get the MAC address of a

3   legitimate cable subscriber?

4   A.   Um, you could trade with other people or use a

5   program called a "sniffer," called CoaxThief.

6   Q.   So you mentioned the term "sniffer."  What is a

7   "sniffer"?

8   A.   What it does is it allows you to read everyone's MAC

9   address in your local area and obtain those addresses

10  and then trade them with other people on the internet

11  from the same provider.

12  Q.   The name of the sniffer program that you mentioned

13  is what?

14  A.   CoaxThief.

15  Q.   Is it C-O-A-X?

16  A.   T-H-I-E-F.

17  Q.   Were you familiar with this concept of changing a

18  MAC address to get free service before Mr. Harris told

19  you about it?

20  A.   No, sir.

21  Q.   Okay.  You describe, um, that Mr. Harris explained

22  to you about changing a MAC address to a legitimate

23  subscriber and what happens once you do that?

24  A.   Um, you obtain free internet service from that

25  provider, not paying for it.

1    Q.  Did you have any discussions with Mr. Harris around

2    that time about his -- in which he expressed his views

3    of cable companies or internet service providers?

4    A.  Um, he felt that the internet should be free and

5    that no one should have to pay for it.

6    Q.  So in early 2003 -- um, well, initially you were

7    living in Phoenix, is that correct?

8    A.  That's correct.

9    Q.  And that's where you met Mr. Harris?

10   A.  That's correct.

11   Q.  At some point did you move?

12   A.  Yes.  I got in a car accident and was unable to

13   reach my financial obligations so I moved back home with

14   my parents in San Diego.

15   Q.  After you moved back to San Diego did Ryan Harris

16   stay in Phoenix for a period of time?

17   A.  To my knowledge, yes.

18   Q.  And did you keep in touch with him?

19   A.  On occasion we spoke on the phone, but mostly

20   on-line through a program called "MSN Messenger."

21   Q.  What is MSN Messenger?

22   A.  It's a chat program that allows you to communicate

23   from one computer to another over the internet.

24   Q.  When you have these chat communications between two

25   computers does the program save some kind of a record or

1   a log of that chat?

2   A.  Yes, the program does save a log or record of what

3   you communicated to that person that you typed on your

4   computer, like a text log.

5   Q.  At some point did you learn about a website called

6   "TCNISO.net"?

7   A.  Yes.

8   Q.  About when was it that you first heard about that,

9   if you remember?

10  A.  Um, around 2002, early 2003.

11  Q.  When you -- how is it you first heard about that

12  website?

13  A.  I heard about that website through Ryan Harris.

14  Q.  Did you visit the website once he mentioned it to

15  you?

16  A.  Yes.

17  Q.  And what was on that?

18  A.  Um, there were tutorials of how to uncap your

19  modem.  There was a program called Sigma 1.3.  And there

20  were diagrams on how to make a specific product called a

21  "serial cable."

22  Q.  Okay, let me ask you about some of what you just

23  mentioned.  You said there was a program on there called

24  Sigma 1.3, is that correct?

25  A.  That's correct.

1   Q.  And I'll ask you about that in a second.  You said

2   also there were diagrams about how to make a -- what

3   kind of cable?

4   A.  A serial cable.

5   Q.  What's a serial cable?

6   A.  It's a cable that allows your computer to

7   communicate to your cable modem and make modifications.

8   Q.  Who was it who was running the website at the point

9   that you learned about it?

10  A.  Um, Ryan Harris, to my knowledge.

11  Q.  So, um, in addition to seeing the program, Sigma

12  1.3, on the website, did you talk to Mr. Harris about it

13  at all?

14  A.  Yes.

15  Q.  What, um -- what did he tell you that program did?

16  A.  That program was capable of uncapping a modem and

17  eventually it could be capable of getting free internet

18  service.

19  Q.  Was there anything in addition to the program itself

20  that Mr. Harris told you people needed in order to get

21  free internet service?

22  A.  Um, there was also -- can you repeat the question?

23  Q.  Sure, yeah.  Yeah.  Let me try that.

24      So if anyone wanted to use that program to get

25  free internet service, did they need anything, any kind

1    of hardware, equipment, cabling, to do that?

2    A.   To my knowledge you needed the serial cable which

3    enabled you to access the cable modem's memory, and at

4    that point you were able to adjust the MAC address.

5    Q.   Did you ever use that program, Sigma 1.3?

6    A.   Yes.

7    Q.   When you used it, how did you physically get a copy

8    of the program?

9    A.   I took it off the website in which Ryan Harris told

10   me where it was.

11   Q.   So you downloaded it?

12   A.   That's correct.

13   Q.   What did you download it onto?

14   A.   Onto my computer and then onto my cable modem.

15   Q.   When you say your cable modem, where were you living

16   at this point?

17   A.   In San Diego, California.

18   Q.   With whom?

19   A.   With my parents.

20   Q.   Was there internet service at your parents' house?

21   A.   Yes, my parents had internet service and they paid

22   for it and I also had a subcable modem that I downloaded

23   the Sigma 1.3 onto.

24   Q.   So the modem that you were downloading onto was not

25   the one that your parents were paying for through their

1    cable company?

2    A.  That's correct.

3    Q.  You got a second line and that's where you

4    downloaded the program?

5    A.  That's correct.

6    Q.  All right.  What did you use it for?

7    A.  I used it for an FTP to upload and download movies.

8    Q.  Let me ask you to break that up a little bit.

9         First of all, did you use that modem, that you

10   loaded Sigma 1.3 onto, to connect to the internet?

11   A.  That's correct, I connected to the internet using a

12   stolen MAC address and a -- um, a separate config file

13   which allowed me to have higher speeds for free.

14   Q.  So, um, you said that you used a stolen MAC

15   address.  Where did you get the MAC address?

16   A.  Um, from trading on forums on the website.

17   Q.  Forums on what website?

18   A.  TCNISO.net.

19   Q.  When you say "trading," what do you mean by that?

20   A.  I traded the MAC addresses from where I lived to

21   where -- with someone else that I had MAC addresses from

22   the same company.

23   Q.  So how did you get MAC addresses from where you

24   lived?

25   A.  I used CoaxThief.

1    Q.   That's the sniffer program that TCN --

2    A.   That's correct.

3    Q.   -- that TCNISO provided?

4    A.   That's correct.

5    Q.   So you got these MAC addresses from your

6    neighborhood with that program?

7    A.   Uh-huh.

8    Q.   Why couldn't you just use those to get yourself

9    internet access?

10   A.   Um, if you had, um, a MAC address from your local

11   area, you could not connect to the internet at the same

12   time as that MAC address, you needed one from a separate

13   area.

14   Q.   You said you can't connect at the same time as that

15   MAC address.  What do you mean by that?

16   A.   What I mean is if my neighbor had -- if I took in

17   their MAC address and I turned on mine in the same area,

18   it would not work at the same time.  So I needed one

19   from a separate location or a separate network.

20   Q.   So if you got a MAC address from a different

21   geographical area, a different part of town, a different

22   part of the state, then that would work?

23   A.   That's correct.

24   Q.   And is that why you traded MAC addresses with

25   somebody on the forums?

1    A.   That's correct.

2    Q.   Now, you said, um -- I think you said that you --

3    when you got on with this modem you got faster internet

4    service than you were paying for, is that right?

5    A.   Up to 10 times the speed.

6    Q.   And what was the advantage of having that faster

7    service?

8    A.   Um, I could download movies or music faster or trade

9    them with other people.

10   Q.   At this point, Mr. Phillips, I would like you to

11   take a look at some of the folders in front of you that

12   have what has been marked for identification as a series

13   of exhibits and the ones I want you to take a look

14   at are, um, what's been -- what are labeled there as

15   Exhibits 5, 6, 10 and 17 through 21.  Can you just

16   quickly look at those and see if you recognize what they

17   are.

18   A.   (Looks.)

19             THE COURT:  I'm sorry.  What are the numbers

20   again?

21             MR. BOOKBINDER:  5, 6, 10 and 17 through 21.

22             (Pause.)

23             THE COURT:  Well, they'll be collectively

24   marked Exhibits D1, 2, 3, 4, 5, 6, 7 and 8, for

25   identification only.

1                (Exhibits D1 through D8, marked.)

2    A.   Yes.

3    Q.   Have you had a chance to look at those?

4    A.   Yes, I've seen them before.

5    Q.   Do you recognize them?

6    A.   Yes.

7    Q.   What are they?

8    A.   They are chat logs from MSN Messenger.

9    Q.   So -- and it's fair to say they're excerpts, just

10   portions of chat logs?

11   A.   That's correct.

12   Q.   And how is it that you're familiar with these

13   particular chat logs?

14   A.   At the time when I left the company I had taken them

15   from the network that we were on, the computer network

16   that we were on.

17   Q.   So you say when you "left the company," that this is

18   something that happened after 2003 that we haven't

19   talked about yet, is that right?

20   A.   That's correct.

21   Q.   And you said you took them from the network.  How --

22   so you copied these?

23   A.   That's correct.  All of our computers in the house,

24   there was one in my room, one in Ryan's room, and one in

25   the living room.  Um, we were all interconnected so we

```
 1    were able to see the files and information on all three
 2    computers.  At that time what I did was I took all the
 3    information that I could off of all three computers and
 4    saved them to a hard drive and saved them to computer
 5    CDR disks.
 6    Q.  And I'll ask you more about the house and that
 7    situation later.
 8         But for now, um, you said you copied them onto CDs
 9    and a hard drive.  Approximately when was that?
10    A.  Early 2006.
11    Q.  What did you do with them after you copied them?
12    A.  Um, I took them with me when I left -- or moved out.
13    Q.  And did you hold onto them?
14    A.  I stored them at my parents' house and everywhere I
15    moved thereafter.
16    Q.  At some point did you give them to law enforcement?
17    A.  Yes, I gave it to the FBI in 2010.
18    Q.  At any point did you alter or change the logs in any
19    way?
20    A.  No.
21              MR. BOOKBINDER:  At this point, your Honor,
22    the government offers just Exhibit 5.
23              THE COURT:  Well --
24              MR. BOOKBINDER:  Actually, your Honor, I'll
25    ask another question, if I could.
```

1    Q.  Would you take a look at Exhibit 5 and just identify

2    who the parties are that are chatting in that log?

3    A.  Me and Ryan Harris.

4              (Pause.)

5              MR. BOOKBINDER:  And now the government does

6    offer Exhibit 5.

7              MR. McGINTY:  And I object, your Honor.

8              THE COURT:  Actually we need essentially a

9    protocol for dealing with this.  I'll see counsel at

10   sidebar.

11

12             AT THE SIDEBAR

13             THE COURT:  All right.  Um, let me just --

14        All right.  Exhibit 5 is what?

15             MR. BOOKBINDER:  It's the chat between

16   Mr. Phillips and Mr. Harris and the version we're

17   offering, it's not that version, it's the one that I

18   provided yesterday, the redacted version.

19             THE COURT:  Well, somebody's got to update

20   me.

21        Okay.  Hold on just a second.

22             (Looks.)

23             THE COURT:  This is --

24             MR. BOOKBINDER:  That's it, your Honor.

25             THE COURT:  And this is one of the -- one of

1    the chats that I ruled on in limine, isn't that right?

2            MR. BOOKBINDER:  Yes.

3            THE COURT:  And is there some -- just a

4    minute.  I'm looking at Document Number 94, Page 7.

5    These are --

6            MR. BOOKBINDER:  Your Honor --

7            THE COURT:  These are -- these are the

8    Phillips statements that I said I would conditionally

9    admit under Rule 801(d)(2)(E) and Harris's statements,

10   his own, under (d)(2)(A), correct?

11           MR. BOOKBINDER:  Correct.

12           MR. McGINTY:  There was an issue about

13   authenticity and I would ask for the opportunity to voir

14   dire him now.

15           THE COURT:  No, I'm going to admit them and if

16   I'm satisfied that -- if somebody had flagged this for

17   me before, before voir dire and before the jury was in

18   the box, then I wouldn't have put them in there.

19           MR. McGINTY:  Well, I'd prefer to do it in

20   open court.

21           THE COURT:  Yeah, then you'll do it on cross-

22   examination.

23        I'm admitting them and if I have to tell the jury

24   to disregard them, then I will.  But basically what he

25   said, his testimony so far, um, is -- and you can tell

1   me, you know, if you might want to challenge it or make

2   a proffer on it, and I'll listen to it and revise it,

3   but that he copied them from the computers that he

4   shared with Mr. Harris and that he took them to his

5   parents' house and everywhere else he moved after that

6   and he didn't alter them before he turned them over to

7   law enforcement, at least that's what's been represented

8   to me, and that the government would be able to link up

9   the chain of custody.

10           And I assume that some law enforcement officer

11  will say that these are in the state in which they were

12  received from Mr. Phillips?

13              MR. BOOKBINDER:  Correct.

14              THE COURT:  So with that understanding, I'll

15  admit it, and if the foundation is sufficiently eroded,

16  then I'll tell the jury to take it out of evidence, I'm

17  sure, and I will tell the jury to disregard it.  Okay?

18              MR. BOOKBINDER:  Thank you, your Honor.

19

20              (In open court.)

21              THE COURT:  The objection is overruled.

22  Exhibit 5 is admitted, but Mr. Phillips' statements in

23  Exhibit 5 are only conditionally admitted.  But this --

24              MR. BOOKBINDER:  Your Honor, at this point I'd

25  like to show a portion of the exhibit now to the witness

1    and to the jury on the electronics system.

2              THE COURT:  Okay.  Ladies and gentlemen --

3    let's see.  Do you have your monitors out, including in

4    the back?  Yes.  And that should turn on the jurors'

5    monitors as well as the rest of ours.

6              MR. BOOKBINDER:  Now that's very small.  Let

7    me blow it up.

8              (Blows up.)

9              MR. BOOKBINDER:  Your Honor, if the Court

10   would inquire if the jurors could read this now.  I can

11   blow it up further, if necessary.

12             THE COURT:  Okay.  If anybody's having trouble

13   reading that, please raise your hand.

14             THE JUROR:  I mean, it's kind of cut off.

15             THE COURT:  Just raise your hand.  Don't

16   speak.  It's hard.  It's hard.

17         If I ask you a question, you can speak, but now

18   just raise your hand.

19             (Juror raises hand.)

20             THE COURT:  Can you blow it up?

21             MR. BOOKBINDER:  The more I blow it up, the

22   more it cuts it off.  So I will endeavor to show the

23   rest of the document.  I think the concern was that the

24   right-hand portion is cut off and that's true.  I'll

25   need to scroll over so that it doesn't get too small.

1              THE COURT:  If at any point somebody's having

2     difficulty seeing or hearing, just please signal.  Okay?

3     Q.  All right.  Now, Mr. Phillips, I want to ask you a

4     little bit about this.

5              Is this one portion of a chat log that you

6     described earlier?

7     A.  Yes.

8     Q.  All right.  And you said, I believe, that this was

9     between you and -- and what name do you -- are you using

10    here on the screen?

11    A.  I'm using the name "YourMomma."

12    Q.  Okay.  And who are you talking with?

13    A.  "DerEngel," Brian Harris.

14    Q.  So, um -- well, let me ask you about the different

15    columns on this chat log.

16             The left-hand column, that's the date of the

17    conversation?

18    A.  That's correct.

19    Q.  Well, in this case what's the date?

20    A.  1-3-2005.

21    Q.  And then the next one is the time, right?

22    A.  That's correct.

23    Q.  And the one to the left, is that the person speaking

24    or the person listening?

25    A.  The person speaking.

1    Q.   So the first line up there is "YourMomma" and that

2    was you speaking?

3    A.   That's correct.

4    Q.   And the next line is the person listening?  The next

5    column.  I'm sorry.

6    A.   That's correct.

7    Q.   So you're speaking to -- and I'll scroll over now.

8    You're speaking to DerEngel?  And what I would like you

9    to do here is, um, if you could -- is can you read the

10   portions that are you speaking and I'll read the

11   DerEngel response.

12   A.   "I'm using a stolen MAC and serial for this FTP."

13   Q.   Let me stop you right there.  Um, a "stolen MAC" is

14   the MAC address that we were discussing earlier?

15   A.   Yes, that's correct.

16   Q.   And "serial" is the cable?

17   A.   Um, the "serial" actually is another unique

18   identification number for the cable modem.

19   Q.   And then you say "for this FTP."  What is an FTP?

20   A.   It's called a "File Transfer Protocol."  It's a

21   program that allows you to transfer information from one

22   computer to another.

23   Q.   Okay.  Then DerEngel says, "110K, it seems right

24   now."  What do you understand "110K" to mean?

25   A.   That means how much my cable modem is uploading to

1    him.  So that means how fast he is downloading from my

2    FTP.

3    Q.  Go ahead.  Read the last line.

4    A.  "And I have my regular house modem running

5    completely for my mom and my other computer."

6    Q.  When you say "regular house modem," what did you

7    mean by that?

8    A.  Um, I meant that the one that my parents paid for

9    and then I had a second one that was not paid for.

10   Q.  So the "regular house modem running for my mom and

11   my other computer," who was using the regular paid

12   modem?

13   A.  Um, my parents and I.

14   Q.  So you testified earlier that you had one of these

15   uncapped modems running at your parents' house.  Is this

16   a chat about that?

17   A.  That's correct, this is a chat about me using a

18   stolen MAC address and serial number, obtaining free

19   service and higher speeds from the provider, illegally.

20   Q.  Let's take, um -- I'd like to show you now, on the

21   screen, Page 5 of this exhibit, and again I'm going to

22   blow it up because obviously it's very hard to read

23   otherwise.  (Blows up exhibit.)  Again, can you read the

24   portions of this that are you and I will read the

25   portions that are DerEngel.

1   A.  "I'm not on an uncapped modem.  Give me thirty

2   seconds."

3   Q.  "Okay."

4   A.  "I will change modems." "Okay."  "Okay, are you

5   ready now?"

6   Q.  What's going -- and then the next line, what's the

7   next line there?

8   A.  Um, the one in gray or --

9   Q.  Yes, the one in gray.

10  A.  I'm sending a file to him.

11  Q.  Um, keep going.

12  A.  "Speed for you?"  "Accept."  "I'm uncapped."

13  Q.  And then there's another -- are you sending another

14  file?

15  A.  I'm sending the exact same file, but he didn't

16  accept it yet.

17  Q.  All right.  Go ahead.

18  A.  "There."

19  Q.  "Okay."

20  A.  "Much nicer speeds."

21  Q.  All right.  So in this chat are you describing

22  changing from the, um -- the modem, the paid-for modem

23  at your parents' house to the uncapped one with the

24  faster speeds?

25  A.  That's correct, I'm changing from the one that I'm

1    paying for to the one that has the illegal MAC address

2    and not paying for internet service.

3    Q.  Now, I'll show you the next page of that exhibit,

4    which is Exhibit 5, Page 6, and what I want to ask you

5    about here is the, um, bottom portion.

6              (Pause.)

7              THE COURT:  Okay.  I think we're having maybe

8    some difficulty with one of the jurors reading this.

9              MR. BOOKBINDER:  Oh, I could try to make it

10   bigger.

11             THE COURT:  Yes.

12             MR. BOOKBINDER:  (Blows up document.)

13             THE COURT:  Is the screen not working?

14             THE JUROR:  It's working.

15             THE COURT:  Okay, Dan, why don't you --

16             (Clerk goes to help juror.)

17             THE COURT:  Are you able to read it now?  Oh,

18   okay.

19        You'll see whatever he puts up there, but you

20   won't see the rest.  I'm afraid that's how it works

21   here.

22   Q.  Let me ask you, this portion of Page 6, of Exhibit

23   5, focusing on the bottom portion that's on the screen

24   now.

25             What's the date of this chat?

1    A.   January 24th, 2005.

2    Q.   It begins around 8:00 p.m.?

3    A.   That's correct.

4    Q.   Now, um, again I want to read a portion of this and

5    have you read the part that's you.  So beginning

6    "DerEngel."

7         "What's the name of the CFG file that you are

8    using for your uncapped modem?"  Well, let me stop.

9         What's the CFG file?

10   A.   A config file.  A config file is a file that the

11   cable companies identify how fast your cable service is.

12   Q.   The configuration file essentially determines the

13   speed of the service on the modem?

14   A.   That's correct.

15   Q.   If you want to get uncapped faster service, do you

16   need a different configuration file for that?

17   A.   That's correct.

18   Q.   All right.  So now going back.  What's the name of

19   the CFG file that you were using for your uncapped

20   modem?

21   A.   "ISRR."

22   Q.   Actually, can you just read the next line.

23   A.   Oh.  "Why?"

24   Q.   "No, why, just tell me."

25   A.   "Okay.  Hold on.  Let me find it."

1    Q.   Let me stop you there and I want to just skip to the

2    bottom of this page.  (Skips.)   There's a series of

3    texts there.  Is that files or is that -- well, what

4    does that mean, there's a series of text numbers and

5    letters?

6    A.   That's information about the speed of the cable

7    modem.

8    Q.   And if you could start reading from the third line

9    from the bottom.  What does that say?

10   A.   "I will d-load it from TFTP."

11   Q.   And what does that mean, "d-load it"?

12   A.   Um, download it from the TFTP.  That's another form

13   of File Transfer Protocol from the modem.

14   Q.   Okay, go ahead.  You can read that again.

15   A.   "If you want me to."

16   Q.   And DerEngel says "Please."

17        So what did you understand him to be asking you

18   there?

19   A.   To take the config file off my modem.

20   Q.   And do what with it?

21   A.   Give it to him.

22   Q.   Did you do that?

23   A.   Yes.

24   Q.   And this was the configuration file that you were

25   using to get uncapped service?

1    A.   Yes.

2    Q.   When you first went to the -- you testified earlier

3    that when you first went to the TCNISO website, there

4    was a program on there called Sigma 1.3, is that right?

5    A.   That's correct.

6    Q.   Was that something that people had to pay for?

7    A.   At that time it was free.

8    Q.   Did you ever talk to Harris about whether he planned

9    to charge for his products?

10   A.   Um, eventually, yes.

11   Q.   And do you remember when that was that you talked to

12   him about that?

13   A.   Around 2003, 2004.

14   Q.   What did he tell you about whether he had plans to

15   start charging for the products?

16   A.   At first it was for the serial cable that allows you

17   to connect your computer to the memory of the cable

18   modem.

19   Q.   That was the first product he charged for?

20   A.   That's correct.  To my knowledge.

21   Q.   Did he tell you what other products he planned to or

22   was charging for?

23   A.   Um, eventually he was going to charge for Sigma and

24   then down the road, um, Black Cat, and then the newer

25   versions of Sigma.

Q.   Okay.  What's "Black Cat"?

A.   "Black Cat" is a cable that allows you to directly connect to the memory and change the memory completely.

Q.   The memory of what?

A.   Of the cable modem.

Q.   All right.  So he was going to start charging for that kind of cable and for the Sigma software itself?

A.   That's correct.

Q.   Um, do you know whether TCNISO became incorporated at some point as a corporation?

A.   Yes.

Q.   How do you know that?

A.   I filled out the paperwork.

Q.   Okay.  And did someone ask you to do the incorporation work for the company?

A.   Yes, Ryan Harris.

Q.   Can you take a look at what's been marked as Exhibit 1.  It should be in front of you.

A.   (Looks.)

Q.   Do you recognize that document?

A.   Yes.

Q.   What is it?

A.   It's an incorporation of California.

Q.   Of what?

A.   Of TCNISO, Incorporated.

1    Q.   Whose signature is on that?

2    A.   Mine.

3              MR. BOOKBINDER:  Your Honor, the government

4    offers Exhibit 1.

5              THE COURT:  As I understand it, there's no

6    objection, and it is admitted.

7              (Exhibit 1, marked.)

8              MR. BOOKBINDER:  And I'll put that up on the

9    screen, Mr. Phillips, and I'll see if I can blow up

10   portions of it.

11             (On screen.)

12   Q.   All right.  So at the top of it the corporate name

13   is what?

14   A.   "TCNISO, Incorporated."

15   Q.   And what's the date of incorporation?

16   A.   May 15th, 2005.

17   Q.   And scrolling down.  Who is listed as the principal

18   executive officer?

19   A.   Ryan Harris.

20   Q.   Um, and what are you listed as for the -- and down

21   below Line 4, he's listed as the Chief Executive

22   Officer, or CEO, as well, is that right?

23   A.   Yes.

24   Q.   And you're listed as what?

25   A.   The Secretary.

1    Q.   Okay.  And, um -- so at this point you were living

2    in California, is that correct?

3    A.   That's correct.

4    Q.   When you incorporated the company.  Where was

5    Mr. Harris living?

6    A.   Oregon, to my knowledge.

7    Q.   Did you talk to him about what state you should

8    incorporate the company in?

9    A.   Yes.

10   Q.   What did he tell you about that?

11   A.   He told me that California would be a good state

12   because it would protect our assets from someone suing

13   our company.

14   Q.   Did he tell you what he was worried about?

15   A.   Um, possibly down the line maybe the cable companies

16   suing us or from possibly losing our assets one way or

17   the other.

18           THE COURT:  I'm sorry.  You've got to keep

19   your voice up.  I couldn't hear the end of it.

20   A.   Could you repeat the question, sir?

21   Q.   Yes.  I asked you what Mr. Harris told you he was

22   worried about.

23   A.   Um, he was worried about the cable companies suing

24   us, losing our assets, or for some other reason

25   unforeseen, us losing our assets, personally.

1    Q.  So you incorporated in California.  What address did

2    you use as the, um, principal business address in

3    California?

4    A.  My parents' address.

5    Q.  Is that the 11410 Mark Abba Drive, is that correct?

6    A.  That's correct.

7    Q.  Why did you use your parents' address?

8    A.  It wasn't a great decision, but our P.O. Box is --

9    you can't incorporate to a P.O. Box.

10   Q.  So TCNISO had a Post Office box in California?

11   A.  Yes, that's correct.  We had to have a physical

12   address to incorporate.

13   Q.  All right.  Let me now direct you back to Exhibit 5,

14   if you could.  And I'll put the page on the screen.  And

15   the page I want to ask you about is Page 9.  (On

16   screen.)  Again, I'll pull up a portion of it and you

17   can read it.

18        First of all, what is the -- what's the date of

19   this particular portion of the chat log?

20   A.  1-27-2005.

21   Q.  And I'm now scrolling over.  I'll read the portion

22   that's DerEngel and you can read the portion that's

23   you.

24        DerEngel:  "Now that we have a phone and an

25   address, what do we need now?  We need to incorporate."

1    A.  "I know."

2    Q.  "Okay, that's your next task.  Incorporate in

3    California.  Use the P.O. Box as our corporate

4    address."

5    A.  "Make it real, 100 percent legit."

6    Q.  "And the phone number, et cetera.  Incorporating

7    buys us free insurance, i.e., we can't be touched."

8         So in that chat log, he's -- Harris is suggesting

9    using a Post Office box as your corporate address.  Did

10   you try to do that or investigate that?

11   A.  Um, I did investigate and found out that you cannot

12   incorporate to a P.O. Box, to my knowledge.

13   Q.  And that's why you used your parents' address?

14   A.  That's correct.

15   Q.  And this, um -- um, let me now go, if we could, to

16   the bottom of that page.  And again this is -- this is

17   the same date, January 27th?

18   A.  That is correct.  It was at the same time.

19   Q.  At 12:28 a.m.?

20   A.  Yes.

21   Q.  So that's -- just to be clear, 12:28 a.m., that's

22   after midnight?

23   A.  That's correct.

24   Q.  Did you guys chat often in the middle of the night?

25   A.  Yes.

1    Q.   I'll read this, since it's the DerEngel portion.

2         "Here is how the split will happen.  51 percent

3    me, 5 percent you, 5 percent Lex, 5 percent Isa, and we

4    will leave 34 percent to be purchased publicly."

5         What did you understand this to be a discussion

6    about, what is he talking about here?

7    A.   About how the company is split apart, who is going

8    to own what portion of the company.

9    Q.   So this is essentially what the stock split up is

10   going to be?

11   A.   That's correct.

12   Q.   And I'll ask you, and we'll talk more about them

13   later, but it says "5 percent Lex," or "Lex."  Who is

14   that?

15   A.   Chris Watts.

16   Q.   Chris Watts.  And did he go by the on-line name of

17   "Lex" or "Lex," and that's L-E-X?

18   A.   That's correct.

19   Q.   "And 5 percent Isa," who is that?

20   A.   Isabella Lindquist.

21   Q.   Let me show you now Page 15 of this exhibit.

22   (Shows.)  Again, let me blow up a portion of it.  (Blows

23   up.)

24         What's the date of this chat log?

25   A.   February 25th of 2005.

1    Q.  All right.  Let me see if you can tell who is saying

2    what.  And can you read the portion that is -- and I'd

3    like you to read the portion that is not highlighted.

4         Is that the portion that was you?

5    A.  That's correct.

6    Q.  Okay.  It's hard to blow it up so that it's big

7    enough so you can see everything on the screen.

8         And so you read the portion that was you here.

9    A.  "Guess what came today from FedEX?  TCNISO's

10   official incorporation papers."

11   Q.  "Okay."

12   A.  "TCNISO, Inc. is now, 100 percent, a legal

13   corporation."

14   Q.  "Are you sure?"

15   A.  "Yup.  Just need EIN."

16   Q.  "What's EIN"?

17   A.  "EIN equals Tax-Id.  We get on Monday."

18   Q.  All right.  "EIN?"

19   A.  "Employer ID Number for taxes equals EIN.  Monday we

20   can get merchant."

21   Q.  What's "merchant," what do you understand that to

22   be?

23   A.  A merchant is a credit card processor for on-line

24   payment.

25   Q.  So this is after you had received the incorporation

1   documents, correct?

2   A.   That's correct.

3   Q.   All right.  So let me turn to -- a quick look at the

4   next page of this exhibit, that's Page 16.

5        Again, we're still on February 25th here?

6   A.   That's correct.

7   Q.   All right.  (Turns.)  And I'll read again the

8   DerEngel part of this and you can read the portion

9   that's you again.

10       Is it the DerEngel part that's in yellow and your

11  response is not highlighted, correct?

12  A.   That's correct.

13  Q.   All right.  Um, I'm sorry.  You know what?  I'm just

14  going to focus actually on this.  (Focuses.)

15       Can you read the, um, second-to-last line?

16  A.   "Well, like I said, we are, 100 percent, a legal

17  company."

18  Q.   "And then we will start on our path to becoming

19  millionaires."

20       Um, at some point did Ryan Harris move away from

21  Phoenix?

22  A.   Yes, he moved to Portland.

23  Q.   In Oregon?

24  A.   That's correct.

25  Q.   All right.  And did he move again after that to

1    California?

2    A.   Yes, he moved to San Diego.

3    Q.   When he moved to San Diego, you were already living

4    there, correct?

5    A.   That's correct.

6    Q.   Where did Ryan Harris live?

7    A.   He stayed at my parents' house.

8    Q.   How long did he live with you at your parents'

9    house?

10                   MR. McGINTY:   Your Honor, can we have dates

11   for this, please?

12                   THE COURT:   Can you try to get the approximate

13   dates.

14   Q.   Approximately when, if you can remember, did

15   Mr. Harris move in with you and your parents?

16   A.   Um, in 2005, early.

17   Q.   How long did he live there?

18   A.   Three months.

19   Q.   Um, at some point, um, when you -- did you move out

20   of your parents house after that?

21   A.   That's correct, we moved a couple of blocks away

22   into an apartment.

23   Q.   And when you say "we," who is we?

24   A.   Me and Ryan Harris.

25   Q.   And how long approximately, and if you can remember,

1    did you live with him in that apartment?

2    A.   Um, six months to a year.

3    Q.   So these were what years are we talking about now?

4    A.   2005/2006.

5    Q.   Did you guys have computers in the apartment?

6    A.   Yes, we had three.

7    Q.   And where were the three computers?

8    A.   One in my room, one in his room, and one in the

9    living room.

10   Q.   Did you have cable modems in the apartment?

11   A.   Yes.

12   Q.   How many?

13   A.   Um, we had one that I legitimately was paying for

14   and then we had one that was using a stolen MAC address

15   and uncapped, and then we had multiple for the business,

16   to sell.

17   Q.   But there were two that were working, is that right?

18   A.   That's correct, in use.

19   Q.   Okay.  The one that you said that was hacked, um,

20   what did you get from that hacked modem?  You were

21   paying for service from that modem?

22   A.   No, we were not paying for service.

23   Q.   And what were the speeds like on that modem?

24   A.   Up to 10 times faster than the paid service.

25   Q.   Who modified that modem so that it could get free

1    service?

2    A.   I did.

3    Q.   All right.  Was -- when you modified that modem, was

4    Mr. Harris there?

5    A.   Yes.

6    Q.   Did you guys talk about the fact that, um --

7    actually, let me step back.

8         What was that modem modified with, what software

9    program?

10   A.   Sigma 1.6.

11   Q.   Do you remember which versions -- you remember it

12   being the 1.6 version?

13   A.   I'm pretty sure it was 1.6.

14   Q.   Okay.  That was just a later version of that program

15   after 1.3, is that correct?

16   A.   That's correct.

17   Q.   And did you ever have a conversation with Mr. Harris

18   about -- do you remember talking about the fact that you

19   had a paid modem and an uncapped modem in the same

20   apartment?

21   A.   That's correct.

22   Q.   What do you remember him saying?

23   A.   Um, "Why should we pay for one?  We don't need to."

24   And I explained back that, "Well, we do, because if we

25   don't pay for the service, they'll come out and unhook

1    the service to the house."

2    Q.  So when you say "unhook the service to the house,"

3    what do you mean by that?

4    A.  The cable company will physically come out and

5    unplug the cable so that you can't get any form of

6    service from it.

7    Q.  So if they physically take the cable off of your

8    house, it doesn't matter what kind of modem you have,

9    you can't get service, is that right?

10   A.  That's correct.

11   Q.  Um, okay.  And so is that why you paid for one modem

12   and then had the other uncapped, the hacked one?

13   A.  Yes.

14   Q.  Now, um, during the time you were living with

15   Mr. Harris, were you working for the company TCNISO,

16   were you doing some work for the company as well?

17   A.  Yes.

18   Q.  What was, um -- what were your roles, what did you

19   do?

20   A.  I would do shipping.  I would make the products, the

21   Black Cat cables, the serial cables.  I'd preflash the

22   modems --

23   Q.  Let me first slow you down so that the Court

24   Reporter can get this down and also so I can ask you

25   about some of the things you're talking about.

A.   Okay.

Q.   So you said you would make the cables?

A.   That's correct.

Q.   All right.  And then I think you said you would "flash" the modems?

A.   That's correct, I would alter the memory of the modems.

Q.   And when you say "alter," using what software?

A.   I would load Sigma 1.6 onto them.

Q.   And what were these -- these aren't your personal modems that you were using, right?

A.   That's correct.

Q.   These were modems that you were selling -- that TCNISO was selling to people?

A.   That's correct.

Q.   All right.  So you made the cables, you flashed or modified the modems, and what else did you do for the company?

A.   I shipped the packages.  I labeled the packages, found out where they were going to.  Um, I also did various things -- sometimes occasionally I'd get lunch or I would get diet Pepsis, because we'd drink it a lot.  Um, I'd do various things around the house to help out.

Q.   Um, were you getting paid for your work for TCNISO

1    at this point?

2    A.   I was going to receive a 5 percent share, that was

3    my belief, but I was not receiving any weekly

4    compensation of any sort.

5    Q.   No salary of anything like that?

6    A.   That's correct.

7    Q.   So how -- what were you doing for money?

8    A.   I was working at a full-time job at a grocery store.

9    Q.   When did you do your work for TCNISO?

10   A.   Um, when I'd get off work and when I had my days

11   off.  My free time.

12   Q.   You testified that you were going to get a 5 percent

13   share in the company.  Did you believe that that would

14   eventually translate to money for you?

15   A.   That's correct, I did.

16   Q.   Did that ever happen?

17   A.   No.

18   Q.   Who else -- I want to ask about the other people

19   that were working at TCNISO during that time.

20        What was Ryan Harris' title at TCNISO?

21   A.   CEO.

22   Q.   Did he have another job?

23   A.   Not to my knowledge.

24   Q.   So this was a full-time job for him?

25   A.   That's correct.

1    Q.   What percentage of company's decisions, would you

2    say, that Mr. Harris made?

3    A.   Up to 100 percent.

4    Q.   Okay.  Who else worked for the company?  Are you

5    familiar with Isabella Lindquist?  You mentioned her

6    earlier.

7    A.   Yes.

8    Q.   What did she do for TCNISO?

9    A.   She was a programmer.  She made the program Sigma.

10   Q.   Where does she live?

11   A.   Kentucky, to my knowledge.

12   Q.   So she worked remotely?

13   A.   That's correct.

14   Q.   Did you ever communicate with her, talk to her in

15   any way?

16   A.   Yes, I communicated with her on MSN Messenger a few

17   times and on another program called "IRC," "Internet

18   Relay Chat."

19   Q.   Did she get paid by the company?

20   A.   Yes.

21   Q.   Do you remember -- do you know how much?

22   A.   At the minimum $500, I remember her getting paid.

23   Q.   $500 one time or was that a regular payment?

24   A.   That I can recall, just that one time.  There might

25   have been more, but that's what I can recall.

1   Q.  All right.  Other than Isabella Lindquist, was there

2   someone else who wrote software for the company?

3   A.  To my knowledge, Paul Clark and --

4   Q.  And?

5   A.  And Chris Watts.

6   Q.  Okay.  So you mentioned a Paul Clark and then a

7   Chris Watts.  Do you know what role Paul Clark played?

8   A.  I believe he was the original owner of the website

9   "TCNISO.net."

10  Q.  Before Ryan Harris?

11  A.  That's right.  To my knowledge.

12  Q.  All right.  And, Chris Watts, what did he do?

13  A.  Um, he helped program CoaxThief and I believe he

14  helped develop some of Sigma.

15  Q.  And so you said it was CoaxThief, I just want to be

16  clear for the Court Reporter?

17  A.  That's correct.

18  Q.  And Sigma as well, some portions of it?

19  A.  Not to my knowledge exactly what he did, but I know

20  that he helped program it.

21  Q.  When, um -- are you familiar with how TCNISO's

22  business worked in the sense of how people were able to

23  buy products from the company at their website?

24  A.  That's correct, on the website.

25  Q.  So and then -- was that the only way you could buy

1    this stuff, you had to go to the website, during the
2    time that you were there?
3    A.  As far as my knowledge, yes.
4    Q.  When people wanted to buy something, to buy a -- you
5    talked about how the company sold software and sold the
6    cables, correct?
7    A.  That's correct.
8    Q.  And I'm not sure you said this specifically, but you
9    talked about modifying modems.  Did the company sell the
10   modified modems as well?
11   A.  Yes.
12   Q.  So if somebody wanted to buy any of those things,
13   how did they pay -- how could they pay?
14   A.  They could pay with PayPal, credit card, or money
15   order.
16   Q.  What is "PayPal," for anyone who doesn't know?
17   A.  PayPal is an on-line merchant, they accept credit
18   cards and they allow you to transfer money from one bank
19   account to another bank account or from one PayPal
20   account to another PayPal account.
21   Q.  Did TCNISO have a PayPal account?
22   A.  Yes.
23   Q.  Whose name was that account in?
24   A.  Ryan Harris's.
25   Q.  And you said credit cards as well, people could pay

1    with a credit card?

2    A.  That's correct.

3    Q.  Did the company have a -- did it have a bank

4    account?

5    A.  Yes.

6    Q.  At what bank?

7    A.  Washington Mutual.

8    Q.  How do you know that?

9    A.  I opened it.

10   Q.  Do you remember approximately when you opened that

11   account?

12   A.  About the same time as opening the incorporation

13   papers.  I'd say 2005.

14   Q.  Whose names or name was on the account as an account

15   holder or a signatory?

16   A.  Ryan Harris's and mine.  Myself.

17   Q.  Did money from TCNISO sales of products go into --

18   what accounts did the money go into?

19   A.  The money went into the Washington Mutual account

20   and his personal PayPal account.

21   Q.  Did you take any salary or payments for yourself out

22   of any of these accounts?

23   A.  No.

24   Q.  Do you know whether Ryan Harris regularly took money

25   out of any of these accounts?

1   A.   Every single week, $400, I believe, out of his

2   PayPal and possibly sometimes out of the Washington

3   Mutual account.

4   Q.   Did you and Harris talk about what his financial

5   goals for this company were?

6   A.   We wanted to make a lot of money, but we wanted to

7   buy a house, so our goal was to make $200,000 at first.

8   Q.   When you say "we," let's say -- I'm going to set you

9   aside here.  Did Mr. Harris tell you what he wanted?

10  A.   Yes, he wanted to raise $200,000 to buy a house.

11  Q.   Okay.  So that was things he said to you?

12  A.   That's correct.

13  Q.   Let's take a look at Exhibit 5, Page 2.  I will put

14  it on the screen.  (On screen.)

15         What's the date of this chat?

16  A.   February 6th, 2005.

17  Q.   Is that January 6th?

18  A.   I'm sorry.  Yes, January 6th, 2005.

19  Q.   Okay.  Let me slide over to see if we can -- again,

20  I'll read the DerEngel part and you can read yours.

21         "Up to $390 now.  Do you think we'll top 400

22  today?"

23  A.   "Yes."

24  Q.   "We're going to be so f-ing rich in the future.

25  We're going to have our own place, our own business."

1          I'll show you now the next page.  This is Page 3

2     of the same exhibit.  And again we'll blow part of it

3     up.

4          Is this January 8th, 2005?

5     A.   That's correct.

6     Q.   Go ahead.  Why don't you read your portion.

7     A.   "We need to deposit money to Washington Mutual."

8     Q.   And that says "WAMU" there?  That's Washington

9     Mutual?

10    A.   Yes.

11    Q.   "We're going to make so much f-ing money."

12    A.   "I know."

13    Q.   "And then we're going to buy a really nice house

14    with a f-ing pool."

15         Turning to the next page, Page 4, and I'm going to

16    ask you now about the excerpts at the top part of that

17    page.

18         Again, January 8th, 2005?

19    A.   Uh-huh.

20    Q.   Is that correct?

21    A.   That's correct.

22    Q.   All right.  I'll read the DerEngel portions, you can

23    read yours.

24         "Over $900 in my PayPal now, two days."

25    A.   "Nice."

1    Q.   "Which means a pool for us."

2    A.   "Yes, it does."

3    Q.   "Let me ask you a question.  Why buy a cheap house

4    when we can afford to buy a nicer house?"

5    A.   "Hee-hee.  I don't know."

6    Q.   "We're aiming at 120K, but that's so doable."

7    A.   "Yes."

8    Q.   "Let's aim for something higher, 160 to 170."

9         Is that -- the 120K and the 160 to 170, those are

10   thousand dollars, is that right?

11   A.   100,000, yes.

12   Q.   Um, right.  So $160,000, correct?

13   A.   That's correct.

14   Q.   Thank you.

15        Turning back for a minute to the products that

16   TCNISO sold.

17        When Ryan Harris first listed modems on the

18   company's website for sale, how did he list them, what

19   did he describe them as, if you can remember?

20   A.   "Diagnostic modems."

21   Q.   Did he tell you why he was describing these things

22   as "diagnostic modems"?

23   A.   He was hoping that, in the future, that the cable

24   companies may purchase them from him.

25   Q.   So did he tell you whether he was ever actually able

1   to sell any of them to the cable companies?

2   A.   To my knowledge they never sold any to the cable

3   companies.

4   Q.   So he never told you that he sold any to the cable

5   companies?

6   A.   That's correct.

7   Q.   And during the time you were involved, did you ever

8   see records of sales of any of these modems to cable

9   companies?

10  A.   Never.

11  Q.   Okay.  So that's when you were first listed as

12  "diagnostic modems."  Did that change the way they were

13  listed over time?

14  A.   Yes.

15  Q.   And then how were they listed later on?

16  A.   Just as "preloaded cable modems with Sigma" or

17  "cable modems for sale."

18  Q.   Um, did you ever have conversations with Mr. Harris

19  about his -- about what if any goals he had about doing

20  business or getting paid by the cable companies?

21  A.   He was hoping that one day maybe the cable companies

22  would buy out the company or basically so we would make

23  a bunch of money right up front.

24  Q.   What did he tell you was his hope that they would

25  buy it for, why did he believe that the cable companies

1    might buy it?

2    A.  He believed that they'd buy it from him because we

3    could be damaging their -- basically by using the cable

4    modems we were able to, um, obtain free internet

5    service, higher speeds, and that cost the cable

6    companies a lot of money, and if we get bought out, then

7    we're paid.  It's like a bribe.

8    Q.  So was the suggestion that cable companies might

9    want to pay TCNISO to essentially buy it and shut it

10   down?

11   A.  That's correct.

12   Q.  Um, okay.  When you talked about different versions

13   of -- there being different versions of the Sigma

14   software program, is that right?

15   A.  Yes.

16   Q.  And you mentioned, I think, Sigma 1.3 and then you

17   mentioned Sigma 1.6 as a later version, is that right?

18   A.  That's correct.

19   Q.  Okay.  Did Ryan Harris tell you what that program,

20   the Sigma 1.6, was designed to do, what was the

21   advantage of it?

22   A.  One of the bigger advantages is it became DOCSIS 1.1

23   friendly.  It also --

24   Q.  Let me stop you right there.

25   A.  I'm sorry.

1  Q.  You said, first of all, "DOCSIS."  How is that

2  spelled?

3  A.  D-O-C-S-I-S.

4  Q.  Okay.  And then I think you said "DOCSIS 1.1

5  friendly."  What does that mean?

6  A.  It was, um -- DOCSIS is like a type of software that

7  the cable modems companies use for the cable modems.

8  Q.  All right.  So you said then that it was "DOCSIS 1.1

9  friendly."  What did you mean by that?

10 A.  It made the cable modem easier to hack, uncap, and,

11 um, get free service.  It also -- Sigma 1.6 also enabled

12 you to have -- it was easier to change the MAC address

13 on the cable modem to enable you to get internet

14 access.

15 Q.  So it was easier than the earlier versions of Sigma?

16 A.  It was much easier.  It was embedded into it.

17 Q.  So the function of MAC address changing was built

18 right into the program, is that what you're saying?

19 A.  That's correct.

20 Q.  Um, and were there any other -- did the Sigma 1.6

21 have a sniffer capability in it?

22 A.  Yes.

23 Q.  So that then -- what did that allow you to do?

24 A.  It allows you to send out the MAC addresses on your

25 local network within your area.

1    Q.   Was this the program you mentioned earlier called
2    CoaxThief?
3    A.   Yes.
4    Q.   How -- you described what it did, that it allowed
5    you to sniff other MAC addresses.  How did you learn
6    that?
7    A.   I learned it through Chris Watts and Ryan Harris.
8    Q.   Are you familiar with something called "Stealth
9    Mode"?
10   A.   Yes.
11   Q.   What -- was that a feature of Sigma 1.6?
12   A.   Yes, I believe so.
13   Q.   What was "Stealth Mode"?
14   A.   Stealth Mode enabled you to be on the internet
15   provider's network without being seen.
16   Q.   Why -- what would be the purpose of that?
17   A.   If you're not being seen, then they can't find you
18   stealing cable, internet or obtaining high speeds.
19   Q.   So you talked about the software products, the 1.6
20   Sigma being the later version of the Sigma program, and
21   you testified earlier that the company also sold modems,
22   modified modems as well?
23   A.   That's correct.
24   Q.   The modems that it sold to people, how did -- how
25   did you get them?

1   A.   Um, we purchased them from various companies, um, we

2   also purchased them from eBay, anywhere we could find

3   them.

4   Q.   When you say "we," who bought those modems?

5   A.   Me and Ryan Harris.

6   Q.   What did you pay for the modems?

7   A.   Ranging anywhere from 15 to 60 dollars.

8   Q.   So you ordered these modems and they got shipped to

9   where?

10  A.   To the apartment we lived at, me and Ryan Harris's

11  apartment.

12  Q.   What did you do with them once you got them?

13  A.   Um, we modified them and sold them to the customers.

14  Q.   Who modified them?

15  A.   Me and Ryan Harris.

16  Q.   When you sold them, um, did you sell them for the

17  same thing you bought them for, less, more, what?

18  A.   We sold them at $100 apiece.  Up to $100 apiece.

19  Q.   So the sales prices vary, but --

20  A.   Depending on the modem type.

21  Q.   Were they more than what you paid for them

22  initially?

23  A.   Always.

24  Q.   Let's take a look at Exhibit 5, Page 7.  And I'll

25  show that on the screen.  (On screen.)  I'll focus you

1    on the excerpts on the bottom of that page now.

2         This is January 25th, 2005?

3    A.  Yes.

4    Q.  All right.  And here the -- I'll read the DerEngel

5    portions of this chat.

6         Is it fair to say that your portions that are not

7    highlighted are unrelated to what he's saying right

8    here?

9    A.  (Reads.)  That's correct.

10   Q.  Okay.  Does that happen sometimes in chats that

11   people are typing essentially at the same time and so

12   what one person says doesn't necessarily coincide with

13   what the other person is saying?

14   A.  That's correct.

15   Q.  Okay.  All right.

16        So DerEngel:  "We're going to be selling SB-5100

17   modems with Black Cat for 99.99."

18        Is that the hundred dollars you were talking

19   about?

20   A.  Yes.

21   Q.  And then let's take a look at the next page.  And I

22   want to ask you -- first of all, this is still January

23   25th.  The time is 12:29.

24        Is this the continuation of that discussion?

25   A.  That's correct.

1  Q.  All right.  Now you read your portion here.

2  A.  "Nice.  Good profit."

3  Q.  "So you got them at what price?"

4  A.  "SB-3100s for 18 dollars each.  SB-5100s for 30

5  dollars each."

6  Q.  "Tight."

7       So that's an example of the prices that you bought

8  these modems at?

9  A.  Yes, that's an example.

10  Q.  Did you ever sell -- do you ever remember selling

11  any of the modems you got unmodified, just in the same

12  state that you bought them, um, to people?

13  A.  Not that I can recall.

14  Q.  Were, um -- did the website list, among the products

15  TCNISO was offering, these unmodified original-state

16  modems?

17  A.  Yes, that I can recall.

18  Q.  And you do remember them being listed on the

19  website?

20  A.  Yes.

21  Q.  And what was the purpose of having them listed that

22  way on the website?

23  A.  So that people would feel comfortable buying them

24  maybe either/or or if they wanted to modify it

25  themselves.

1    Q.   But you don't remember actually selling any that

2    weren't modified?

3    A.   Not that I can recall at all.

4    Q.   So when you sold the modems to people, um, who was

5    it who then shipped them out?

6    A.   Me or Ryan Harris.

7    Q.   How did you know what you were supposed to send and

8    to whom, how did figure that out?

9    A.   The website had a program built into it that sent it

10   to our computer in the living room and it would tell us

11   where the orders were going to, who bought what, and

12   then it would print a shipping label, would create the

13   box, and we'd put it in the box and ship it to that

14   customer.

15   Q.   So TCNISO had some kind of records, business records

16   essentially, that showed that information, the customer,

17   what they bought, where they lived?

18   A.   That's correct.

19   Q.   Take a look, if you could, at -- actually, I'll show

20   it to you.   At Exhibit 5, Page 10.   Let me blow this

21   up.   (Blows up.)   Okay.   This is February 9th.

22        This is a part of the chat log from February 9th,

23   2005?

24   A.   That's correct.

25   Q.   Can you read your portion.

1    A.  "Are you busy?"

2    Q.  "Somewhat.  I'm getting orders ready to ship today.

3    We're at like 7 to 10 orders shipping --"

4    A.  "Okay."

5    Q.  "-- per day."

6         So at this point, as of February of 2005, is that

7    a discussion about sort of what the volume of orders

8    was, 7 to 10 per day?

9    A.  Yes.

10   Q.  Did it go up from there?

11   A.  Um, on average some days there would be more and

12   some days there would be zero.

13             THE COURT:  Mr. Bookbinder, about how much

14   longer do you think you have with this witness?

15             MR. BOOKBINDER:  Um, wait a second, your

16   Honor.

17             THE COURT:  Well --

18             MR. BOOKBINDER:  About 20 minutes to a half

19   hour.

20             THE COURT:  Okay.  Well, when you're at or

21   getting to a convenient breaking point, I'm going to

22   excuse the jury so we can talk about tomorrow.

23             MR. BOOKBINDER:  Yes, your Honor.  This is a

24   good spot.

25             THE COURT:  All right.  Ladies and gentlemen,

1    I'm going to excuse you now.  You did a great job, you

2    were all here at 9:00 this morning, and we were working

3    so things would go smoothly and they've gone pretty

4    smoothly as these things go.  So please come back again

5    at 9:00 tomorrow, um, we'll start as soon as you're all

6    here or as soon after that as I can deal with whatever I

7    need to deal with.

8         It's very important that you continue to keep an

9    open mind, that you don't discuss the case among

10   yourselves or with anybody else.  Don't read or watch or

11   listen to anything about the case.  If there's something

12   in the media, as I said, if it's in the newspaper, turn

13   the page, if it's on the radio, turn it off, change the

14   station.  And, of course, don't talk about the evidence

15   you're hearing with anybody else or communicate on the

16   internet about it.

17        The Court will be in recess for the jury.

18        And you should leave your notebooks right on your

19   seat and you'll get them back tomorrow.

20             (Jury leaves, 12:55 p.m.)

21             THE COURT:  You may be seated.

22        All right.  And you're excused until 9:00 tomorrow

23   morning.  You can go, thanks.

24             (Witness leaves.)

25             THE COURT:  All right.  We discussed this this

```
 1    morning.  You're going to continue to work on the
 2    stipulations and submit them tomorrow, hopefully.  After
 3    Mr. Phillips the witness will be Mr. Kohler and there
 4    are no remaining issues for me to rule on or there are
 5    no issues for me to rule on with regard to Mr. Kohler.
 6         When it comes time for Lindquist or at the 11:00
 7    break, in any event, I'll ask her if she intends to
 8    assert her rights and deal with the immunity order.  I
 9    had ruled that part of Exhibit 6 was admissible and part
10    of it was to be redacted, I believe.
11         Has that been done?
12              MR. BOOKBINDER:  Yes, your Honor.
13              THE COURT:  All right.  Do you expect we'll
14    get past Lindquist tomorrow?
15              MR. BOOKBINDER:  I sort of doubt it, your
16    Honor.
17              THE COURT:  Who is after Lindquist?
18              MR. BOOKBINDER:  After Lindquist is Benjamin
19    Brodfuehrer.  He's an employee of Charter
20    Communications.
21              THE COURT:  Okay.  And are there -- I just
22    have to go in my notes.  Are there objections to his
23    testimony?
24              MR. BOOKBINDER:  I don't know.
25              THE COURT:  Okay.  Actually, I've got it right
```

1    here.  The document seems to have fallen out of my

2    file.  (Looks.)  Well, I'll check now.  Your objections

3    to 8 and 9 are based on relevance and Rule 403.  So I'll

4    look at those.

5         And then the witness after that is Larosa and

6    there are no objections at this time to Exhibit 15.

7         Okay?  Is there anything else we should discuss?

8              MR. BOOKBINDER:  Your Honor, just a mechanical

9    matter about Chris Kohler, the Motorola witness.  We

10   have prepared, and we've given it sometime ago to

11   Mr. McGinty, but two chalks we want to use with him for

12   him to just explain how internet, cable internet access

13   works and how cable modem hacking works, and what we're

14   hoping to do is --

15             THE COURT:  Are those the chalks that were

16   marked earlier today as Exhibit C?

17             MR. BOOKBINDER:  Yes.

18             THE COURT:  Could I see them?  These?

19             MR. BOOKBINDER:  They are, your Honor.  And

20   we've got them on poster boards, like for the opening,

21   and what we were hoping and what we thought might be

22   easiest is if we could put them just on an easel here

23   and just have him step down and point to things.

24             THE COURT:  That's fine.  That's fine.

25             Okay?  All right.  I'll see you at 9:00

```
 1   tomorrow morning and we will continue.

 2        The Court is in recess.

 3             (Adjourned, 1:00 p.m.)

 4

 5             C E R T I F I C A T E

 6

 7        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 8   hereby certify that the forgoing transcript of the

 9   record is a true and accurate transcription of my

10   stenographic notes, before Chief Judge Mark L. Wolf, on

11   Wednesday, February 22, 2012, to the best of my skill

12   and ability.

13

14

15   /s/ Richard H. Romanow 11-06-12
     _____
16   RICHARD H. ROMANOW  Date

17

18

19

20

21

22

23

24

25
```