1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              No. 1:09-cr-10243-MLW

4

5     UNITED STATES OF AMERICA

6

7     vs.

8

9     RYAN HARRIS

10

11                         *********

12

13                    For Jury Trial Before:
                      Chief Judge Mark L. Wolf
14

15

16                    United States District Court
                      District of Massachusetts (Boston.)
17                    One Courthouse Way
                      Boston, Massachusetts 02210
18                    Friday, February 24, 2012

19

20                         ********

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
24                bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    ADAM J. BOOKBINDER, ESQ.
          United States Attorney's Office
 4        John Joseph Moakley Federal Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts 02210
          (617) 748-3112
 6        E-mail: Adam.bookbinder@usdoj.gov
     and
 7    MONA SEDKY, ESQ.
          U.S. Department of Justice
 8        601 D. Street, N.W.
          Washington, D.C. 20530
 9        (202) 353-4304
          Email: Mona.sedky@usdoj.gov
10        For the United States of America

11

12    CHARLES P. McGINTY, ESQ.
          Federal Public Defender Office
13        District of Massachusetts
          51 Sleeper Street, 5th Floor
14        Boston, Massachusetts 02210
          (617) 223-8080
15        E-mail: Charles_mcginty@fd.org
          For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

4

    ISABELLA LINDQUIST (Continued.)
5
       By Ms. Sedky:        16              70
6
       By Mr. McGinty:           53                    72
7

8   BENJAMIN BRODFUEHRER

9      By Ms. Sedky:        72

10     By Mr. McGinty:           116

11

    WILLIAM MADEIRA
12
       By Mr. Bookbinder: 134           150
13
       By Mr. McGinty:           141
14

15  JOSE LAROSA

16     By Ms. Sedky:       153

17     By Mr. McGinty:           165

18

19                    E X H I B I T S

20
       EXHIBIT 8.............................. 103
21
       EXHIBIT 15............................. 156
22
       EXHIBIT 33............................. 152
23
       EXHIBIT 62............................. 32
24

25
```

```
 1                 P R O C E E D I N G S
 2              (Begins 9:00 a.m.)
 3              THE COURT:  Good morning.  Would counsel
 4     please identify themselves for the record.
 5              MR. BOOKBINDER:  Yes, your Honor.  Good
 6     morning.  Adam Bookbinder and Mona Sedky for the United
 7     States.
 8              MR. McGINTY:  And Charles McGinty and
 9     Christine Demaso for Mr. Harris, who is here at counsel
10     table.  Good morning, your Honor.
11              THE COURT:  Good morning.
12         Since I saw you yesterday, I received, I believe
13     electronically, your stipulations, but the version I
14     have is not signed by Mr. Harris.
15              MR. McGINTY:  He can sign this one, your
16     Honor.
17              THE COURT:  Okay.
18              (Defendant signs paper.)
19              THE COURT:  I think I've also received a
20     revised Exhibit 5, is that correct?
21              MR. BOOKBINDER:  Yes, your Honor, you should
22     have -- well, that may be Exhibit 5, and we've given,
23     um, Mr. Hohler, as well, copies, and I think in a binder
24     clip are copies of all of the exhibits that have
25     highlighting in them.  We've removed now the only one
```

 1   that's in evidence already.  It's Exhibit 5.

 2           THE COURT:  Okay.  So I'll replace those.

 3       Then we're going to continue with the Lindquist

 4   testimony.

 5       Does the government intend to try to get in,

 6   through Lindquist or anybody else, any DShocker, who I

 7   understand to be Hanshaw, statements under

 8   ***Petrozziello***?  He's not on the ***Petrozziello*** list.

 9           MS. SEDKY:  We do not, your Honor.

10           THE COURT:  All right.  But it's still the

11   government's contention that he's an unindicted

12   co-conspirator?

13           MS. SEDKY:  Yes.

14           THE COURT:  And then with regard to

15   Brodfuehrer, am I correct that the only objection is to

16   the video clips, Exhibit 8?

17           MR. McGINTY:  That's correct, your Honor.

18           THE COURT:  All right.  And has the government

19   revised Exhibit 8 -- revised Exhibit 8 so it only has

20   the clip you want to play?

21           MR. BOOKBINDER:  It does, your Honor, yes.

22           THE COURT:  And what is the objection?  I've

23   looked at least part of this, but my clerk's looked at

24   all of them.

25           MR. McGINTY:  Your Honor, the objection is to

 1    relevance, part of it is foundation.

 2              THE COURT:  Actually, remind me what Exhibit 8

 3    is.

 4              MR. McGINTY:  Exhibit 8 are clips --

 5              THE COURT:  Maybe the government should tell

 6    me.

 7              MR. McGINTY:  Certainly.

 8              MS. SEDKY:  The witness who is going to be

 9    introducing Exhibit 8 is a witness from Charter

10    Communications, I believe one of the internet services

11    providers, and what he did, in the course of his

12    investigation, is he tested himself, Sigma X, and what

13    he did was there is a software program that's commonly

14    available that will videotape what your screen is

15    showing at any time and it creates a video file.  So

16    what he did was he did three different -- he videotaped

17    three parts of using Sigma X as if he were a buyer and

18    user of the product.

19         So the first clip he runs the sniffer program and

20    he runs it live on his laboratory machine and he's

21    videotaping it with a software program in his computer

22    and he'll testify about how he did this, and then he

23    saved it to a file and he gave it to us.

24         The second clip is where he then takes one of the

25    MAC addresses that he got from the sniffer and he inputs

1    it into Sigma X, and then he tests it before he puts --

2    with the old MAC address, and we'll show that it doesn't

3    work, he can't get on-line, and then he changes it to

4    the new MAC address that comes from the first clip, the

5    sniffer, and it will show graphically that he gets on

6    with it.

7         And the third clip is the config changer feature

8    of Sigma X and that sort of goes to the uncapping.  And

9    what he does there is he runs a commercially-available

10   speed test -- and he'll talk about what a speed test is,

11   how it can test your modem speed, and he runs it before

12   he changes the config file, and you see the results, and

13   then he changes the config file using Sigma and he

14   reruns the speed test, and it shows the new results.

15              THE COURT:  Which are much faster?

16              MS. SEDKY:  Much faster.

17              THE COURT:  Okay.  And what's the relevance?

18              MS. SEDKY:  Well, they show that the product

19   works and they show the user's experience and how easy

20   it is and they go to the core functionality of these

21   products.  And we believe they would be a very valuable

22   aid to the jury, who's heard a lot of oral testimony

23   about these rather obscure products that they've

24   probably never seen before, and we think it would be

25   very helpful for them to understand how the product

1    actually looks in practice.

2            THE COURT:  And this is something that

3    Mr. Brodfuehrer actually did, he's going to testify

4    that, "I did this and I did that and this is going to"

5    -- and, you know, "and this is what came up?"

6            MS. SEDKY:  Yes.

7            THE COURT:  Okay.  Mr. McGinty.

8            MR. McGINTY:  Your Honor, by a report dated

9    February 22nd, 2012, um, we had disclosure of Charter

10   obtaining the cloned modems that it tested from

11   purchases from the TCN website or from cloned cable

12   modems that were obtained in the field.  Charter

13   purchased the cable modem from the TCN website and

14   obtained a cable modem which had Black Cat loaded onto

15   it from the field.  So --

16           THE COURT:  "From the field" means what?

17           MR. McGINTY:  Meaning whatever the field might

18   be.  I --

19           THE COURT:  From the black market or --

20           MR. McGINTY:  It could well be black market,

21   some capture they made, um, maybe a purchase off of

22   Craig's list or wherever it is that one gets random

23   items for sale.

24        So the issue is what is the thing?  And, as I

25   understand it, these were not tests that were done on an

1    actual cable node or modem node or a cable node

2    connected to a CMTS, um, this was done within a

3    laboratory where one or another or both of these items

4    was used.  And obviously there's a problem if what we're

5    doing is we're testing something which came from

6    somewhere other than TCNISO.

7              THE COURT:  Well, I think there's two things.

8    I'll have to listen to the foundation, but to the extent

9    Mr. Brodfeurher's going to testify that, "I purchased

10   this from TCNISO's website and I ran it and this is what

11   happened," um, then that's admissible.  To the extent he

12   testifies, "I bought it someplace else," I'll listen to

13   the foundation, what, you know, is the evidence from

14   which the jury could find that the defendant's company,

15   you know, put this in the stream of commerce.  And if

16   I'm satisfied that the jury could find, by a

17   preponderance, that this product originated at TCNISO, I

18   expect I will admit it, and I will instruct the jury

19   with regard to the experts generally, but any evidence,

20   particularly, but with regard to the experts -- well,

21   they have to -- they're going to -- you know, if they

22   find that it's proven that this came in this form from

23   TCNISO, you know, then they should consider the

24   evidence.  If they're not persuaded that that's where it

25   came from, originated, um, then they shouldn't rely on

```
 1    it.  And if you ask me or remind me, I'll give that kind
 2    of preliminary instruction where it's appropriate.
 3         But, generally speaking, um, this is relevant to,
 4    among other things, demonstrating the alleged capacity
 5    of the devices or software and making it comprehensible
 6    with a proper foundation, Rule 403, doesn't operate to
 7    exclude it.
 8         So then we hope to get to Larosa.  As I understand
 9    it, there's no objection to the one exhibit that's
10    anticipated, Exhibit 15, the Black Cat CD-ROM.
11         Is there a foreseeable objection to any of his
12    testimony, particularly concerning the forum, is he
13    going to testify about what he saw on a forum or more
14    than one forum?  Is there any objection?
15              MR. McGINTY:  Um, if he's testifying about the
16    forum, then I would object.
17              MS. SEDKY:  He will not be testifying about
18    the forum, your Honor.
19              THE COURT:  All right.
20              MS. SEDKY:  He'll testify that he went to the
21    website and that's where he bought his series of
22    products.  But that's it.
23              THE COURT:  Okay.
24         All right.  But while we're at it, Madeira, um,
25    there are no exhibits.  He's going to testify that he
```

1    purchased and used TCNISO products.

2         Are you going to be asking him about any forum?

3              MR. BOOKBINDER:  Your Honor, he'll say that he

4    got information from the website about how to use the

5    products, but he's not going to -- again, he isn't going

6    to be talking about, um, posts on the forums.  But I

7    think that information is likely out of the tutorials or

8    things like that.

9              THE COURT:  I'm sorry.  What's the end of

10   that?

11             MR. BOOKBINDER:  The tutorials.

12             THE COURT:  What about them?

13             MR. BOOKBINDER:  That's the information that

14   he used to tell him how to run the product rather than

15   forum posts.

16             THE COURT:  All right.

17        Is there going to be an objection to that,

18   Mr. McGinty?

19             MR. McGINTY:  I'd have to see what the

20   specific testimony is.

21             THE COURT:  All right.  But it's not the

22   forum.

23        And how about Hanshaw, does the stipulation take

24   care of the previous objections to Exhibits 11 and 12?

25             MR. McGINTY:  It does.

1          THE COURT:  And are there any remaining

2     objections to the Hanshaw exhibits?

3          MR. McGINTY:  There are not, your Honor.  I

4     think we stipulated that those are admissible.

5          THE COURT:  All right.

6          MR. BOOKBINDER:  Your Honor, one issue with

7     Hanshaw that you raised earlier, um, while we don't

8     intend to elicit from Isabella Lindquist or any other

9     witness other than Mr. Hanshaw his statements, we will

10    be asking him about things that he posted on forums or

11    said in this Pound Surfboard chatroom about, for

12    example, looking for MAC addresses.  Um, so I suppose

13    that those might well fall under the -- that they can be

14    admissible as co-conspirator statements.  And to that

15    extent --

16         THE COURT:  Well, this -- and there's a reason

17    I flagged it, and we're not going to get to him today,

18    but -- well, is Hanshaw "DShocker"?

19         MR. BOOKBINDER:  Yes.

20         THE COURT:  All right.  Because Phillips

21    testified, if I remember right, in essence that

22    Mr. Harris said "DShocker is an idiot, don't have

23    anything to do with him," and Ms. Lindquist --

24         How are you going to prove -- there has to be a

25    meeting of the minds.  Um, maybe Hanshaw wanted to be in

1    on the business and in the alleged conspiracy and maybe

2    Mr. Harris didn't want to agree with him.

3            MR. BOOKBINDER:  Your Honor, what it -- I

4    think the evidence would be, and I think Ms. Lindquist,

5    I believe, testified about it yesterday, is that, um, he

6    was a frequent and constant presence on the website and

7    in the forums, that he was banned at times, that he came

8    back, that he was involved and he was boasting that he

9    was helping people use the products, and he'll testify

10   in more depth about that, and that I don't think there's

11   much question that he and Mr. Harris had a contentious

12   relationship at times for sure.  But just because they

13   weren't friendly and because there were times when

14   Mr. Harris said, "I don't want you to have anything to

15   do with the guy," um, where you've got someone who is a

16   constant presence in your company, for example, on your

17   website, helping people use the products, um, where he's

18   communicating regularly with the other core

19   co-conspirators, Ms. Lindquist and Mr. Phillips, um,

20   we'd suggest that all of that makes him a --

21           THE COURT:  Well, this goes to the issue of

22   multiple conspiracies, it goes to an issue that rarely

23   comes up -- I can't remember it ever coming up, that he

24   has to have made the statement at a time when he was a

25   member of the conspiracy.  I think conceivably one can

1    come in and out.  But all I'll say for present purposes

2    is, one, I have a concern that --

3         Hanshaw is not on your **Petrozziello** list?

4    (Silence.)  He's not.  He's not.  It doesn't mean that

5    it's fluid and you're bound to it, necessarily, but it's

6    not necessary -- you shouldn't assume that I would even

7    conditionally admit his testimony.  You're going to have

8    to meet the requirements, that he was a co-conspirator

9    -- he was a co-conspirator at this moment, you know,

10   when he was making it, um, and we're going to end the

11   evidence probably Tuesday and then I'm going to get a

12   Rule 29 motion.  And ordinarily I would say, "I'll

13   listen to the closing arguments, I won't rule on it,"

14   but, you know, I've been asking questions since we first

15   got into this substantively in December and how are you

16   going to prove the conspiracy?  And I'm listening.  I've

17   got an open mind.  But you may not, you may not have

18   enough for Rule 29 purposes.

19        I assume you're planning to make a Rule 29 motion,

20   Mr. McGinty?

21             MR. McGINTY:  Well, I tried to make a motion

22   to dismiss prior to trial anticipating this very issue,

23   so, yes, I would --

24             THE COURT:  Yeah, and I think you should be,

25   you know, prepared to present it and argue it on Tuesday

```
 1    when the evidence ends, um, because if I'm going to
 2    grant it, it's going to have a profound effect on the
 3    closing arguments.
 4              MR. BOOKBINDER:  Your Honor, we wouldn't be
 5    seeking to introduce the Hanshaw statements
 6    conditionally.  I think at that point I think that the
 7    Court will have all the evidence it needs to make a
 8    ruling.  So either -- so I assume the Court will either
 9    -- either the Court will admit them or will not admit
10    them.  But I don't think there will be a conditional
11    admission issue presented.
12              THE COURT:  And I see that this is still in
13    Westlaw, I think I'll put it in the federal supplement,
14    and I think you should remind me, but I wrote in detail
15    -- and I'll give you the cite later, but in August of
16    last year I wrote in detail on the Rule 29 standard in
17    *DiMasi,* and, unlike the jury, I keep an open mind, but,
18    um, I continue to have questions about the conspiracy
19    charges.
20         All right?  Is there anything else before we get
21    Ms. Lindquist and the jurors?
22              MR. BOOKBINDER:  No, your Honor.
23              THE COURT:  Then let's put Ms. Lindquist on
24    the stand and bring in the jurors.
25              (Ms. Lindquist takes the stand.)
```

```
 1                    (Jury enters, 9:20 a.m.)
 2                    THE COURT:  Ladies and gentlemen, good
 3      morning.  You've maintained your streak of getting here
 4      at 9:00, all 12 of you, and that's great.  I've been
 5      working with the lawyers on issues that might come up
 6      today, and I don't want to jinx us, but so far things
 7      have been going very smoothly.  I want to keep the
 8      witness in the jury box and I've been working to try to
 9      sustain that.
10           Ms. Lindquist, do you understand that you're still
11      under oath?
12                    THE WITNESS:  Yes.
13                    THE COURT:  All right.  You may resume.
14
15      DIRECT EXAMINATION BY MS. SEDKY:  (Continued.)
16      Q.  And I just want to refresh everyone's recollection
17      of where we left off yesterday.  I think you were
18      talking about actually programming the MAC changer that
19      Mr. Harris had asked you to program?
20      A.  Yes.
21      Q.  And I think my last question, and I'm not sure if I
22      got to it yesterday, but what was that product called?
23      A.  Um, I believe the first product you named was called
24      "Sigma 1.0," I believe.
25      Q.  And what did you do with that Sigma, did you give it
```

1    to anyone?

2    A.  Yeah, well, after I wrote it, I, um, gave copies of

3    it to DerEngel.

4              THE COURT:  I'm sorry.  To who?

5              THE WITNESS:  To DerEngel.

6    Q.  And when you gave it to him, did you place any types

7    of limitations on the use or how did you -- well, what

8    kind of information did you convey?

9    A.  Well, we had agreed to, um, not release the actual

10   MAC-changing features to the public right away.  What we

11   -- we had two versions of it, actually, one version that

12   didn't have that feature and one version that did.

13   Q.  And notwithstanding that understanding, did

14   Mr. Harris eventually release Sigma with the MAC-changer

15   to the public?

16   A.  Yes.

17   Q.  And do you recall what that product was called?

18   A.  I believe that was Sigma 1.3.

19   Q.  So for Sigma 1.3 -- I'm going to just refer to that

20   as "Sigma" or "Sigma 1.3" in case I forget.  But from

21   here on out, assume that my questions, when I say

22   "Sigma," I'm talking about Sigma 1.3 and beyond.

23   A.  Uh-huh.

24   Q.  Could you describe what the core functions were of

25   Sigma?

1    A.  Well, the original, um, Sigma had a lot of

2    functions.  There was a feature, of course, to, um,

3    change the MAC address, there was another feature that

4    allowed you to specify what configuration file and where

5    to download it from, um, and I believe there was also a

6    feature to change the serial number code.

7    Q.  And when you were talking about the configuration

8    file specifier, does that mean that you could change the

9    configuration file?

10   A.  Yes, you could specify what the configuration could

11   be, whatever you wanted.

12   Q.  And what was the purpose of that?

13   A.  Well, the configuration file, um, tells the modem,

14   um, what settings to use, for instance, you know, um,

15   what IP address to have, what speeds to use, all that

16   type of stuff.

17   Q.  And does it play any role in the uncapping that you

18   were talking about yesterday?

19   A.  Yes.

20   Q.  What role is that?

21   A.  Um, well, as I said, the configuration file, among

22   other things, contains the upload and download speeds

23   that the modem is supposed to restrict itself to.

24   Q.  And you talked about a serial number changer.  What

25   is that?

A.  Um, it's just a -- kind of like the MAC changer, it
was just a feature that allowed you to type in the -- to
change the serial number that was programmed into a
modem at the factory.

Q.  At the time that Sigma was initially released to the
public, was it a standalone software program or did it
come preloaded onto a modem?  What was the plan?

A.  Um, the original version was what we call a
"software patch," which was just basically a little bit
of code that would modify the actual file itself.  So in
other words, like the original firmware that went on the
modem, um, you would take a copy of that and then apply
this patch to that and it would change the file to be,
um -- to have those features.

Q.  When you say "original firmware," what do you mean?

A.  Um, well, whatever firmware was flashed onto, um, at
the factory.  Um, firmware is kind of like software.

Q.  So if it were a Motorola-brand modem, let's say,
what would the firmware be in that instance?

A.  Well, usually they would use, um -- I think they're
only a proprietary-kind of operating system and that's,
you know, kind of the firmware is the operating system
that controlled everything.

Q.  So Sigma was a patch onto Motorola's proprietary
software?

1    A.   Yes.

2    Q.   And did they eventually preload the Sigma onto

3    refurbished modems?

4    A.   Yes.

5    Q.   And can you tell us what if any concerns you had

6    when DerEngel released Sigma to the public?

7    A.   Well, at first there was a little bit of concern

8    about, um, you know, having it out there, but then once

9    the MAC-changer got released, I was kind of concerned

10   that that may, um, cause some problems with the cable

11   company and then that would make them kind of angry at

12   us.

13   Q.   And what do you mean by "cause some problems," can

14   you be more specific for us?

15   A.   Well, among other things, you know, um, it could

16   possibly disrupt the network if someone was using an IP

17   address that was -- not an IP address, but a MAC address

18   that was assigned to another modem, um, it was on their

19   same kind of system, and that could cause some

20   problems.  And also it could cause some problems because

21   people could use modems without actually having to, you

22   know, sign up for them.

23   Q.   "Sign up" meaning pay?

24   A.   Yes.

25   Q.   And what if anything did you tell DerEngel about

1    your concerns?

2    A.   Well, I just, I guess, expressed that I really

3    didn't want to release that widespread to the public, at

4    least not the MAC-changer, and that's pretty much it.

5    Q.   How did TCNISO's customers actually end up using

6    Sigma with the MAC-changer?

7              MR. McGINTY:   Objection.

8    Q.   If you know.

9              THE COURT:   Yeah.   Sustained.   You're going to

10   have to lay a foundation as to how she has personal

11   knowledge of that.

12   Q.   Based on your experience working with TCNISO and

13   your experience with cable modem hacking, do you have a

14   sense of how people were using Sigma?

15             MR. McGINTY:   Objection.

16             THE COURT:   Sustained.   I mean, you're going

17   to have to lay a foundation that establishes personal

18   knowledge.   She's not called as an expert.   You need to

19   break it down because it's conceivable that there would

20   be some evidence on --

21             MR. McGINTY:   Objection.

22             THE COURT:   Here, I'll see you at sidebar.

23

24             AT THE SIDEBAR

25             THE COURT:   Okay.   The question is -- I think

1    the question is, "How did people use Sigma?"  Right?

2              MS. SEDKY:  She said she knows it, but I don't

3    know that I can ask her about the process.

4              THE COURT:  Well, this is what I've been going

5    through before the jurors came in, whether you wanted

6    any ruling or any more rulings on the posts.

7              MS. SEDKY:  Well, I'm trying to get her to say

8    she knows how it's used from being part of the company,

9    but as to that specific message --

10             THE COURT:  Well, that's worse, not better.

11   How is he going to cross-examine her unless he tests the

12   basis of her knowledge?  You would have to get it in

13   through co-conspirator hearsay or something like that.

14             MS. SEDKY:  Well, it establishes her

15   knowledge.  I mean, the posts, the fact that people were

16   describing what they were doing and that's how she forms

17   her knowledge.

18             THE COURT:  Her knowledge is only --

19             MS. SEDKY:  -- what she's reading.

20             THE COURT:  And it may not be true.  It could

21   be that -- you're offering it for the truth of whether

22   people are using it to steal service and that's hearsay

23   and unless it comes in under 801(d)(2)(A)or (E), it's

24   for the truth.

25             MS. SEDKY:  I could her ask about --

1          (Interruption by Court Reporter.)

2          THE COURT:  Here, Mr. McGinty, let her go in

3     front.

4          (Ms. Sedky steps forward.)

5          MS. SEDKY:  I could ask her what she read

6     about, what people told her they were doing.

7          THE COURT:  It's for the truth.

8          MS. SEDKY:  It goes to what she's read.

9          THE COURT:  I know it goes to what she's read,

10    but what's that relevant to?

11         MS. SEDKY:  Only what her belief is, what

12    she's been informed of, what people have told her.  She

13    can testify to what people told her.

14         THE COURT:  She's capable of testifying to

15    that, but what is the relevance of it, and if it's

16    relevant, what rule makes it admissible?

17         MS. SEDKY:  Her state of mind and her

18    knowledge of what people were saying they were doing is

19    relevant.

20         THE COURT:  To whether she's a

21    co-conspirator?

22         MS. SEDKY:  Yes.

23         THE COURT:  Look, what I -- I suspect that

24    there's somewhat more direct evidence than that.

25         MS. SEDKY:  If she has -- that everybody out

1   there is posting -- that if she has a widespread belief

2   that everybody who is using this product is using it to

3   steal service, that goes to her intent and her

4   participation in the conspiracy about what she thinks

5   people are doing.

6           THE COURT:  What's your response to that?

7           MR. McGINTY:  She testified that she was self-

8   employed.  That's what was agreed to.

9           THE COURT:  All right.  What else?

10          MR. McGINTY:  What else?  The government is

11   putting it on for the truth of the matter.  They're

12   trying to get her to say that she believed the truth of

13   something that a third party is saying.

14          THE COURT:  All right.  Right now I'm

15   excluding it.  I suppose even if was wasn't true, it

16   might bear on her intent to conspire with people to

17   steal service.  I assume, though, that there's other

18   evidence of that right now.

19      You know, she says she expressed concern, but at

20   the moment it appears to me that Rule 403 would operate

21   to exclude it.  Its primary probative value is for the

22   truth of the matter asserted that people are using this

23   to steal service and I don't see a rule of evidence that

24   would let it get in for the truth, and therefore its

25   marginal probative value, in view of what I think is

1    other evidence of her participation in the conspiracy --

2    I mean, she can testify, I suppose, that she believes

3    that people were using it to steal service and that's

4    why she expressed the concern.  But, um --

5         MS. SEDKY:  Well, can I ask her whether she

6    believed it's what people were doing?

7         MR. McGINTY:  Objection.

8         MS. SEDKY:  That's what I was asking her.

9         THE COURT:  Um, you can ask her why she

10   expressed concern.

11        MR. McGINTY:  That's been asked and answered.

12        THE COURT:  Well, you can ask it again.  But

13   we'll go back.

14

15        (In open court.)

16   Q.  You testified earlier that you had some concerns and

17   you expressed those concerns.  Could you break that out

18   a little bit more for us, what exactly you were

19   concerned about?

20   A.  Um, well, I was concerned that, um, if the use of

21   this MAC-changer became too widespread, it could cause

22   disruptions to, you know, the cable companies that use

23   these type of modems and, um, you know, after a certain

24   point, you know, when you cause too much disruption,

25   they're going to get displeased and perhaps even take

1   some action against us.

2   Q.   And by "disruption" -- what do you mean by

3   "disruption"?

4   A.   Well, if people were using it -- if too many people

5   were using it to, um, let's say, you know, to copy MAC

6   addresses and that type of thing, um, it could

7   potentially, um, knock legitimate users off the network.

8   Q.   The people whose MAC addresses it actually was, is

9   that what you mean?

10  A.   Yes, the people whose MAC addresses, um, were

11  cloned, um, could possibly, you know, lose their service

12  when some other modem came on line that was cloned.

13  Q.   And when you said you thought the cable companies

14  would be mad, what did you mean by that?

15  A.   Well, um, just displeased, I guess I really don't

16  know how else to characterize it.  But I thought that,

17  you know, after a point it would become such a problem

18  for them that they may, you know, come after us -- sort

19  of take some type of action against us.

20  Q.   And why, in your mind, would it be a problem for

21  them?

22  A.   Well, like I said, you know, it's not only the

23  MAC-changing thing, but the, um, speed, you know,

24  changing stuff as well because, um, you know, it would,

25  um, you know, tax their networks, use more bandwidth

1    than they've allotted for, possibly cause slowdowns,

2    and, like I said, disrupt other people's service.

3    Q.  And were you worried that people were going to be --

4            MR. McGINTY:  Objection.

5            THE COURT:  It's overruled.  She's got to at

6    least ask the question before I can decide whether it's

7    an acceptable question or not.

8    Q.  You testified earlier, I believe, that one of your

9    concerns had to deal with, um, paying for service.  Can

10   you elaborate on that, please.

11   A.  Um, well, that's what I'm trying to say, that I

12   think it would be a concern of mine that if some people

13   were using it and not paying for service, then it would

14   be losing the cable companies some money and, um, as I

15   said, after a certain point, they would be -- it

16   definitely would cause them to probably want to take

17   some action to stop it, you know, at the source.

18   Q.  Okay.  Now, I'd like to shift to another role that

19   you played in the company.  Um, you testified yesterday

20   that, as the software developer, you would sometimes

21   update the programs, is that correct?

22   A.  Uh-huh.

23   Q.  Did Mr. Harris ever talk to you about what the ISPs

24   were doing in response to Sigma?

25   A.  Yes.

1    Q.   And what did he tell you?

2    A.   He would occasionally tell me that, you know, um,

3    the cable companies, for instance, might have a special

4    feature, you know, on their particular network that was

5    preventing our modems from, you know -- um, preventing

6    some of the features of our firmware from working.  For

7    instance, you know, they could -- I don't know the exact

8    specifics, it was a while ago, but I remember there were

9    several things that, you know, came up over the years,

10   like somebody would take actions to, um, block this

11   thing from happening or detect the modems this way or

12   whatever and we'd occasionally, um, add features to the

13   firmware that would, um, I guess, kind of obfuscate the

14   modem from being detected on the network or go around

15   some security measures.

16   Q.   Okay, so let's unpack that.  First, he would

17   describe to you what he knew about the security measures

18   that the ISPs were employing?

19   A.   Yes.

20   Q.   And then what did he tell you to do with that input?

21   A.   Um, well, I guess, you know, he'd describe it and

22   just kind of ask if, um, I had any ideas of how to get

23   around it and if I could implement that in the software.

24   Q.   And what did you do in response?

25   A.   Um, well, usually I would, you know, kind of look

1    into it, do some research, and see if I can come up with

2    anything.

3    Q.   Did he ever forward you information from other

4    people about their problems?

5    A.   Yes.

6    Q.   And what did you do with that information?

7    A.   Um, again, it was the same type of information.  It

8    was, um -- you know, either one of two things, either

9    there's a problem with something, the modem getting onto

10   a particular provider or sometimes it was just some

11   bugs, you know, in the modem that we already had.

12   Q.   So he would come to you telling you about a problem

13   and you would rewrite code and then what would you do

14   with that code that you rewrote?

15   A.   Um, then I would send it back.

16   Q.   And then what would he do with it?

17   A.   He would then, I guess, you know, do whatever he

18   wanted, he could distribute it on his website and/or

19   later on flashed it onto modems.

20   Q.   And was there a process for updating software or how

21   did he get this out to his users, if you know?

22   A.   Well, like I said, he sold the modems from the

23   website, um, he flashed and he also had downloaded

24   links.  I remember there were some download links for

25   the individual software.

```
1    Q.   Were there different versions after Sigma 1.3?

2    A.   Um, yeah, we went all the way to Sigma 1.7.

3    Q.   And can you tell us, in a nutshell, what were the

4    differences of those different versions, 1.3 to 1.7?

5    A.   Um, I really don't remember the specifics of each

6    individual release, um, it was quite a while ago, but,

7    you know, basically I guess the first outlet for Sigma,

8    1.5 or 1.6, it was mostly just individual changes to,

9    um, you know, work-arounds, bug fixes, that type of

10   thing, as I mentioned before, and then when it got to

11   1.7 we added a file system and some other features to

12   it.  But it was basically the same thing, you know,

13   still adding corrections and fixing bugs and that sort

14   of thing.

15   Q.   So when you would do one of these work-arounds, in

16   your words, there would be a new one of these versions?

17   A.   Yeah, and after two or three of them, then we did a

18   couple.  We would usually work around it once, you know,

19   and then maybe a couple months later we'd release

20   another version.

21   Q.   Do you recall whether Mr. Harris ever mentioned any

22   particular ISPs and their security measures?

23   A.   Um, I can't remember any particular ones, no.

24   Q.   All right.  How effective were your work-arounds at

25   defeating the ISP's security measures?
```

```
 1    A.  Well, I'm assuming they were pretty effective.  I,
 2    of course, couldn't test it directly myself, but I would
 3    send them off and, you know, either not hear about it
 4    or, you know, hear that it didn't work.  So most of the
 5    time it seemed like it worked because I didn't hear
 6    anything about it further, at least as to those
 7    particular problems.
 8    Q.  And in the course of your writing these updates, um,
 9    could you describe any conversations you might have had
10    with Mr. Harris about timing or time deadlines?
11    A.  Um, well, he always seemed to want it yesterday.
12              MS. SEDKY:  I'd like to show the witness
13    Exhibit 62, your Honor?
14              THE COURT:  I'm sorry.  Exhibit --
15              MS. SEDKY:  Exhibit 62.  It's been premarked.
16    You haven't -- I'd like to show it to her first.
17              THE COURT:  That's fine.  The jurors' monitors
18    are not on.
19    Q.  I'd like to direct you to your screen for one moment
20    and tell me if you recognize this document?
21    A.  (Looks.)
22    Q.  Okay.  What we're going to do is --
23         Do you recognize what this is?
24    A.  I'm not seeing anything.  My monitor is on, I just
25    don't see anything.
```

1          (Pause.)

2          THE COURT:  All right.  Now it's on.

3   Q.  Do you recognize this?

4   A.  Yes.

5   Q.  And what is this document?

6   A.  It looks like it's an excerpt from a chat log, um,

7   from a few years ago.

8          MS. SEDKY:  Your Honor, the government offers

9   Exhibit 62 into evidence.

10         THE COURT:  Okay.  It is admissible, so I will

11  put it on the jurors' monitors.

12         MR. McGINTY:  Just with prior objection noted,

13  your Honor.

14         THE COURT:  Yes, the objection is overruled.

15         (Exhibit 62, marked.)

16         MS. SEDKY:  I'm sorry?

17         THE COURT:  In part.  It's on the jurors'

18  monitors.  This is admissible under Rule 802(d)(2)(A).

19  Q.  Okay.  So could you please read from the left, the

20  date of this conversation.

21  A.  It was in 2005.  It looks like, um, February 18th.

22  Q.  And what's the time stamp on that?

23  A.  Um, it's about 3:00 a.m.

24  Q.  And do you know whether that is California time,

25  where Mr. DerEngel was located, or was that your local

```
 1    time on that time stamp?
 2    A.   It was -- I can tell by other logs that it was, um,
 3    California time.
 4    Q.   Okay.  And I'll go ahead and read the yellow
 5    portion, the DerEngel portion, and how about if you read
 6    yours?
 7    A.   Okay.
 8    Q.   "You take a look at the proj?"
 9    A.   "I am."
10    Q.   Okay.  Um, this is a continuation of the same
11    conversation and I will read his part.  "I must get
12    sleep.  I trust you will work on this all night long."
13    A.   "It's day, the sun is coming up."
14    Q.   "All morning long.  Isa --"
15    A.   "Blah."
16    Q.   And is "Isa" a nickname that he called you?
17    A.   Yes, "Isa."  It's short for "Isabella."
18    Q.   "Isa working for Engels?"
19    A.   "Yeah, yeah, just a minute.  Wait.  It will
20    happen."
21    Q.   And is that what they call an "emoticon"?
22    A.   Yeah, this little frown face.
23              THE COURT:  I'm sorry.  I didn't understand
24    it, nor did I hear it, actually.
25              THE WITNESS:  Oh, sorry.
```

1  A.   Yeah, the little frowny face below that.

2  Q.   And what is that called, is it an emoticon?

3  A.   Yes, it's an emoticon.

4  Q.   What's an "emoticon," for the jury?

5  A.   Um, it's an emotional icon, it's the textual

6  representation of, I guess, emotions since it's hard to

7  convey that in text.

8  Q.   So he makes the frowny face.  "I've been waiting for

9  three weeks."

10       And was this a fairly typical exchange you had or

11  had you had other conversations like this?

12  A.   Yes, we had several conversations like that over the

13  years when I was working for him.

14  Q.   And you testified earlier that part of your job at

15  TCNISO was writing these work-arounds.  How big a part

16  of that job was it?

17  A. Um, well, after the first couple of -- or the first,

18  you know, initial system -- I guess, the first next two

19  or three releases of Sigma were pretty much just work-

20  arounds to fix various problems like that.

21  Q.   And I'd like to talk about some of the other TCNISO

22  projects that you worked on.  Are you familiar with

23  "Sigma X"?

24  A.   Yes.

25  Q.   What is that?

1    A.   Um, it's the same thing as Sigma except for it's

2    written for a different class of modems.   The firmware

3    -- um, Motorola eventually changed the firmware such,

4    um, that the old work-arounds or the old, um, our old

5    patches would no longer work on their firmware, so we

6    had to come up with a new one.   Um, at that point I was

7    working on other stuff and really wasn't interested in

8    creating another firmware, so it was created by a

9    different person.

10   Q.   And who was that person?

11   A.   I knew him as "L3X."   His name, I believe, is Chris

12   Watts.

13   Q.   And when you say "L3X," could you just spell that

14   for the Court Reporter?

15   A.   L-3-X.   That's just how we pronounced it.   I don't

16   know if that's right.

17   Q.   And do you understand what L3X's role was in Sigma

18   X?

19   A.   Um, he was the principal software developer.

20   Q.   And did you communicate with him?

21   A.   Um, yes.   Frequently.

22   Q.   And during what time frame?

23   A.   Um, it seemed like it was about 2003 to about 2006.

24   Q.   Now, you talked earlier about what the three key

25   functions of Sigma that you designed were.   What were

1    the core functions of Sigma X?

2    A.  Well, Sigma X, supported the, um, MAC changer, it

3    also supported the configuration file changing, um, it

4    had some other, you know, features on there as well as

5    far as like there was an interface we added so you could

6    log into it and, you know, textually control the modem.

7    There was, um, also a, um -- later on, and I don't know

8    which version, but I know there was a sniffer added at

9    some point in time.

10   Q.  And could you tell us what a "sniffer" is?

11   A.  Um, a "sniffer" is something that basically listens

12   to the communications that are traveling over the modem,

13   even communications, I guess, which are not even meant

14   for that modem.  It just kind of listens because the

15   cable modems are a party line and everybody that's

16   connected to it can get messages from all the other

17   modems.  So a "sniffer" will listen to all those

18   messages and pick out certain content that we're kind of

19   searching for.

20   Q.  And could you describe what type of content this

21   sniffer would pick up?

22   A.  Um, in particular, I think this one -- um, no, this

23   one was actually made to look for MAC addresses.

24   Q.  Anything other than MAC addresses?

25   A.  Um, not that I know of.

1    Q.   And why would somebody need a sniffer for MAC

2    addresses?

3    A.   Um, like I explained earlier, you needed to tell the

4    modem to get on a network that it wasn't a party of, you

5    know, or authorized to, and you would need, um, a MAC

6    address to do that.  So the purpose of the sniffer was

7    to listen in on the, um, the -- kind of this party line

8    and see what other MAC addresses were traveling, you

9    know, over the line and, you know, pick them up and kind

10   of keep a log of them.

11   Q.   And for you to use later, is that the idea?

12   A.   Yeah, for people to use later.

13   Q.   And have you ever heard of BlackCat?

14   A.   Yes.

15   Q.   What is BlackCat?

16   A.   BlackCat was a hardware and software product that we

17   created that allowed, um, the flashing of this firmware

18   we wrote onto the modems, because this new class of

19   modems they came out with, this new firmware required

20   different techniques to actually load the firmware on

21   the modem.  So BlackCat was for that.

22   Q.   From your vantage point was this new class of

23   modems, were they more secure?

24   A.   Um, a little bit, but I don't think that was their

25   intention, I think it was just kind of an accident.

1    They didn't put in some of it and leave in some of the

2    holes that we were able to exploit before.

3    Q.  And what role did you have with BlackCat?

4    A.  Um, well, I designed the hardware for it because it

5    required a hardware component to interface the PC to the

6    modem itself.  I also, um, wrote a lot of the software

7    that actually interfaced with this.  And, um, I wrote --

8    actually like I said, the underlying hardware interface

9    for it and software.

10   Q.  And what were the dates that you were working on

11   BlackCat, if you remember?

12   A.  Um, I believe it was -- it seemed like 2005, if I

13   can recall.

14   Q.  Was it ever sold on the TCNISO website?

15   A.  Yes, it was.

16   Q.  And you've talked about your familiarity with Sigma

17   and BlackCat, um, Sigma X.  Did you design or are you

18   aware of any design functions that would allow anyone to

19   keep track of who was using those various modems?

20   A.  Um, yeah, actually there was, um -- I'm not sure

21   about Sigma X, but I know on Sigma, um, on the Sigma's

22   1.0 -- but I'm not really sure when it started, but

23   definitely from 1.3 until 1.7 we had some features which

24   allowed us to determine who was using the modem.

25   Q.  What were they?

1    A.   Well, it was done by -- the modem itself had a

2    web-based user interface that when you set the settings

3    and stuff, you were basically clicking on our web page,

4    and, um, what was done was there was a little picture, a

5    hidden picture of some type, placed on that web page,

6    and that web page, or this image, was -- it was

7    specified that it was to be downloaded from a different

8    server at TCNISO.  So what would happen is most of the

9    other content that the user would see on the user

10   interface came from the modem itself, the modem had its

11   own web server on it, but this particular image was from

12   a completely different website, and like I said, it was

13   from a TCNISO website.  So what would happen is, when a

14   user clicked on this web page, it would download this

15   one little image from the TCNISO site and then on that

16   server there would be a log of what IP address was used

17   to get that image.

18   Q.   Do you know who controlled that server, that TCNISO

19   server?

20   A.   Um, I believe it was controlled by Engel.

21   Q.   Do you know where it was physically located?

22   A.   No.

23   Q.   And what information would get conveyed to the

24   TCNISO server about the user?

25   A.   Um, I believe it would just be the IP address.

Q.  And what's an IP address?

A.  Um, an IP address is like an address that identifies you on the internet as a whole, whereas compared to a MAC address, it identifies you on like a little segment of your own local internet, an IP address is actually more of a global thing.  You know, there are separate IP addresses for places in China, here, or everywhere.

Q.  And what does the letters "IP" stand for?

A.  "Internet Protocol."

Q.  So why would having someone's IP address be important?

A.  Well, um, you could -- you know, there was this kind of thing, you could track IP addresses and there are several ways to look up, um, where geographically the IPs are located so that we can do some stuff like that. We could, I guess, also do some marketing research with it to see who is using the modem and where, and, um, also it allowed them to, um, I guess, identify the modems -- you know, identify which IP addresses were using our modems.

Q.  Was there any licensing feature that you know of?

A.  Yes.

Q.  Could you tell us about that?

A.  Well, um, yeah, there was -- every copy after, I believe, 1.3 of Sigma had a licensing key that kind of

1    went along with it.  I don't know if you ever installed

2    Windows or something like that, but you have to type in

3    a little product key to get it to activate.  Well, Sigma

4    was mostly the same way.  Um, there were several

5    different ways to authenticate that version of the

6    software and that we put some features in there to try

7    to, um, prevent people from just copying the software

8    and using it on a different modem without getting

9    another key from us.  In other words, you could only

10   install it on a modem that, you know, we specified you

11   can install on.

12   Q.  So this was sort of to protect the copyright almost

13   or the --

14   A.  Yeah, it was copyright protection mostly.

15   Q.  You didn't want people using it without paying?

16              MR. MCGINTY:  Objection.

17   A.  Yes.

18   Q.  All right.  And did you ever add any disclaimers

19   into any of the software that you designed?

20   A.  Um, yes.

21              MS. SEDKY:  I'd like to, um, show Exhibit 63

22   to the witness.  It hasn't yet been introduced into

23   evidence.

24              THE COURT:  Is there going to be an objection

25   to this, Mr. McGinty?

```
 1              MR. McGINTY:  Um, there is the objection that
 2    was previously made.
 3              THE COURT:  All right.  And, you know, to the
 4    extent that some of this has been conditionally
 5    admitted, that's the objection?
 6              MR. McGINTY:  I'm sorry?
 7              THE COURT:  You made an objection at pretrial,
 8    I said I would conditionally admit certain items, and
 9    that's the issue with regard to 6, is that right?
10              MR. McGINTY:  I'm sorry.  May I have a moment,
11    your Honor?
12              THE COURT:  Sure.
13              (Pause.)
14              MR. McGINTY:  May we approach the sidebar for
15    a moment?
16              THE COURT:  Yes.
17
18              AT THE SIDEBAR
19              THE COURT:  Okay.  I didn't think there were
20    any objections to it.  What's the issue?
21              MR. McGINTY:  This is where she gives notice
22    about the disclaimer.  He does not respond.  When adding
23    a section at the end, um, which is this one right here,
24    it's Page 6.3.
25              THE COURT:  Just a second.
```

1           (Pause.)

2           THE COURT:  We're on Page 6.3  (Reads.)  All

3      right.

4           MR. McGINTY:  This raises an issue that we had

5      talked about regarding chats, which is that they are

6      instantaneous messages back and forth and that they

7      happen so quickly that it's important to know which one

8      a person is seeing or responding to and what the other

9      person is just reading into the chat and the other

10     person isn't paying any attention to.

11          So here you have her making a statement and not a

12     response from him confirming or denying or in any way

13     responding to it.  We have later an indication that he

14     had responded with, um, "Did you try bending resistors

15     on an old serial PCB and did you look at a new PCB?"

16          THE COURT:  What's a "PCB"?

17          MR. McGINTY:  A "PCB" is mentioned up here,

18     "Did you fail to receive" --

19          (Pause.)

20          MR. McGINTY:  So she is -- she is referring to

21     the PCB.  She's referring to a disclaimer.  The

22     indication is that he hasn't looked at the PCB and

23     inferentially hasn't paid any intention to her.

24          THE COURT:  What's a "PCB"?

25          MR. McGINTY:  A "PCB," it's a piece of some

```
 1    kind of software circuit board.  It's something
 2    electronical.
 3                MS. SEDKY:  But the Court ruled this is a
 4    present sense impression of Ms. Lindquist.
 5                THE COURT:  What is?
 6                MS. SEDKY:  When she's saying "Hee hee hee."
 7                THE COURT:  Where is the "hee hee hee"?
 8                MS. SEDKY:  When she talks about adding the
 9    disclaimer.
10                THE COURT:  Oh, yeah, that's a, "hee, hee,
11    hee."
12                MS. SEDKY:  And that's all he intended to
13    say.
14          As to Mr. McGinty --
15                (Interruption by Court Reporter.)
16                MS. SEDKY:  If Mr. McGinty wants to bring out
17    the rest of the communication, he's welcome to do so.
18                THE COURT:  Yeah, it's admissible as a present
19    sense impression and you can also ask her -- I assume
20    you could also ask her, "What did you mean by 'hee hee
21    hee'?"  And "Were you serious about the disclaimer?" and
22    "Why did you put it in there?" and, I suppose, you may
23    want to ask her about the, "If the companies came after
24    us."  And so I think it comes in as a present sense
25    impression and also under 801(d)(2)(E).
```

1          The objection is overruled.

2               MR. McGINTY:  Your Honor, the present sense

3     impression is ordinarily some sort of sensory immediate

4     input.  She is the one who is creating the comment about

5     this.

6               THE COURT:  No, that's an excited utterance.

7     The objection is overruled.

8

9               (In open court.)

10              THE COURT:  The objection has been overruled.

11              MS. SEDKY:  My understanding is that all of

12    Exhibit 6 has been admitted into evidence, but I just

13    wanted to be clear about that.

14              THE COURT:  Um, I had thought so.

15         But with that ruling I've just made, is there any

16    problem with the rest of Exhibit 6?

17              MR. McGINTY:  Apart from prior rulings, no,

18    your Honor.  Well, prior objections.

19              THE COURT:  Okay.  Then I'm going to put the

20    jurors' monitors back on now.

21    Q.  Do you recognize this document?

22    A.  Um, yes.

23    Q.  What is the time stamp on this?

24    A.  Um --

25    Q.  I'm so sorry.  There's the date.

```
 1   A.   Okay.  It's 2005, 4-14.

 2   Q.   And what's the time?

 3   A.   3:15 p.m.

 4   Q.   And what -- could you please read your portion.

 5   A.   "I added a disclaimer saying essentially that the

 6   device should not be used for malicious purposes, 'hee,

 7   hee, hee, hee, hee, hee, hee'."

 8   Q.   Um, Ms. Lindquist, did you think that TCNISO

 9   customers would follow these disclaimers?

10   A.   Um, I didn't believe that they would --

11              MR. McGINTY:  Objection.

12              THE COURT:  Overruled.

13        Excuse me.  If you want to object, then stand.

14        Please don't answer until I rule.

15        The objection is overruled.  You may answer.

16              THE WITNESS:  Sorry.

17   A.   Um, yes.  Would you repeat the question, please.

18   Q.   When you were writing "this disclaimer, 'hee, hee,

19   hee, hee, hee'," um, did you think, at the time, that

20   TCNISO customers would actually follow those

21   disclaimers?

22   A.   Um, no, I didn't have much faith in them.

23   Q.   Based on your conversations with Mr. Harris, did he

24   ever tell you that he did not want his customers to

25   steal service?
```

1    A.   Um, I can't recall one way or the other.

2    Q.   Okay.  I'd like you to take a look at Exhibit 5.

3    (On screen.)

4         Now I'd like to talk about, um --

5              (Pause.)

6    Q.   Okay.

7              MS. SEDKY:  I'm sorry, your Honor.

8              THE COURT:  It's okay.

9              (Pause.)

10   Q.   Is this another conversation between you and

11   DerEngel?

12   A.   Yes.

13   Q.   And are you identified by a different user name

14   here?

15   A.   Yeah, I was using the, um, nickname "Miew" here.

16   Q.   And I'll read DerEngel's portion.  What's the date

17   on this document?

18   A.   Um, this one is 2005, 6-20, at 5:24 a.m.

19   Q.   DerEngel says --

20             THE COURT:  I'm sorry.  What page of Exhibit 6

21   is this?

22             MS. SEDKY:  This is 6.4, your Honor.

23             THE COURT:  Yes.  Thank you.  And Exhibit 6 is

24   admitted.

25   Q.   "But I love my little laptop.  It's not as fast and

1    it can't play all those awesome games like my PC can,

2    but, expletive, free internet wherever I am."

3         Um, I'd like to talk about money now.  How much

4    did you get paid, if any, overall during the course of

5    your employment with TCNISO?

6    A.  Um, at first there was this little, you know,

7    payments here and there, like $10, $20 for various

8    things, like I would occasionally build some hardware or

9    something, and, um, eventually when the company got

10   incorporated, um, I went to a pay of $400 and later $500

11   a month.

12   Q.  And if you could try to accumulate all of that money

13   over time, approximately how much would you say you've

14   received?

15   A.  Um, I can't be exactly sure, but it was around 5 to

16   $7,000.

17   Q.  Were you ever given any other kinds of compensation,

18   other forms?

19   A.  Um, well, other than the modems and equipment that

20   was sent, there was one occasion I was given a computer.

21   Q.  And were you going to be having any ownership in the

22   company?

23   A.  Yes, actually I was given some stock.

24   Q.  And is -- and, to your knowledge, were you able to

25   do anything with that stock?

1    A.   No, I never really was.

2    Q.   Do you remember what percentage of stock you were

3    given?

4    A.   I believe it was 10, 15 percent.  Either one of

5    those two.

6    Q.   Of the company?

7    A.   Yes.

8    Q.   And how were you paid each month?

9    A.   Um, each month, um, I first started out getting cash

10   occasionally and then, um, I believe it eventually went

11   to checks.

12   Q.   You never got paid any other way?

13   A.   Um, well, one time -- well, like I said, one time

14   they sent me the computer.

15   Q.   Okay.  Did you have any communications with

16   Mr. Harris about his financial goals?

17   A.   Occasionally we talked about the goals of -- you

18   know, the direction that the company was going.

19   Q.   And what was your sense of his financial goals?

20   A.   Um, well, I believed he wanted to grow the company,

21   you know, get it bigger and bigger, and eventually take

22   it public and perhaps offer its stock publicly.

23   Q.   I'd like to show you Exhibit 1.

24        What's the date on this check?

25   A.   This is 2005, January 17th at 4:14 p.m.

1  Q.  And this is DerEngel saying, "You'll make a lot of

2  money when we're big and powerful," and that's another

3  one of those emoticons?

4  A.  Yes, that's a smiley face.

5  Q.  And were there other conversations like this?

6  A.  Yes.

7  Q.  I'd like to turn your attention to Exhibit 6, Page

8  5.

9       What's the date on this?

10 A.  Um, the date is 2005, September 4th, and at

11 10:47 p.m.

12 Q.  "You know I'm working hard on your future, right?

13 This book deal, once they are publishing this book all

14 over the world, our sales are going be 10 times more,

15 $100,000 easy."

16      So was this another type of those conversations

17 that you had?

18 A.  Yes, this was typical of the conversations that I

19 had with the company.

20 Q.  And during your involvement with TCNISO, how were

21 you personally getting internet service to your own

22 home?

23 A.  Um, at first I had -- um, when I first met DerEngel,

24 I was actually running a little private internet

25 service, you know, that I ran myself, um, and when I say

1    that, um, like a little ISP, with 10 web servers, and

2    various other servers that were on the internet.  So I

3    had a combination of business class DSL lines and later

4    on some T-1 lines.  Eventually, however, I kind of got

5    out of business and just actually went to cable, which

6    is what I still have now.

7    Q.  And when you say a T-1 line, what does that mean?

8    A.  Um, a T-1 line is just a special -- it's like a line

9    direct from like the phone company, it's capable of

10   doing, um, pretty fast -- well, back then anyway it was

11   considered pretty fast, but it's about 1.5 Megabits, I

12   believe.

13   Q.  And what was the business class service, what does

14   that mean?

15   A.  Um, the business class, it looks to differentiate

16   from, you know, like the standard consumer class of

17   service.  Business class DSL, you would get, um, you

18   know, several IP addresses, like a whole block of IP

19   addresses, so you can have each of your servers

20   identified on the internet, and you also have a little

21   bit extra bandwidth and a lot better customer service.

22   Q.  And were you paying for these services the entire

23   time you were working at TCNISO?

24   A.  Yes.

25   Q.  Did you ever use any of the products that you

1    designed or that TCNISO offered yourself to obtain

2    internet service without paying for it or to obtain

3    faster service without paying for it?

4    A.  Um, not that I recall.  I wouldn't, however, use the

5    modems, I'd just plug them in, check them, make sure

6    they would come up after I made changes to the

7    software.  I would make sure they actually just came up

8    and that was about it.

9    Q.  Outside of the testing context, did you ever use it

10   as a source to get your own service?

11   A.  Not that I recall, no.

12   Q.  And I'd like to ask you about your understandings of

13   immunity.  Do you have immunity in this matter?

14   A.  Yes.

15   Q.  And what's your understanding of what that means?

16   A.  It means that I cannot be criminally prosecuted for

17   anything I say here today.

18   Q.  And what's your understanding of what obligations

19   you have today to get that protection?

20   A.  Um, my obligations are to show up and tell the truth

21   to the best of my recollection.

22   Q.  And what happens if you give false testimony?

23   A.  Um, I would -- I'm not really sure, but I would

24   imagine there would be some, you know, legal

25   repercussions to that.

1    Q.   Do you know whether you would lose the protections

2    of immunity or not?

3    A.   Yes, I would.

4    Q.   So how did it all end for you?  You talked about

5    this fairly constant involvement.  Um, how did you end

6    up leaving the company?

7    A.   Um, just over time, um, you know, I was doing other

8    kinds of things, you know, branching out from just the

9    same old cable modem things over and over again, and,

10   um, I eventually just kind of slowly worked on less and

11   less projects and then eventually just went my own way.

12   Q.   Well, what time frame would you say you sort of

13   finally departed?

14   A.   Um, I think the last project we did together was

15   probably around 2007.

16            MS. SEDKY:  Okay.  I have nothing -- oh,

17   actually, may I consult my co-counsel, your Honor?

18            THE COURT:  Yes.

19            (Pause.)

20            MS. SEDKY:  The government has nothing

21   further, your Honor.

22            THE COURT:  Mr. McGinty.

23            MR. McGINTY:  Thank you, your Honor.

24

25   CROSS-EXAMINATION BY MR. McGINTY:

1    Q.   Ms. Lindquist, good morning.

2    A.   Good morning.

3    Q.   You don't want to be here today, do you?

4    A.   No.  I don't think a lot of people do.

5    Q.   Now, on your LinkedIn page, um, you talk about how

6    you like to take things apart and see how they work.  Is

7    that fair to say?

8    A.   Yes.

9    Q.   And, um, you have a skill, a particular skill

10   working with embeded systems, do I understand that

11   right?

12   A.   Yes.

13   Q.   And you seem to enjoy working on them, am I right?

14   A.   Yeah.

15   Q.   And you call yourself a "reverse engineer."  Can you

16   tell us what that means?

17   A.   Well, reverse engineering is the part of looking at

18   a product, um, you know, something that was manufactured

19   and figuring out how it was manufactured, what processes

20   were used, how it was put together, you know, how to

21   either recreate it or modify it.  That's usually the

22   goal of reverse engineering.

23   Q.   So basically opening up and seeing what its innards

24   are?

25   A.   Yes.  Correct.

1    Q.   What its capabilities are, correct?

2    A.   Yes.

3    Q.   What its secrets are?

4    A.   Uh-huh.

5    Q.   And that's something you're particularly skilled at?

6    A.   Yes.

7    Q.   Now, um, you spoke to the government first, in this

8    case, do you recall October 20th, 2009?

9    A.   Um, not particularly.

10   Q.   Do you remember it was back, um, probably about two

11   years ago?

12   A.   Uh-huh.

13              THE COURT:   I'm sorry.  You have to say "yes"

14   or "no."

15   A.   Oh, yes.

16   Q.   And since then you've been interviewed by the

17   government what, about five or six times?

18   A.   Yes, that's about right.

19   Q.   And, um, during those times they've gone over with

20   you and over with you and over with you what they expect

21   you would testify to at trial, is that fair to say?

22   A.   Um, we did talk about, um, you know, what I would

23   say, but, um, they didn't put any words in my mouth.

24   Q.   Well, I'm not talking about putting words in your

25   mouth, I'm talking about whether they reviewed with you

1    the questions that they would ask you?

2    A.  Yes, they did.

3    Q.  And they would review with you what your answers

4    would be, am I right?

5    A.  Yes.

6    Q.  And then they would ask you some more questions

7    indicating what they expected you would say?

8    A.  Yes.

9    Q.  And this occurred over the course of time, perhaps

10   as many as three or four times, am I right?

11   A.  Yes.

12   Q.  With sessions that ran to -- what was the longest

13   session that you spent with them?

14   A.  The longest session I spent was probably about a

15   whole day, but it was split over two days.  Well, maybe

16   8 or 9 hours.

17   Q.  Now, incidentally, do you use a screen name?

18   A.  Yes, I've used a few over the years.

19   Q.  Okay.  Do you view those as aliases?

20   A.  Yes.

21   Q.  You do?

22   A.  Yes, nicknames.  Aliases.

23   Q.  And you view them as nicknames, okay, and you view

24   them as ways of presenting yourself on the net, correct?

25   A.  Correct.

1    Q.  Now, when you were first asked about the TCN

2    products, you told the government that Mr. Harris would

3    modify cable modems to add diagnostic features to that.

4    Do you remember saying that?

5    A.  Yes.

6    Q.  And that those diagnostic features would allow the

7    user to adjust pretty much anything on the cable modem,

8    correct?

9    A.  Correct.

10   Q.  Um, you told them that the changes in the modem's

11   firmware were mostly for diagnostic purposes.  Do you

12   remember saying that?

13   A.  I don't remember saying that exactly, but I could

14   have said that.

15   Q.  And do you remember that, um, when you spoke to them

16   you were describing some of those diagnostic

17   characteristics, do you remember?

18   A.  Uh-huh.  Yes.

19   Q.  Now, um, would it be fair to say that there's an

20   industry standard called "DOCSIS"?

21   A.  Yes.

22   Q.  Now, would you tell the jury what that stands for?

23   A.  "Data Over Cable System Interface Specification."

24   Q.  Now, the DOCSIS standard is a cable industry-

25   generated protocol, correct?

1    A.   Yes.

2    Q.   In other words, it is a form of specification by the

3    cable companies of what they want in that box called a

4    "modem," correct?

5    A.   Correct.

6    Q.   And one of the things you were doing is to sort of

7    take a peek into that and find out what that was all

8    about, correct?

9    A.   Yes.

10   Q.   And modems, um, generally only permit modifications

11   to their internal programming that are sent down the

12   pike from the cable company, is that fair to say?

13   A.   That's correct, that's how they're designed.

14   Q.   So they're built sort of Xbox style where they

15   create the specification and you live with it, is that

16   fair to say?

17   A.   Yes.

18   Q.   And that's true even on a modem that you would own,

19   am I right?

20   A.   Yes.

21   Q.   Um, now, what Sigma did is that Sigma exposed the

22   computer and what the computer -- and what the modem's

23   capability was for user interface, am I right?

24   A.   Um, yes, exposed the embedded computer in there and,

25   um, gave you a user kind of interface that, you know, as

```
1    you're modifying, you know, change in certain
2    parameters.
3    Q.   Okay.  And the parameters would include changing
4    firmware, for example?
5    A.   Uh-huh.
6                THE COURT:  You have to say "yes" or "no."
7    A.   Oh, yes.
8    Q.   Okay.  And it would permit you to customize your
9    network, would it not?
10   A.   Yes.
11   Q.   Now, some people, um, I believe you called them
12   "geeks," some people would be interested in having a
13   modem just to peek inside and find out what makes it
14   work, am I right?
15   A.   Yes.
16   Q.   Would you call yourself one of those?
17   A.   Yes.
18   Q.   And the curiosity there is what makes something
19   tick?
20   A.   Yes.
21   Q.   And what its inner capability is?
22   A.   Yes.
23   Q.   And also what it would permit you to do is to do
24   some advanced configuring within the modem, am I right?
25   A.   Yes.
```

1    Q.   And it would, um, help you to, um, change some

2    filters that the cable company used to effect your

3    content, am I right?

4    A.   Um, yes, it would allow you to change some of the

5    filters.

6    Q.   Okay.   And the filters -- sometimes cable companies

7    use filters to keep out worms and other kind of internet

8    intruders, am I right?

9    A.   Yes.

10   Q.   Sometimes they use it to affect the content that you

11   have on your computer, correct?

12   A.   Yes.

13   Q.   And they also, in effect, enclose ports?

14   A.   Yes.

15   Q.   And ports would be channels where particular kinds

16   of internet content are directed through, am I right?

17   A.   Yeah, according to particular services like Web or

18   Telenet or whatever, you get directed into a particular

19   port, usually.

20   Q.   And the cable company has the capability from its

21   headquarters, wherever the cable company lives, to reach

22   out and close that port so that content that would go

23   through that port is closed off, fair to say?

24   A.   Yes.

25   Q.   (Pause.)   Now, you mentioned this Sigma 1.3 program

1    and you mentioned that you thought you had a

2    MAC-changer.  Are you sure about that?

3    A.   Um, I'm not, and I said there was some version, I

4    know it was 1.3 or 1.4, around there, that came out with

5    the MAC-changer.

6    Q.   Now, 1.3 was a "patch"?

7    A.   Yes.

8    Q.   As you put it?

9    A.   Yes.

10   Q.   Now, just so that we understand what that is, you

11   mentioned that a "patch" is something that's placed on

12   top of the firmware, am I right?

13   A.   Yes, it's, um -- a "patch" is something that

14   modifies -- it's a specific set of instructions to

15   modify the firmware potentially.

16   Q.   So were you working with the firmware in a Motorola

17   modem?

18   A.   Yes.

19   Q.   And in the Motorola modem there is firmware that

20   permits a lot of different functions to occur, am I

21   right?

22   A.   Yes.

23   Q.   Is your patch resting on top of that structure?

24   A.   Yes, I mean, retaining most of the structure of the

25   software and the patch was kind of a minor thing

1  compared to the overall system.

2  Q.  So in effect what you're doing is you're cloning the

3  functionality of the Motorola modem's architecture and

4  placing atop that a patch.  Do I understand that?

5  A.  Um, I would say it more as we're not really cloning

6  it, it's already there, and we're just changing what

7  parts we need to change in order to make it do what we

8  need it to do.

9  Q.  To permit that increased functionality, right?

10  A.  Yes.

11  Q.  (Pause.)  And eventually that was a capability of

12  learning the IP address of users of the Sigma program.

13  Do you remember that?

14  A.  Yes.

15  Q.  And Mr. Harris expressed to you concern about his

16  products being used by other sellers, other users, did

17  he not?

18  A.  Yes, he was concerned about it being used by people

19  who were not actually paying for it, not going through

20  him.

21  Q.  Basically.  Um, so what this would do is it would

22  send back the image, that was the network-based image,

23  it would send back the image with the IP of the user, am

24  I right?

25  A.  It would send back the image to the IP of the user,

1    actually.

2    Q.  And when it sends back that image to the IP of the

3    user, it permits comparison of that IP if a person were

4    to do that, am I right?

5    A.  Yes.

6    Q.  And, um, when you were asked whether you knew

7    whether Mr. Harris ever did that, your answer was, "I

8    believe so," am I right?

9    A.  Um, yeah.

10   Q.  You didn't say that you -- well, strike that.

11        And this capability permits the retrieval of this

12   image, does it not?

13   A.  Um, yeah.

14   Q.  And what it would permit is a seller of an item to

15   learn whether its firmware remained on the same IP that

16   it was originally connected to.  Do I understand that

17   right?

18   A.  Yes, that would be one function.

19   Q.  All right.  So that if a person took that material

20   and put it on a different computer, there was the

21   possibility of detecting that, am I right?

22   A.  Yes, if it moved onto a different computer that

23   wasn't connecting to that same location, it would more

24   than likely change the IP address.

25   Q.  Now, you had testified about some communication with

1    DShocker, do you recall that?

2    A.  Um, I remember testifying to that.

3    Q.  Now, you said that originally you had communicated

4    with DShocker via IRC, Internet Relay Chat?

5    A.  Yes.

6    Q.  Is it the case that at some point you communicated

7    directly with him via an Internet Relay Chat?

8    A.  Yes, although we have talked in private a few times.

9    Q.  Okay.  So you went from, in a sense, public

10   communication to private communication, am I right?

11   A.  Um, yes.

12   Q.  And during the private communications, he tried to

13   persuade you to provide him with the raw Sigma code,

14   didn't he?

15   A.  Yes, in one of our later conversations.

16   Q.  Now, the raw Sigma code is not the same thing as the

17   Sigma software, is it?

18   A.  No, the code is what generates the software.

19   Q.  All right.  And that is basically -- for a software

20   programer, that's, in effect, the key to the kingdom, am

21   I right?

22   A.  Yes.

23   Q.  Now, you developed that software, am I right?

24   A.  Yes.

25   Q.  So, in effect, it was your software to have, to

1   hold, to sell, am I right?

2   A.  Um, I'm not sure, but I know the original versions

3   of it I wrote without any obligations or any contracts

4   or anything.  So as far as I understand, it is.

5   Q.  You made an agreement to sell it to him, did you

6   not?

7   A.  Um, yes, eventually.

8   Q.  And when you agreed to sell it to him, he was going

9   to give you $100, was he not?

10  A.  Yes.

11  Q.  He didn't give you the $100, did he?

12  A.  Um, actually he sent me some money over the PayPal

13  service, but it was almost immediately, um, you know,

14  taken back because the transaction was reversed.

15  Q.  Now, this had occurred after you had left TCNISO, am

16  I right?

17  A.  Yes, it did.

18  Q.  And it turned out that when DShocker's communicating

19  with you, he seems to have part of that code already?

20  A.  Yes, he did, and that's what persuaded me to send it

21  to him at that point.

22  Q.  You thought he had that code because he must have

23  hacked into Harris's computer, am I right?

24  A.  Yes, I had heard that.

25  Q.  And he told you that he wanted to get the balance of

1   this code.  Do I understand that right?

2   A.  Um, yes, that's correct.

3   Q.  And you then gave it to him, all of it?

4   A.  Yes.

5   Q.  For the $100 you never got?

6   A.  Yes, I sent him --

7   Q.  After you got --

8           THE COURT:  I'm sorry.  You have to let her

9   answer.

10  A.  I was going to say I sent him pretty much everything

11  I had at the time.

12  Q.  And this was after you had left?

13  A.  Yes.

14  Q.  (Pause.)  The government referred you to a chat and

15  on the chat, um, I believe it was Page 6-4 where he

16  says:  "Free internet wherever I am."  Do you remember

17  that chat that we looked at just a short time ago on the

18  screen?

19  A.  Yes.

20  Q.  Do you remember an interview where the government

21  asked you about that chat?

22  A.  Yes.

23  Q.  Didn't you tell the government that when Harris made

24  the comment to you about free internet wherever he goes,

25  "Lindquist was not sure if he was referring to WIFI or

1    cable modems"?

2    A.   That's correct.

3    Q.   And you told that to the government during the

4    interview on January 31st of this year, am I right?

5    A.   Yes.

6    Q.   Now, you have, um, a -- you are on Project Wiki, are

7    you not?

8    A.   Um, yes.

9    Q.   And on Project Wiki, um, you have a resume that

10   describes your experience, am I right?

11   A.   Yes.

12   Q.   And that's available on the internet today, if we

13   look for it?

14   A.   Yes.

15   Q.   And you describe with some pride things you've done,

16   things you've participated in, am I right?

17   A.   Yes.

18   Q.   And on your project -- and let me back up.   Project

19   Wiki is a site where persons with skill, ability,

20   training and experience can put their credentials out

21   there so that other people can see it and have

22   professional communications with them, hire them, engage

23   them, look to them for guidance, is that fair to say?

24   A.   Actually the Project Wiki is just more of a site

25   where people can document projects that they're working

```
 1    on and then, um, yeah, people that -- I guess companies,
 2    you know, can use it for that reason.  And that's why I
 3    put my resume up there, because it has a lot of my
 4    projects, and so companies can see my work and what it
 5    looks like and they can kind of see what they're going
 6    to get.
 7    Q.  And in your Project Wiki, um, resume, you talk about
 8    being a reverse engineer, do you not?
 9    A.  Yes.
10    Q.  And you talk about how you had worked for TCN and
11    while there "conceived and developed diagnostic devices
12    for users"?
13    A.  Yes.
14    Q.  How you had "crafted patches to enhance product
15    functionality," am I right?
16    A.  Yes.
17    Q.  That you had "developed hardware and software for
18    loading and debugging firmware on NIPS systems using EJK
19    for Linux and Windows," right?
20    A.  Yes, and Black Cat.
21    Q.  That you had "coded device drivers for DX Works for
22    file systems and IO devices," am I right?
23    A.  Yes.
24    Q.  You "conceived and developed diagnostic devices for
25    users," am I right?
```

1    A.   Yes.

2    Q.   That "by an understanding of the device's functions

3    and capabilities, you proposed new product features and

4    better ways to meet design criteria while simplifying

5    design and adding open-ended functionality"?

6    A.   Yes.

7    Q.   Now, all of these things are descriptions that you

8    made -- that you give about your experience -- in your

9    description of your experience on the internet, am I

10   right?

11   A.   Um, would you say that again?

12   Q.   Well, this is part of the resume that you have on

13   the internet now?

14   A.   Yes.

15   Q.   And it's with some pride that you describe yourself

16   in that fashion, am I right?

17   A.   Yes.

18   Q.   Talking about what amounted to be considerable

19   achievements?

20   A.   Yes, I was proud of it, as you say.

21   Q.   Dishonored by an immunity order?

22   A.   Um, I don't understand.

23   Q.   When you describe what you did at TCN, being an

24   employee of TCN and working in the development of these

25   products, did you do it with pride?

```
 1    A.   Um, yeah, well, I do -- everything I do I try to do
 2    the best I can.
 3              (Pause.)
 4              MR. McGINTY:  May I have a moment, your
 5    Honor?
 6              THE COURT:  Yes.
 7              (Pause.)
 8              MR. McGINTY:  No further questions.  Thank
 9    you, your Honor.
10              THE COURT:  Is there redirect?
11              MS. SEDKY:  Thank you, your Honor
12
13    REDIRECT EXAMINATION BY MS. SEDKY:
14    Q.   Ms. Lindquist, when you were talking about the
15    Project Wiki, is that some kind of almost a sales tool
16    for you?
17    A.   Yes.
18    Q.   So were you inclined to put down that you "designed
19    a MAC-changer to help people steal service"?
20    A.   Um, no, I wouldn't put that down.
21    Q.   Were you inclined to write that you were helping
22    people uncap their modems?
23    A.   Um, no, I wouldn't put that.
24    Q.   But, in fact, were you?
25    A.   Um, essentially, yes.
```

1    Q.   And when Mr. Harris first reached out to you -- do

2    you remember yesterday you were testifying about he

3    first reached out to you, I think it was in '02, and he

4    asked you to do this new project, did he ask you to

5    write a MAC-changer or did he ask you to build a full,

6    comprehensive diagnostic modem that could protect --

7                MR. McGINTY:  Objection.  Leading the witness.

8                THE COURT:  Overruled.

9         First, let her finish the question to see if this

10   is permissible and appropriate.  Go ahead.

11   Q.   Did he ask you fairly straightforwardly to design a

12   MAC-changer or did he ask you to build a soup-to-nuts

13   comprehensive diagnostic modem that could allow people

14   to change their ports and change their filters and their

15   packet sizes and whatnot?  What did he ask you to do in

16   that first conversation?

17   A.   In the first conversation I remember only that, um,

18   I believe his kind of objective was to make a

19   MAC-changer.

20               MS. SEDKY:  I think I have nothing further,

21   but may I consult with my co-counsel?

22               THE COURT:  Yes.

23               (Pause.)

24               MS. SEDKY:  We have nothing further, your

25   Honor.

1

2   RECROSS-EXAMINATION BY MR. McGINTY:

3   Q.  Ms. Lindquist, did you hide your employment with

4   TCN?

5   A.  Um, no.

6   Q.  In fact, you put on the internet part of the code

7   that you wrote for Sigma, isn't that true?

8   A.  Yes.

9           MR. McGINTY:  No further questions.

10           THE COURT:  Thank you.  Your testimony is

11   complete.

12           THE WITNESS:  Thank you.

13           (Witness steps down.)

14           THE COURT:  The United States may call the

15   next witness.

16           MS. SEDKY:  Thank you, your Honor.

17       The United States calls Benjamin Brodfuehrer.

18           (BENJAMIN BRODFUEHRER, sworn.)

19

20           * * * * * * * * * * * * * * * * * * * *

21           BENJAMIN BRODFUEHRER

22           * * * * * * * * * * * * * * * * * * * *

23

24   DIRECT EXAMINATION BY MS. SEDKY:

25   Q.  Good morning.

1   A.   Good morning.

2   Q.   Would you please state your name and spell it for

3   the record, slowly.

4   A.   Yes.  My name is Benjamin Brodfuehrer.  The first

5   name is B-E-N-J-A-M-I-N.  The last name is

6   B-R-O-D-F-U-E-H-R-E-R.

7   Q.   And, um, where do you work, Mr. Brodfuehrer?

8   A.   I work for Charter Communications.

9   Q.   And where are you located, where is your office?

10   A.   My office is in Town and Country, Missouri, which is

11   in the St. Louis metropolitan area.

12   Q.   Where is Charter Communications based?

13   A.   We're based out of St. Louis, Missouri.

14   Q.   And what is Charter?

15   A.   Charter is the fourth largest cable MSO in the

16   United States.

17   Q.   What's an "MSO"?

18   A.   An "MSO" is a multisystem operator.  It just means

19   that we operate more than one local cable system.

20   Q.   How long have you worked for Charter?

21   A.   Um, just over 10 years.

22   Q.   Do you know whether Charter provides cable internet

23   service to Massachusetts?

24   A.   Yes, we do.

25   Q.   What parts?

1    A.   Central Massachusetts, Worcester, Oxford,

2    Sturbridge, Pepperell.

3    Q.   Could you tell us a little bit about the different

4    jobs you've held during the course of the ten years

5    you've been at Charter?

6    A.   Sure.   I've worked in customer support, commercial

7    customer support, applications, development, network

8    engineering, specifically for DOCSIS technology, um, in

9    the lab, in the testing environment, and I'm currently a

10   principal engineer for DOCSIS technology for the entire

11   enterprise.

12   Q.   And what is DOCSIS technology, briefly?

13   A.   Um, basically DOCSIS technology is the transfer of

14   data over the cable system, which is what we've used to

15   enable internet access.

16   Q.   Are you familiar with the MAC address in a modem?

17   A.   Yes, I am.

18   Q.   Could you describe what role the MAC address plays

19   in letting Charter identify its subscribers?

20   A.   Sure.

21          MR. McGINTY:  Objection, your Honor.

22          THE COURT:  Overruled.

23          MR. McGINTY:  Foundation.

24          THE COURT:  Overruled.

25       You may answer.  If there's an objection, you

1    should not answer until I rule on it.  If I say

2    "sustained," that means you may not answer.  If I say

3    "overruled," that means you may.  Go ahead.

4    A.   Charter Communications uses the MAC address to

5    determine, um, the specific modem.  We can look up that

6    MAC address in our billing systems, back office systems,

7    to see what subscriber it's assigned to, and what

8    services they are currently paying for.

9    Q.   And what happens once you identify a MAC address as

10   belonging to a paying subscriber, what does Charter do

11   next?

12   A.   Um, next, the system would authorize a MAC address

13   that connected to the system and it would send that

14   specific modem, um, its configuration file, that would

15   tell it at what speed to operate it.

16   Q.   And how do you measure speed, typically?

17   A.   Um, speed is typically measured in bits per second

18   or, with today's speeds, megabits per second.

19   Q.   And is that similar to or related to bandwidth?

20   A.   Um, they are very similar, they're often used

21   interchangeably.

22   Q.   Does Charter provide different levels of internet

23   service to different customers?

24   A.   Yes, we provide, um, several different levels of

25   service starting with a basic, a slow tier that is

1    priced lower, all the way up to an ultra, our fastest

2    tier that's priced the highest also.

3    Q.  And could you tell us what happens on one of

4    Charter's networks if someone on that network starts

5    using up a lot of bandwidth?

6    A.  Um, if a specific subscriber or a group of

7    subscribers start using a lot of bandwidth, it will

8    cause us to have to upgrade the plant to make more

9    bandwidth available in that area, which means the

10   addition of additional hardware on the plant and

11   man-hours to complete the work.

12   Q.  Well, before -- well, let's take a step back.

13   Before we get into how Charter responds, what happens,

14   if anything, to the other customers on that network?

15   A.  Sure.  Before the plant upgrades are done, there is

16   only a finite amount of bandwidth available in any given

17   area, so if it is all used up or close to being used up,

18   all other subscribers would be negatively impacted and

19   would experience slow speeds.

20   Q.  And so in response to that Charter then does these

21   various upgrades.  Can you describe those again.  I'm

22   sorry.

23   A.  Sure.  When we need to upgrade the cable system,

24   we'll actually have to go out in the field and add

25   equipment to the networks, which is return transmitters

1    and possibly additional fiber optic cable lines, if we

2    don't have them there already, and then we also have to

3    do upgrades and the head-in, which is the master

4    location that all the lines come back to, and add

5    additional equipment there.

6    Q.  And how does this investment affect its pricing

7    structure at Charter?

8    A.  Obviously the more money that we have to spend on

9    plant maintenance and plant upgrades, it's a cost that

10   we have to pass on to the subscriber, so that the rates

11   would go up.

12   Q.  You testified earlier that one of your

13   responsibilities is working in the lab testing modems.

14   Could you tell us a little bit more about that and what

15   type frame you were doing that?

16   A.  Sure.  I worked in the lab up until about two years

17   ago, I worked there for approximately three years.  Um,

18   any cable modem, et al that --

19            MR. McGINTY:  Objection.

20            THE COURT:  Okay.  Right there she was just

21   asking you what you were doing.

22       Why don't we go question by question.

23   Q.  Okay.  So those were the years.  And could you just

24   tell us roughly what, at this laboratory -- what was

25   your role in this laboratory?

A.   Sure.  Um, at the lab we test all the modems that

are used on the network and we also test the CMTS, which

is the master device that controls all the modems.

Q.   And in the course of that, are you familiar with

what the word "hacked" or "cloned" modem is?

A.   Yes, I am.

Q.   What's your understanding of that word?

A.   We use the word "hacked modem" to generally refer to

any modem that has been modified to operate in a manner

that it was not originally intended to.  To clone a

modem is the terminology, it refers to a modem that has

been modified to specifically look like a duplicate of

another modem.

Q.   And are you familiar with what MAC changing is?

A.   Yes, I am.

Q.   What is that?

A.   There are certain hacks on modems that allow you to

change the MAC address that is supposed to be

permanently assigned to the modem, so the modem reports

that it has a different MAC address.

Q.   And what's the purpose of that?

A.   Um, the purpose of that would be to impersonate

another modem, specifically impersonate another

subscriber.

Q.   To do what?

A.   That would effectively allow you to steal service

from the cable company, as you would appear as the other

subscriber, and you would receive the same services they

were paying for.

Q.   Are you familiar with the term "uncapped modem"?

A.   Yes, I am.

Q.   And when we were talking earlier about "hacked

modems," are you including in this umbrella both the MAC

changing and the uncapped modem or do you use this term

separately?

A.   Um, like I said, "hacked modem" is a general term

that we would refer to both a cloned modem or an

uncapped modem.

Q.   Okay.  Could you tell us what an "uncapped modem"

is, please?

A.   An "uncapped modem" is a modem that has no speed

limits set on it, so it effectively can download as fast

as the hardware is capable of.

Q.   And what's the benefit of that?

A.   The benefit of that would be to get more service

than what you were paying for.  So you could subscribe

to a basic level of service, uncap your modem, and in

effect receive the highest level of service.

Q.   And could you tell us what happens if two people on

Charter's network in the same neighborhood try to use

1    the same MAC address at the same time?

2    A.   Sure.   If two modems on the cable plant are close to

3    your geographic area, they're on the same segment, they

4    both have the same MAC address, um, the system would

5    work in an unpredictable way that would most likely

6    cause both devices to either not function at all or to

7    function with impaired service, such as slow speeds.

8    Q.   So if I were someone who had a cloned modem and I

9    got on the Charter network in my neighborhood first, how

10   would that affect the legitimate actual subscriber's

11   use?

12   A.   Um, if you got on it first, most likely what would

13   happen is the legitimate subscriber would not be able to

14   connect to the network.

15   Q.   And would this problem be alleviated if the person

16   on the cloned modem, using the cloned modem, could get a

17   MAC address from somewhere else?

18   A.   Yes, if the clones are not geographically close

19   together, specifically if they're not on the same

20   segment of the plant, such as they're across town from

21   each other or across the country or something, then both

22   modems would work just by -- both would receive the same

23   level of service.

24   Q.   And could you describe for the jury what impacts, if

25   any, the use of cloned modems or hacked modems, excuse

1    me, on Charter's network causes for Charter?

2    A.  Um, yes, it causes a loss of revenue because we are

3    not receiving either additional premiums, for people who

4    uncapped their modem, that we would normally receive, or

5    in the case of a cloned modem, um, we are not receiving

6    any revenue most likely from that subscriber since they

7    are not a legitimate subscriber.  They can also cause us

8    to have to do a plant upgrade sooner than we expected

9    to.

10   Q.  And could you describe the magnitude of cable modem

11   hacking for Charter, the magnitude of the problem?

12                MR. McGINTY:  Objection.

13                THE COURT:  Well, I think you're going to have

14   to lay a foundation as to how he knows.

15                MS. SEDKY:  Okay.

16   Q.  Do you know what type of resources Charter devotes

17   to trying to deal with hacked cable modems?

18                MR. McGINTY:  Your Honor, can I have a moment?

19                THE COURT:  At sidebar?

20                MR. McGINTY:  No, just --

21                THE COURT:  Oh, okay.

22                (Pause.)

23                MR. McGINTY:  Actually, may we approach the

24   sidebar?

25                THE COURT:  Yes.

```
 1
 2                AT THE SIDEBAR
 3                THE COURT:  We may take a break and I might
 4     look at Document 106, but I thought the government,
 5     actually, in response to the objection, said it wasn't
 6     going to seek this kind of testimony from this witness.
 7                MS. SEDKY:  Right now we are only asking about
 8     cable modem hacking generally.  We would like him to
 9     talk about how big of a problem cable modem hacking
10     generally is, whether it's a big problem or a small
11     problem.
12                THE COURT:  What difference does it make?
13                MS. SEDKY:  Because it --
14                THE COURT:  And it also -- you know, I assume
15     that Mr. Harris wasn't the only person out there doing
16     this.  Is this going to open the door to all kinds of
17     confusing evidence as to whether Mr. Harris is a big
18     problem or not if he was involved in a scheme to get
19     money or property or something of value and use the
20     wires in furtherance of the scheme?
21                MS. SEDKY:  Well, to the extent we do plan on
22     asking Mr. Brodfuehrer, your Honor, one of his
23     responsibilities in the lab is to do market research and
24     figure out who the big people out there are who are
25     providing hacked cable modems and he -- I was intending
```

1    to ask him what -- you know, whether TCNISO fell in this

2    market.  And the reason that this is relevant is because

3    to the extent that Mr. Harris's defense here is, "I have

4    no idea how my products were being used," to the extent

5    that the reality of the marketplace is that this guy is

6    a scourge on the cable companies, it certainly shows --

7    we can't get the user posts anymore, they're admitting

8    stealing service, but to the extent that we can show

9    that the reality of the marketplace is that these modems

10   were all over these cable companies' networks, it shows

11   the fact that they were being used to steal service.

12             THE COURT:  Well, I'm going to take the

13   break.  I want to take -- the first thing I want to do

14   is take a look at your document number --

15             MS. SEDKY:  We will not be asking about

16   TCNISO.

17             THE COURT:  I thought you just said you were

18   going to ask where he fit in the universe of --

19             MS. SEDKY:  We're going to ask about market

20   share, but not dollar damages.

21             THE COURT:  Well, what's the difference?

22        Anyway.  What do you say about all of this?

23             MR. McGINTY:  I'm dumbfounded.  I thought this

24   was out of --

25             THE COURT:  Yeah, I did, too.  Maybe -- I'll

1     take the break in a few minutes, but for the moment it's

2     out.

3              MS. SEDKY:  Okay.

4              THE COURT:  Based on what I understood were

5     the representations that I can't lay my hands on.

6              MS. SEDKY:  I apologize, your Honor.

7              THE COURT:  But not only on the

8     representations -- I mean, you know, in Massachusetts,

9     at least at one time there were numerous bank robbers,

10    including, you know, reputedly, demonstrably lots of

11    bank robbers in Charlestown, and, you know, whether one

12    particular person robbed a bank or whether -- you know,

13    you wouldn't be able to get in evidence that lots of

14    people robbed banks, you'd have to prove that this

15    person robbed a bank.

16             MS. SEDKY:  But Mr. Harris's defense is, "I

17    did not know or intend for my people to steal service or

18    uncap their modems," and to the extent that the actual

19    realities of how in practice people were using his

20    products is certainly relevant to establish what he --

21             THE COURT:  This witness is going to be able

22    to say he knows, during the period of the conspiracy,

23    how many people were using TCNISO products?

24             MS. SEDKY:  He will say that there was already

25    persistent hacked modems on the Charter network and that

1    they were the leader in the marketplace and that's how

2    he picked them.  I mean, he did his own research.

3    Charter had done research on their own long before they

4    heard from the government because --

5              THE COURT:  Well, there are certain things he

6    can do.  I mean, you can lay a foundation, I think, but

7    don't go into sort of the economic injury.

8              MS. SEDKY:  I don't intend to.

9              THE COURT:  Yeah, you are.

10             MS. SEDKY:  No, I just want to get the

11   magnitude, I wasn't going to talk about --

12             THE COURT:  That is the economic interests.

13             MS. SEDKY:  Just is it big or small?  That

14   these people --

15             THE COURT:  Excuse me.  I understand the

16   argument.

17             MS. SEDKY:  Okay.  What may I say?

18             THE COURT:  You can go into, I believe, what

19   leads up to him getting the video, what did he do?

20             MS. SEDKY:  Okay.

21             MR. McGINTY:  Well, I don't know what that's

22   going to be.  This guy's an engineer, he has no

23   responsibilities for marketing or for sales of these

24   devices.  Now, how do these guys, um, 10 years in the

25   business working up front in a ground-level job, get the

1   expertise and competence in the business -- just as a

2   foundation to --

3            THE COURT:   No.   Excuse me.   There was no

4   objection to him giving expert testimony, but it has to

5   be within certain parameters.

6        Do I have the expert disclosures?

7            MS. SEDKY:   I do, your Honor.

8            (Pause.)

9            MS. SEDKY:   He was in the lab testing unit and

10  that's what he did, he tested --

11           THE COURT:   You can go into what he did and he

12  can say -- you know, if there is a proper foundation he

13  can say, "You know, I went in and I found these TCNISO

14  products were being used to steal service, so I wanted

15  to see how that worked and so I acquired one from the

16  website and, you know, one from the market," which

17  raises whatever issues it raises, "and then I ran it and

18  this is it."   That can go in.   But we'll get Number

19  106.   But my understanding is -- you know, whether it's

20  big or little, you're talking about economic injury,

21  which I had understood you agreed not to get into.

22           MS. SEDKY:   My specific question was -- we

23  have not even mentioned the word "TCNISO.net" to this

24  witness, I was really speaking just generally.

25           THE COURT:   I don't think it's -- yeah, I

1      don't think it's a proper inquiry, you know, that it's a

2      large problem.  You're not in your closing argument, you

3      know, permitted to say, "This is a massive national

4      problem, so you should convict him".

5              MS. SEDKY:  We believe that it goes to

6      Mr. Harris's knowledge that --

7              THE COURT:  All right.  Well, now you're going

8      to get your break.  I have a call that I have to make.

9      I have to discharge certain of my other judicial

10     duties.  But we'll get 106.  And you've got my ruling at

11     the moment, so I suggest you plan to go in a different

12     direction.

13

14              (In open court.)

15              THE COURT:  Ladies and gentlemen, the

16     objection's sustained.  We're almost at the break and

17     there are a few things I need to look at and there may

18     be a phone call I have to make in my capacity as Chief

19     Judge.  So I'm going to give you a 20-minute break,

20     we'll resume at 11:15, and we'll continue to about

21     1:00.

22          All right.  The Court is in recess.

23              (Recess, 11:55 a.m.)

24              (Resumed 11:15 a.m.)

25              THE COURT:  Okay.  On the issue we left off

1    on, what I was referring to was in the government's

2    opposition to the defendant's motion in limine regarding

3    the testimony, on Page 5, under the caption, "Motorola,

4    Charter employees," the government wrote:  "The

5    defendant objects to Motorola employee Chris Kohler

6    testifying that he received numerous complaints from

7    ISPs about TCNISO's products and Charter Communications

8    employee Benjamin Brodfuehrer testified about the

9    financial injury TCNISO products caused to Charter.  In

10   light of these objections, the government will not

11   elicit this testimony."  So that's what I was referring

12   to.

13          MS. SEDKY:  Your Honor, we withdraw that line

14   of questioning.  We misunderstood, we didn't intend to

15   abrogate the Court's order, but we won't ask about the

16   --

17          THE COURT:  Well, actually I didn't make any

18   order --

19          MS. SEDKY:  Oh, I'm sorry.

20          THE COURT:  -- because you said you weren't

21   going to offer the evidence.  But what you're saying, I

22   think, is that you're going to honor the representation

23   and -- I mean, the issue is relevant.  You have to prove

24   that Mr. Harris devised or participated in a scheme to

25   get money or property or something of value based on

1   false misrepresentations with intent to defraud and the

2   wires were used with his knowledge or were reasonably

3   foreseeable -- was reasonably foreseeable to him that it

4   would be used.  So it's not an irrelevant issue and --

5   but you said you weren't going to ask this witness those

6   questions.

7          What I do think, as I said, or what I thought you

8   would do leading up to Exhibit 8 is -- is he the one --

9   is he going to testify or is he able to testify that he

10  personally did a certain investigation and he found that

11  TCNISO's products were being used to hack the Charter

12  system?

13          MS. SEDKY:  Yes, he is.

14          THE COURT:  And therefore he bought some of

15  those products to see how they worked?

16          MS. SEDKY:  Yes.

17          THE COURT:  Well, that's not expert testimony,

18  that's based on personal knowledge of what he did and,

19  in my present view, it's relevant and admissible.

20          MS. SEDKY:  Thank you, your Honor.

21          MR. BOOKBINDER:  Your Honor, just one other

22  matter.  Mr. McGinty, a couple of times, has brought out

23  -- and it's proper cross-examination that we have met

24  repeatedly with witnesses before their testimony, but

25  I'd ask whether the Court would instruct the jury that

1    there is nothing improper about those meetings because

2    they may otherwise have an impression, based on the

3    questioning, that that's something that we're not

4    supposed to be doing.

5              THE COURT:  Well, I don't know that I would

6    give them that instruction now.  And, you know, you can

7    ask --

8              MR. BOOKBINDER:  I don't disagree with that,

9    your Honor.  Maybe the appropriate time would be -- that

10   may be the basis for cross-examination of Mr. Hanshaw as

11   well and I would anticipate --

12             THE COURT:  You know, and you could say -- and

13   I don't know what the answer is, but if you wanted, you

14   could ask, "If the defendant had asked to meet with you,

15   would you have done it?"  Things like that.  Because if

16   I gave them any instruction, I'd have to say it's

17   permissible for a witness to meet with one party or

18   another, but, you know, you may consider whether or not

19   they met in judging the credibility of the evidence.

20             MR. BOOKBINDER:  Well, let's see how it goes

21   with Mr. Hanshaw and we'll ask to approach if we think

22   that --

23             THE COURT:  Well, all right.

24        All right.  Are we ready to get the jury back?  I

25   guess so.  So we'll get the jury.  And why don't we put

1   the witness back on the stand, please.

2              (Witness enters, 11:19 a.m.)

3              (Jury enters, 11:20 a.m.)

4              THE COURT:  Ms. Sedky, you may resume.

5              MS. SEDKY:  Thank you.

6   Q.  Mr. Brodfuehrer, when you were working in Charter's

7   lab testing environment, did you ever test any modified

8   modems of a company called TCNISO?  Are you familiar

9   with that name?

10  A.  Yes, I did.

11  Q.  Um, how did you acquire, if you did, any of the

12  modems from --

13             THE COURT:  Well, let me just clarify

14  something.  She asked if you tested and I think she

15  meant -- I understood her to mean you individually.

16             THE WITNESS:  Yes, I did.

17             THE COURT:  Okay.  Go ahead.

18             THE WITNESS:  Sorry.

19  Q.  And are you aware of how it is Charter, or anyone in

20  your lab, acquired the products that you ended up

21  testing from TCNISO?

22  A.  Yes, one of them we purchased and one of them we

23  reclaimed from the field.

24  Q.  And when you say one of them you purchased, do you

25  know how that was purchased, how did that take place?

1    A.   Um, a former employee's wife, she purchased that on

2    our behalf and then gave it to us.

3    Q.   Do you remember which product that was?

4    A.   I believe that was a Sigma modem.

5    Q.   And when you say you got them from the field, what

6    does that mean?

7    A.   Um, that means that we located one on the network

8    that was in the subscriber's house and then when we

9    approached that subscriber they decided to surrender

10   that modem and start paying for service.  So I don't

11   know, in that specific case, whether they started paying

12   for service or used a legitimate modem or were

13   disconnected completely from their cable plan, but they

14   did return the modem.

15   Q.   And when approximately did you analyze the TCNISO

16   products?

17   A.   I would say they first started in the 2008 or 2007

18   era.

19   Q.   And over time did you acquire a series of different

20   products from TCNISO to test?

21   A.   Um, we did software upgrade our device from time to

22   time.

23   Q.   And about how long would you say you were tracking

24   TCNISO's products?

25   A.   Um, for a couple of years.  They are still used for

1    some purposes in the lab today.
2    Q.  And could you explain -- are you familiar with a
3    product called Sigma X?
4    A.  Yes.
5    Q.  What is that?
6    A.  That is one of the versions of the software that
7    runs on a TCNISO product and that is what currently is
8    running on our TCNISO that we have.
9    Q.  And how did you acquire that copy of Sigma X?
10   A.  Um, that we -- either our modem that we purchased
11   was either originally shipped with Sigma X or it was
12   software upgraded to Sigma X at some point.
13   Q.  So that was not one of the ones you got from the
14   field?
15   A.  No, it was not.
16   Q.  Could you explain very briefly, before we get into
17   any details, how Sigma X worked on Charter's network as
18   a result of your testimony that you were about to --
19            MR. McGINTY:  Objection.  Foundation.
20   A.  Um, Sigma --
21            THE COURT:  Well, why don't you lay some
22   foundation.
23            MS. SEDKY:  All right.
24   Q.  Did you, in fact, test Sigma X back in 2008?
25   A.  Yes, I did.

1    Q.   And in the course of your testing were you able to

2    draw any conclusions about whether it worked

3    effectively?

4    A.   Yes, it did work effectively.

5    Q.   How did it work effectively?

6    A.   Um, it worked as designed, or what I would consider

7    as designed, in that it allowed you to, um, steal cable

8    service.

9    Q.   And after doing your own testing on Sigma

10   X, were you later asked by the government to analyze and

11   test Sigma X?

12   A.   Yes.

13   Q.   And at that time were you also asked to record

14   portions of your test results?

15   A.   Yes, I was.

16   Q.   Did you, in fact, record those portions?

17   A.   Yes, I did.

18   Q.   And could you tell us how does somebody -- or how

19   did you make a recording of your testing, what did you

20   do?

21   A.   Um, I used a piece of free software that's available

22   that records what's on the computer screen into a video

23   file so you can play it back later.

24   Q.   And did you save copies of those files?

25   A.   Yes, I did.

1    Q.  And did you provide them to the government?

2    A.  Yes, I did.

3    Q.  And prior to testifying today, did you have an

4    opportunity to examine a disk labeled as Government's

5    Exhibit 8?

6    A.  Yes, I did.

7    Q.  Did that disk contain copies of the files that you

8    provided to the government?

9    A.  Yes, it did.

10           MS. SEDKY:  Your Honor, I'd like to introduce

11   Exhibit 8 into evidence.

12           MR. McGINTY:  May we approach sidebar, your

13   Honor?

14           THE COURT:  Yes.

15

16           AT THE SIDEBAR.

17           THE COURT:  Go ahead.

18           MR. McGINTY:  The item tested was Sigma either

19   as shipped or as upgraded.

20           THE COURT:  Well, I made it known that it's

21   the same thing, you're going to have to lay a foundation

22   as to how it's going to be upgraded and whether he

23   knows.

24           MS. SEDKY:  I'll ask him.

25           THE COURT:  I mean, I think he -- yeah, I

 1    mean, basically the question is, "Did the upgrade come

 2    from" --

 3                  MS. SEDKY:  Your Honor --

 4                  THE COURT:  -- TCNISO?"  Okay.

 5                  MR. McGINTY:  Who did it?

 6                  THE COURT:  I'm sorry.  Just wait.

 7            Who got the upgrade?

 8                  MR. McGINTY:  Who did it and does he know?

 9    This is supposed to be the thing.

10                  THE COURT:  Yeah, I know.  All right.

11                  MR. McGINTY:  May I voir dire him on it, your

12    Honor?

13                  THE COURT:  We'll see.  We'll see.

14

15                  (In open court.)

16    Q.  I'd like to step back and ask you about how it is

17    that you acquired Sigma X.  You were saying earlier that

18    you either -- that it came on the original modem or

19    perhaps it was upgraded.

20            Do you know whether -- were you involved in the

21    process of upgrading -- doing any of these upgrades

22    yourself?

23    A.  No, I did not specifically do the upgrades on that

24    device, one of my co-workers did.

25    Q.  And what do you know about what happened?

```
1              MR. McGINTY:  Objection.

2              MS. SEDKY:  Do you know where they -- oh, I'm

3      sorry.

4              THE COURT:  Well, you're going to -- it's

5      conceivably possibly hearsay, so you're going to have to

6      get over that.

7      Q.  Do you have any knowledge of where the --

8              THE COURT:  Other than what somebody told

9      you.  Go ahead.

10             MS. SEDKY:  That's right.

11     Q.  Other than what somebody told you, do you have any,

12     um, information about where they obtained these upgraded

13     software programs?

14     A.  You could download an --

15             MR. McGINTY:  Objection.

16             THE COURT:  Yeah.  Basically, at this point,

17     we're trying to find out -- I'm trying to find out what

18     you know personally as distinguished from -- you know,

19     what you saw or heard or did yourself, as opposed to

20     what somebody else told you.

21         So -- and Ms. Sedky will ask you some questions

22     intended to make that distinction.  And please answer --

23     you know, listen to the question carefully and keep that

24     distinction between personal knowledge and what you were

25     told in mind when you answer.  Okay?
```

1           THE WITNESS:  Okay.

2    Q.  Well, how did you, when you were updating -- did

3    you, yourself, ever update any of the Sigma products?

4    A.  Not specifically myself, no.

5    Q.  Do you know how other people did, without telling me

6    what they said?

7           MR. McGINTY:  Objection.

8    Q.  Is it based on what they have told you or have you

9    observed other people doing whatever they did?

10          MR. McGINTY:  Objection.  Other people?

11          THE COURT:  No, the objection is overruled.

12   That question is fine.

13   A.  Could you re-ask the question?

14   Q.  Sure.  Did you ever observe other people, in your

15   lab testing environment, um, getting upgrades to the

16   Sigma product?

17   A.  Yes, I did.

18   Q.  What did you observe them doing, these people in

19   your lab?

20   A.  I observed them logging onto the TCNISO website and

21   checking for the newest software version and then

22   downloading that version of software to the computer so

23   it can be placed onto the modem.

24   Q.  Was that the standard practice in your test -- that

25   you observed in your department for the way to get

1  upgrades?

2  A.  (Pause.)  For that modem specifically or for modems

3  in general?

4  Q.  Um, for the modem that you tested and recorded, the

5  software that's on the modem --

6            THE COURT:  Well, I think you were asking

7  about a standard practice.

8            MS. SEDKY:  I was.

9            THE COURT:  And that would relate to modems

10  generally and not a particular modem.

11            MS. SEDKY:  Right.

12  Q.  So in modems generally, what was the standard

13  practice that people in your group did to update the

14  Sigma product?

15            MR. McGINTY:  Objection.

16            THE COURT:  Overruled.

17       Well, let me put it this way.  Was there a

18  standard practice with regard to getting upgrades?  Was

19  it done more than once?

20            THE WITNESS:  For the -- yes, it was, it was

21  done more than once.

22            THE COURT:  And did you observe it being done

23  more than once?

24            THE WITNESS:  Um, I observed it being done at

25  least once.

1          THE COURT:  And what did you observe, what you

2     just described?

3          THE WITNESS:  Yes, sir.

4     Q.  Did you ever observe any other way that people in

5     your group would obtain the updates?

6     A.  For that specific modem, no.

7          THE COURT:  No, for modems generally.  Was

8     there a --

9          Did Charter get modems from TCNISO once or more

10    than once -- directly from TCNISO, once or more than

11    once, to your knowledge?

12         THE WITNESS:  Once.

13         THE COURT:  Okay.  And did it also get modems

14    that were modified not by TCNISO, as far as you know,

15    but from other producers?

16         THE WITNESS:  Yes.

17         THE COURT:  And was it a standard way to get

18    modems and upgrades -- well, I should separate it, to

19    get modems -- well, to get upgrades on modems?

20         THE WITNESS:  More specifically for hacked

21    modems or for all modems in general?

22         THE COURT:  For hacked modems.

23         THE WITNESS:  No, there's not a standard way.

24         THE COURT:  But as far as he knows, there was

25    only one upgrade of -- well, let me you this.

1           To your knowledge was there only one upgrade

2     obtained by Charter to a TCNISO modem?

3                 THE WITNESS:  Um, no, even though, like I

4     said, I saw the process being done once, the devices say

5     what version of software they're running on and I saw

6     the version of software change more than once.

7                 THE COURT:  Okay.  So you saw it done once.

8           Do you know what version of Sigma was obtained in

9     the transaction you observed?

10                THE WITNESS:  No, I do not.

11                THE COURT:  All right.  I'll see counsel at

12    sidebar.

13

14                AT THE SIDEBAR

15                THE COURT:  Okay.  Now where are we?

16                MR. McGINTY:  He did not see this upgrade.

17    His initial testimony was that it was delivered either,

18    um, as, the way he put it, "It either got shipped or it

19    was upgraded," and now we learn that it was upgraded.

20    We don't know that he saw it.  He can't say that he saw

21    this.

22                THE COURT:  Well, I didn't understand him to

23    qualify his earlier testimony that it was shipped or it

24    was upgraded.

25                MR. McGINTY:  Well, that's what he had said

```
 1    originally, either it was shipped or it was upgraded,

 2    but now he says, um, that it was upgraded in the lab,

 3    um, but he doesn't mention who it was that did it.

 4            THE COURT:  I don't know that he said that

 5    this one was upgraded, what I understood him to say was

 6    that he saw one upgrade and he doesn't know whether this

 7    one was shipped or this has the version of that upgrade

 8    or if it was some other upgrade that he didn't know was

 9    on there.

10            MS. SEDKY:  Your Honor, if anything, we would

11    argue that this goes to the weight, not the

12    admissibility of the evidence, and Mr. McGinty is able

13    to cross-examine him.  You'll see on the actual exhibit

14    itself that it has labels and on top what the name of

15    the product is and it identifies it as "Sigma X," it

16    tells you which version it is -- it's apparently a self-

17    authenticating document, and if Mr. McGinty wants to,

18    um, challenge him on cross, um, then he's welcome to do

19    that.

20            THE COURT:  What do you say?

21            MR. McGINTY:  I say that he says, "I tested

22    the thing, um, I tested it with this upgrade," um, but

23    he has not provided the foundation that this upgrade is

24    on this machine so that the results are admissible, and

25    there's a foundational step that has to be taken here.
```

1    This doesn't go to weight, it goes to admissibility.

2              THE COURT:  All right.  The objection is

3    overruled.  This, I think, is properly analyzed under

4    Rule 104(b).  I mean, this is relevant if the software

5    was on the modem as it was sent from TCNISO or was

6    obtained from TCNISO, um, and based on his evidence, I

7    think the jury could conclude, by a preponderance of the

8    evidence, that it was either on there originally or, um,

9    that it was acquired.  Now, it doesn't have to reach

10   that conclusion and you'll argue that they haven't shown

11   where this came from, but it's admissible.

12

13             (In open court.)

14             THE COURT:  Okay.  You may proceed.

15             MS. SEDKY:  The government offers Exhibit 8

16   into evidence.

17             THE COURT:  Exhibit 8 is admitted.

18             (Exhibit 8, marked.)

19             MS. SEDKY:  And I would like to have

20   permission to play the first of the videos.

21             THE COURT:  Yes, you may.

22             (Starts video.)

23             MS. SEDKY:  Well, before we start playing it.

24   Q.  Mr. Brodfuehrer, could you look at your monitor and

25   tell us what are we looking at here?

1  A.  Um, you're looking at the web interface for a Sigma

2  X cable modem.

3  Q.  Okay.  And at the top line under the box where it

4  says the label "Sigma X version," yadda, yadda, it says

5  "Sigma web Shell Sniffer"?

6  A.  Yes.

7  Q.  Okay.

8          MS. SEDKY:  So I'm going to play the video and

9  I'll pause it.

10  Q.  Is this what shows up on a user's computer?

11  A.  Yes, this is either --

12          THE COURT:  Actually is this the recording

13  that you testified earlier you made as a test of the --

14          THE WITNESS:  Yes, sir.

15          THE COURT: -- modem?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Okay.

18  Q.  And what's happening in this video clip?

19  A.  Um, earlier I clicked on the buttons to start the

20  web sniffer with the default options.  Now it is waiting

21  the watch for another cable modem on the system to come

22  on line so it can grab some information from that modem

23  when it starts up.  Specifically during this test, um,

24  we started a group of other modems that would simulate

25  other modems from other houses connecting to the

 1    network.

 2         So now you can see results coming into the bottom

 3    section there.

 4    Q.  Okay, let's take a sample of these results.  So

 5    let's look at the below screen here.  Well, actually,

 6    let me take a look at -- so the top blue bar, what does

 7    that say, "Sigma Coax Side Sniffer"?

 8    A.  Yes, that is what that says.

 9    Q.  And below that there's a line there.  Let's take the

10    first series there.  Could you tell us what that series

11    of numbers is, what the data is sniffing?

12    A.  Sure.  The bottom box there, there's basically three

13    columns worth of data.  The first column contains the IP

14    address of the modem that installed.

15    Q.  And what's in the second column?

16    A.  In the second column is the MAC address of the modem

17    that's --

18    Q.  And what's that third column?

19    A.  The third column is the name of the configuration

20    file.

21    Q.  And where are these MACs coming from, if you know?

22    A.  These are other modems that are connected to the

23    cable plant.

24    Q.  Okay.

25              MS. SEDKY:  I'd like to go to the next video.

1    Okay?  And before I start playing it --

2    Q.  So we're back on this same landing page, it sounds

3    like?

4    A.  Yes.

5    Q.  And could you --

6              MS. SEDKY:  I'm going to start playing this.

7    Q.  So the MAC address that's right in the dark blue

8    box, what's that?

9    A.  That is the MAC address that's currently assigned to

10   the modem.

11   Q.  Okay.  And what are you doing here?

12   A.  Um, I'm loading up a -- I'm attempting to load the

13   Google news site and as you can see we were redirected

14   to the Charter sign-up page, which is what would happen

15   to any modem that's not currently paying for service.

16   Q.  And I apologize, I partially blocked it.

17        So this is the screen that Charter will send out

18   to someone who's using a MAC address that it does not

19   recognize as a valid subscriber's MAC address?

20   A.  That is correct.

21   Q.  All right.

22   A.  I'm also attempting to load the Massachusetts state

23   government site just to verify that I can't go there

24   either, that it will just redirect you back to the sign-

25   up page again.

1  Q.  So no Google, no nothing basically?

2  A.  Right.

3  Q.  What are you doing now?

4  A.  So now we're going back to the first page that we're

5  on, I've typed in a different MAC address and clicked

6  the "change" button and saved that change.  Now I'll go

7  down and I'll click the reboot button that will restart

8  the cable modem.

9  Q.  So that MAC address that you put in, that was on the

10  results page of the first video clip?

11  A.  Yes, it was.

12  Q.  So what's happening right now?

13  A.  Right now the modem is restarting, reconnecting to

14  the cable network.  This can take a few minutes to

15  happen.  So I'm just waiting patiently while it does

16  that.  (Pause.)  At this point the lights on the modem

17  indicating that it was connected to the web interface

18  wasn't quite responding yet.  It will be here in just a

19  few seconds.  There it is.  You can see the MAC address

20  is what we set it to.  Now it's restarting the web

21  browser.

22  Q.  So just an ordinary hiccup or?

23  A.  Yeah, with that Firefox it was.  (Pause.)  And now

24  it's attempting to load the Google news site again.  You

25  can see this time it successfully brings up the Google

1    news web page.  Then you can load the Massachusetts

2    state government site, but apparently the last few

3    seconds of the video got cut off before I sent it to

4    you.  But it did load.

5    Q.  Okay.  So we've got the MAC address from the

6    sniffer, put it into the Sigma interface with the MAC

7    changer, and the result was that it works, is that fair

8    to say?

9    A.  Yes.

10   Q.  Okay.  Now, before I show you the next video, um,

11   are there products out there that test speeds of

12   people's cable modems?

13   A.  Um, yes, we have servers on our network that do it

14   and there are several independent servers that do it,

15   also.

16   Q.  Okay.

17            MS. SEDKY:  So now I'd like to show this

18   video.

19   Q.  And is this one of those speed test tools?

20   A.  Yes, this is one of the ones that Charter owns.

21   Q.  And did you perform a speed test on your own modem?

22   A.  Yes, I did.

23   Q.  As it existed before you made any changes to it?

24   A.  This was a modem that was authorized to connect to

25   the network, but I didn't make any changes besides that.

1    Q.  And what's happening now?

2    A.  Um, right now the test itself is running, it takes

3    several seconds to complete, and then we'll see a bar

4    graph once it's done.

5    Q.  And just for a point of clarification, this little

6    small thing that's -- it's under like a speedometer, is

7    that fake or real?

8    A.  That is basically a decoration on this version of

9    the speed test.

10   Q.  Okay, so that's not the data, those are not the

11   results?

12   A.  No, it's not.  (Pause.)  Okay.  So we've got the

13   results now.  So pause it for just a second.

14        So the result of our test is the bottom bar graph

15   there, the green is the download speed, the orange is

16   the upload speed, and right below it it says "Your

17   download speed is 4.6 megabits per second" and it says,

18   to the right of that, "Your upload speed is 959 kilobits

19   per second," which is basically .9 megabits.

20   Q.  Okay.  So now what are you doing?

21   A.  Um, now I'm giving it a name of a configuration file

22   that is on my computer that I wanted to load instead of

23   its standard config that we sent it, um, from the

24   originating and billing system.

25   Q.  And this is back -- you're back on the Sigma main

1   web interface and you're --

2   A.   Yes.

3   Q.   And you're inputting this new config file in a box

4   that says "config file"?

5   A.   Yes.  I'm also inputting the IP address of which

6   server, the TFTP server that it should download the file

7   from, which is the local computer, and I have instructed

8   it to reboot so it will trigger the download with the

9   new configuration.

10  Q.   So what's happening here?

11  A.   It's going through the same startup procedure as

12  before, I just show the IP address of the computer there

13  that show that it is, in fact, the IP that I typed in.

14  And this is the TFTP server and it will show that the

15  modem does successfully download the file from this

16  specific PC.  There's the two messages that show that

17  that happened.  (Pause.)  And at this point we're just

18  waiting for the modem to complete coming on line, like

19  we did before.  (Pause.)  This shows my IP address

20  changed back to a public IP address on the internet.

21  And now I'm starting the test over.

22  Q.   Okay.  And, again, the bogus but good-looking

23  graphic?

24  A.   Yes.  (Pause.)  Now that the test is completed, you

25  can see the bar graph is much longer this time and below

1  it it says "your download speed is 33 megabits per

2  second" and "your upload speed is 2 megabits per

3  second."

4  Q.  Now, in addition to conducting tests on Sigma X that

5  we just observed, you mentioned earlier that one of the

6  other ways that your group acquired TCNISO's products

7  was from the field?

8  A.  Yes.

9  Q.  And in your experience have you ever been able to

10  analyze yourself any of those field-obtained modems?

11  A.  Yes.

12  Q.  And were they uncapped, did you observe that?

13          MR. McGINTY:  Objection.

14          THE COURT:  I think you're going to have to

15  lay a little more precise foundation including whether

16  they were TCNISO modems.

17  Q.  Were you able to determine whether or not the modems

18  that you got from the field had a TCNISO -- was a TCNISO

19  modem or had TCNISO software on it?

20  A.  They had a web interface that was consistent with

21  the TCNISO products.  They said "TCNISO" on the web

22  interface and they had a copyright "TCNISO" on them.

23  Q.  And were you able to perform any analysis on them?

24  A.  Yes.

25  Q.  Did you observe the configuration file that was

1    already existent on this modem or on these modems?

2    A.  Well, once a modem's powered off, it no longer has

3    configuration until it reconnects.

4    Q.  Okay.  Were you able to figure out whether there had

5    been any modifications to this modem?  Well, were you

6    able to figure out whether this modem had been

7    "uncapped," as you understand that term to mean?

8    A.  That specific modem?  No.

9    Q.  Okay.  Any other modems from TCNISO?

10   A.  We do have modems on our network that we know are

11   uncapped and we have modems on our network that we know

12   are --

13            MR. McGINTY:  Objection.

14            THE COURT:  Yeah, sustained.  You can't answer

15   it in that form.  She's asking about what you personally

16   know and she's going to have to establish that it's

17   something you know and not something somebody else told

18   you.  Okay?

19            THE WITNESS:  Okay.

20            MS. SEDKY:  Okay.

21   Q.  Um, let's step aside from the field testing that you

22   did.

23        Can you describe what, if any, security measures

24   Charter took to try to respond to TCNISO's products, if

25   any?

1    A.  There are security features that are built into the

2    CMTSs that are supposed to stop certain types of modem

3    hacking activities.  The one that we were specifically

4    using the most at that time was called "TFTP Enforce"

5    and that security feature did not effectively stop the

6    TCNISO modems.

7              THE COURT:  What was it called?

8              THE WITNESS:  TFTP Enforce.

9    Q.  Are you familiar with like probings?

10   A.  Yes.

11   Q.  What is "probing"?

12   A.  Um, probing can be done by -- from the operator side

13   of the network we will specifically ask the modems

14   specific information about their signal levels and other

15   statistical things that they do, what brand they are,

16   what model they are, what version of software they're

17   running, just basic management information such as that.

18   Q.  And in your analyses of TCNISO's products, were

19   there any features designed into it that affected your

20   probing functions?

21   A.  Yes, they have an option in the web interface that

22   you can disable that to where it will not respond.

23   Q.  And what's T -- I'm embarrassed to say I can't

24   remember the acronym, "TP Enforce"?

25   A.  Yes.

1    Q.   What is that?

2    A.   Um, that is a security feature that is built into

3    the CMTS that will watch the modems when they boot up

4    and it will ensure that they download the configuration

5    file, the specific file they're supposed to get from us,

6    and that they do download the file from us.

7    Q.   And how is it that TCNISO's products were able to

8    delete that?

9    A.   Um, they still downloaded the configuration file

10   from us even though they later, as you saw on the video,

11   loaded a configuration file from another device.

12   Q.   And does Charter periodically update software on its

13   modems?

14   A.   Yes, we do.

15   Q.   And what would happen to a Sigma software-coded

16   modem if Charter had sent out an update?

17   A.   If it behaved like a normal modem, it would download

18   the new version of software and replace the current

19   Sigma software and then start operating like a normal

20   cable modem, yes.

21   Q.   So it would wipe out Sigma, essentially?

22   A.   Yes.

23   Q.   And do you know whether TCNISO products had any

24   features to adjust to that?

25   A.   Yes, they had an option to block upgrades so that if

1    we told it to download a version of software for what we

2    thought it was, it would just not do it and it would

3    report a failure.

4    Q.  And you testified earlier that you watched these

5    products over time, these updates and things to TCNISO's

6    products.  Did you notice whether TCNISO's products

7    changed as Charter's security measures changed?

8    A.  Right, as the Charter security features became more

9    robust, newer versions on the CMTS that could defeat

10   older versions of software on modems -- the newer

11   versions of software could, um, circumvent those once

12   again.

13   Q.  And how would you evaluate their ability to

14   circumvent Charter's security measures?

15   A.  I think it was very effective.

16   Q.  Um, on the Charter network, based on what you've

17   seen, what use, if any, um, would there be to sniff MAC

18   addresses other than to change your MAC and steal the

19   service?

20   A.  I don't know of any legitimate use that a subscriber

21   would have for sniffing a MAC address.

22   Q.  And based on your experience examining modems on the

23   Charter network, what use, if any, other than to steal

24   service would someone change their MAC address?

25   A.  Um, I don't know of any legitimate use beside

1    stealing service.

2    Q.  And why would somebody want to block updates?

3    A.  Um, once again I do not know of any legitimate use

4    to block an update unless you specifically want to stay

5    on a hacked version of software.

6              MS. SEDKY:  I have nothing further.  Actually,

7    one moment, your Honor?

8              (Pause.)

9              MS. SEDKY:  We have nothing further.

10             MR. McGINTY:  May I, your Honor?

11             THE COURT:  Yes.

12

13   CROSS-EXAMINATION BY MR. McGINTY:

14   Q.  Mr. Brodfuehrer, good morning.

15   A.  Good morning.

16   Q.  When you were -- do you remember being interviewed

17   by the agents in November of 2011?

18   A.  Yes, I do.

19   Q.  And do you remember that, um, they had asked you

20   some information about your educational background?

21   A.  Yes.

22   Q.  Do you remember that?

23   A.  Yes.

24   Q.  And you had told them that you had an associate's

25   degree in MIS from the University of Missouri?

```
 1   A.  No, sir, I did not.

 2            MR. McGINTY:  May I approach the witness, your

 3   Honor?

 4            THE COURT:  Why don't you just put it on the

 5   --

 6            MR. McGINTY:  Because it hasn't been admitted,

 7   so.

 8            THE COURT:  I know.  I'm going to take it off

 9   the jurors' monitors.  You can put it up there, we'll

10   all see it, and they won't.  Mr. Hohler will help you.

11            MR. McGINTY:  Okay.

12            (Pause.)

13   Q.  I draw your attention to the second paragraph.

14        Do you recall telling the agents that you earned

15   an associate's degree in MIS from the University of

16   Missouri?

17   A.  No, sir, I did not, I told them that I'm currently

18   attending St. Charles Community College in Cottleville,

19   Missouri and I'm enrolled in an MIS program.

20   Q.  All right.  So you are currently a student at

21   St. Charles Community College, am I right?

22   A.  That is correct.

23   Q.  You began your studies there in 2009, do I

24   understand that correctly?

25   A.  That sounds correct.
```

1    Q.   And you are currently a student in a class, um, that

2    is studying systems analysis, do I understand that?

3    A.   That is correct.

4    Q.   And there's a text that you have with you today

5    that's alongside of you, is that your study text?

6    A.   Yes, but not for that class.

7    Q.   For a different class that you're taking?

8    A.   Yes.

9    Q.   Now, um, when a customer gets cut off by Charter for

10   nonpayment of service, does Charter physically go and

11   disconnect the service?

12   A.   We have two types of disconnects that we do, it

13   depends on how delinquent you are, the first one is

14   called a soft disconnect where we will deauthorize your

15   cable modem, we will turn off any of your set-top

16   boxes.  The analog cable will still work.  That means

17   that if you have a TV with a line hooked directly to it,

18   that would still work.  And at a different point of

19   delinquency, we do go out and disconnect you from the

20   cable network.

21   Q.   So if I say -- if I tell Charter that I'm moving out

22   of my apartment and won't need service any longer, does

23   Charter come and disconnect my cable connection to the

24   CMTS?

25   A.   Um, apartments are a unique situation.  If you

1    specifically had service with Charter, we would come out

2    and physically disconnect your apartment from the entire

3    cable network, including the CMTS.  If you were in an

4    apartment complex that had a bulk agreement with us

5    where the apartment owner paid for service, then we

6    would not because there was still somebody paying the

7    bill at that point.

8    Q.  So if no one's paying the bill and I move out, then

9    you're going to disconnect the service?

10   A.  Yes, physically disconnect it from the plant.

11   Q.  Physically?

12   A.  Yes.

13   Q.  And if that's the case, there's no juice going

14   through the coaxial cable, am I right?

15   A.  That is correct.

16   Q.  And if I attached a modem to that, I can't make that

17   modem live -- I can't make that coaxial cable to the

18   CMTS live, can I?

19   A.  Correct.

20   Q.  Now, modems are sold in a lot of different places,

21   are they not?

22   A.  That is correct, they are.

23   Q.  So Radio Shack and so forth?

24   A.  Yes.

25   Q.  Now, all of them have MAC addresses, do they not?

1    A.   That is correct.

2    Q.   And if you buy a modem at Radio Shack, the MAC

3    address is on the outside of the box, isn't it?

4    A.   Um, some vendors, yes, some vendors, no.

5    Q.   So if I know that Charter has a service in a

6    community, let's say Boulder, Colorado, and I went to

7    the Radio Shack and I wrote down the MAC addresses on

8    all of those modems, and I wait about a month, I might,

9    would it be fair to say, reasonably assume that one or

10   other of those MACs might be in service.  Would that be

11   fair?

12   A.   Assuming that you choose a state that we offer

13   service in, which Boulder, Colorado, we do not.  But,

14   yes, the example is valid.

15   Q.   Okay.  So I could write those down, because they're

16   on the box in some instances, and I can infer that the

17   sale might be in a region that Charter might serve,

18   right?

19   A.   Yes.

20   Q.   And I could use that MAC to try to get service, am I

21   right, that MAC number, a clone on the computer, I might

22   do that, right?

23   A.   Well, cloning the MAC onto the computer would not

24   give you service.

25   Q.   Putting the MAC on it would not if I, um, changed

1    the MAC address?

2    A.  You said cloning it onto the computer.

3    Q.  I'm sorry.  I'm sorry.  Forgive me for my -- but I

4    could use that MAC, under certain circumstances, to get

5    service from you, am I right?

6    A.  Under certain circumstance, yes.

7    Q.  Now, um, you testified about having done some tests

8    on modems.

9    A.  Yes.

10   Q.  And you testified that you had done these tests,

11   certain of these tests in 2007.  Do I understand that

12   right?

13   A.  I said in the 2007 and 2008 area, yes.

14   Q.  So in either 2007 or 2008, you do some testing on a

15   modem, um, that was your testimony?

16   A.  Yes.

17   Q.  And there was a second modem that had been taken

18   from the field, am I right?

19   A.  Yes.

20   Q.  Now, the first modem you were unsure whether it came

21   with Sigma as shipped or as upgraded.  Do I understand

22   your testimony correctly?

23   A.  That is correct.

24   Q.  And if you're uncertain about whether it was shipped

25   or upgraded, presumably you didn't see the upgrade

1   process, am I right?

2   A.   I testified that I saw it upgraded one time, but I

3   know it's been upgraded more than one time.

4   Q.   Okay.   Are you talking about that same modem?

5   A.   Yes.

6   Q.   So now your testimony is that you do know that it

7   was upgraded.   Do I understand that?

8   A.   That is what I said before, that I witnessed the

9   process once, and that I hadn't specifically seen the

10  version of the software change on it more than once.

11  Q.   But did I misunderstand your testimony originally?

12             THE COURT:   I think he's not going to be able

13  to answer whether you misunderstood.   So phrase it a

14  little differently.

15  Q.   Did you originally testify that you were unsure

16  whether it came with Sigma as shipped or as upgraded?

17  A.   That is correct.

18  Q.   And, um, the government asked you whether -- the

19  government asked you whether you had any tests or

20  reports related to tests that you conducted at that

21  time, do you remember that?

22  A.   Yes, I recall them asking in November, if that's

23  what you're referring to.

24  Q.   And you told them at the time that you could not

25  locate reports that Charter created, which presumably

1    would be you, because you're the only one doing the

2    test, right?

3    A.   Correct.

4    Q.   That Charter created, with the tests conducted, on

5    the modified cable modems from TCNISO, am I right?

6    A.   Correct.

7    Q.   And when you used the word "test on modems," you're

8    talking about modems being plural, am I right?

9    A.   Are you specifically asking if I recall in November

10   if I said "modem" or "modems"?  I do not recall.

11   Q.   And -- but in any event, the government wanted you

12   to give them the documentation from what you had done,

13   am I right?

14   A.   Yes.

15   Q.   And you didn't have any, did you?

16   A.   I did not have any available, no.

17   Q.   Would you -- they asked you whether you had it, so

18   is it your testimony that you do have documentation of

19   that test?

20   A.   No, I do not have documentation of that test.  I'm

21   sorry.

22   Q.   So when you said "documentation available," um,

23   you're not suggesting there's any out there, are you?

24   A.   I'm not suggesting there's any out there, no.

25   Q.   So you testified, as I understand it, that the

1     upgrade might have been applied more than once.  Do I

2     understand that right?

3     A.  Yes.

4     Q.  And, um, is it your understanding that if Sigma were

5     to be applied, that it would need to be applied a second

6     time or redundantly, is that your testimony?

7     A.  Could you clarify that, please?

8     Q.  Well, you're testing for what the capability of the

9     software is, am I right?

10    A.  Yes.

11    Q.  The hardware and the firmware, and you're trying to

12    find out what that capability is, am I right?

13    A.  Yes.

14    Q.  And to find out what that capability is, you want to

15    properly download the software so that it reflects what

16    a user's opportunity for using that software would be,

17    right?

18    A.  Correct.

19    Q.  And your testimony is that it might have been

20    downloaded multiply, do I understand that right?

21    A.  Yes.

22    Q.  (Pause.)  Now, when you testified -- well, strike

23    that.

24        You submitted a resume, did you not, to the

25    government?

```
1   A.  Yes, I did.

2   Q.  And in the resume it talks about your work at

3   Charter, does it not?

4   A.  Yes, it does.

5   Q.  Now, it doesn't mention your prior work at Wraith

6   Computer Systems, does it?

7   A.  No, sir, it does not.

8   Q.  Okay.  And you worked for a time at a business

9   called Wraith Computer Systems, did you not?

10  A.  Yes, I did.

11  Q.  And you were a general partner of Wraith Computer

12  Systems, were you not?

13  A.  Yes, I was.

14  Q.  And now your name is Benjamin C. Brodfuehrer, is it

15  not?

16  A.  Yes, it is.

17  Q.  Are you the Benjamin C. Brodfuehrer who is the

18  subject of 59 active warrants in the State of Indiana on

19  your taxes?

20  A.  Not that I'm aware of.

21  Q.  Are you aware that two of those have been satisfied?

22          MS. SEDKY:  Objection, your Honor.

23          THE COURT:  Yeah, I'll see you at sidebar.

24

25          AT THE SIDEBAR
```

1          THE COURT:  All right.  You want to ask him

2     whether he's the subject of warrants for tax evasion.

3     Okay.

4          So these are not convictions?

5          MR. McGINTY:  These are not convictions.

6          THE COURT:  Okay.  So this is analyzed under

7     Rule 608(b), and if it's admissible, you can ask him the

8     question, but you're stuck with the answer, and you

9     can't offer any extrinsic evidence.

10          MR. McGINTY:  No, but I can ask him more

11     questions to make sure that the answer is correct.

12          THE COURT:  Right.

13          So what do you want to ask him?

14          MR. McGINTY:  Well, I want to ask him if he is

15     this Benjamin C. Brodfuehrer?  I want to ask him whether

16     he ever lived at this address?  Whether this is his --

17     whether the business that he worked for was, in fact,

18     Wraith Computer Systems?

19          THE COURT:  How do you spell it?

20          MR. MCGINTY:  W-R-A-I-T-H Computer Systems.

21     And it's basically to establish that there's a basis

22     for, um, his knowing.  I'm not putting this in, but I'm

23     inquiring about it.

24          THE COURT:  What's it you want to do?

25          MR. McGINTY:  I'm not going to put in

1   extrinsic evidence.

2           THE COURT:  Okay.  So what is the evidence you

3   have?

4           MR. McGINTY:  What I have is a suitcase full

5   of, um, tax liens on this guy, a total of $243,000, of

6   which two warrants have been recalled because they were

7   --

8           THE COURT:  Well, why is -- I have to analyze

9   it under 608, as a threshold matter, to determine

10  whether it relates to his character for truthfulness.

11          MR. McGINTY:  Well, it's certainly probative

12  of his truthfulness, it's probative of --

13          THE COURT:  Why is it -- why is payment of

14  taxes --

15          MR. McGINTY:  Because the rule provides, um --

16  (Reads.)  "probative of the truthfulness or

17  untruthfulness, being inquired on cross-examination,

18  concerning the witness's character for truthfulness or"

19  --

20          THE COURT:  I know.  I know.  So -- well,

21  excuse me, let me tell you what the question is, so you

22  can answer it.

23      You know, if this had been flagged for me in

24  advance, then I would have looked into it.

25      But nonpayment of taxes is not necessarily

1    evidence of truthfulness.

2              MS. SEDKY:  This is the same number every

3    single time.

4              MR. McGINTY:  No, it's not.  It changes.

5              THE COURT:  No, but let him answer the

6    question.

7         So why is it that if you don't pay your taxes it's

8    evidence of untruthfulness as opposed to filing a false

9    tax return?

10             MR. McGINTY:  Right.  I think both would be.

11   If you have an obligation -- he has obligations and he

12   hasn't met them, and the State of Indiana is trying to

13   collect on them, and he's avoiding the consequences of

14   them, and he's living in an adjoining state to resist

15   what is going to be a tax levy on him.

16             MS. SEDKY:  There's no evidence of that.

17             THE COURT:  May I look at this?

18             MR. McGINTY:  Certainly.

19             THE COURT:  Well, why don't you tell me what

20   this is.

21             MR. McGINTY:  These are, um, they are tax

22   liens, they are from the State of Indiana, they are for

23   -- these are the filing dates.  They reflect state tax

24   warrants.  There's a whole host of them.  They are

25   substantial and go back to 2007.

1          (Pause.)

2          MS. SEDKY:  Your Honor, if somebody owns a

3    business and they don't pay whatever the corporate or

4    state taxes are, it doesn't make them a cheat, it

5    doesn't make them a dishonest human being.

6          THE COURT:  If you don't pay your taxes, it

7    may or may not, but it doesn't necessarily go to the --

8    you need to know a little more.

9          Okay.  So you've asked him if he's that Benjamin

10   Brodfuehrer and he says "Nope, not that I know of."

11         What else do you want to ask him?

12         MR. McGINTY:  I want to ask him if he had been

13   an employee of this company?  During what period was he

14   an employee?  I'm going to ask him whether he had --

15   whether the, um -- whether he had -- whether his company

16   had a tax lien put against him?  I need to be able to --

17   no, I have to --

18         THE COURT:  You can ask a couple more

19   questions on this.  It's a close question as to whether

20   it's probative of truthfulness or not as opposed to an

21   inability to pay.  There are all kinds of people who

22   don't pay their taxes, you know, if they had lost their

23   job or the business had gone down the tubes.  But you've

24   already asked the first questions without objection and

25   I'll let you ask just a couple more.  But you're limited

1    to the answers, as I say.

2          So just a couple more, um, probative questions.

3

4          (In open court.)

5          THE COURT:  Ladies and gentlemen, I'm going to

6    let Mr. McGinty ask a few more questions on this

7    subject, as I understand it, which is being admitted for

8    the limited purpose of your assessing Mr. Brodfuehrer's

9    truthfulness in his in-court testimony.  Go ahead.

10   Q.  Mr. Brodfuehrer, had you been a principal at Wraith

11   Computer Systems?

12   A.  What do you mean by a "principal"?

13          MR. McGINTY:  May I approach the witness, your

14   Honor?

15          THE COURT:  No, just put it up so we can all

16   see it, without the jury.

17   Q.  Do you understand the word "general partner"?  Were

18   you the general partner of Wraith Computer Systems?

19   A.  Yes.

20   Q.  And was Wraith Computer Systems involved in, um,

21   system upgrades and repair, software installation,

22   technical support, and work akin to that?

23   A.  Yes.

24   Q.  And Wraith Computer Systems -- you were affiliated

25   with Wraith Communication Systems before you went to

1    Charter Cable, correct?

2    A.   You mean Wraith Computer Systems?  You said

3    communications.

4    Q.   I'm sorry.  With Wraith Computer Systems before you

5    went to Charter?

6    A.   That is correct.

7    Q.   And what was the work you did at Wraith?

8    A.   Um, basically we built PCs for people who -- well,

9    we would repair PCs for people, that type of work.

10   Q.   And when you say "we," how many people worked for

11   Wraith?

12   A.   Two.

13   Q.   And who were they?

14   A.   Myself and Seth Spurlow.

15   Q.   And was Wraith's principal place of business in

16   Indiana?

17   A.   Yes.

18   Q.   And was it located at 1737 Culbertson Avenue in New

19   Albany, Indiana?

20   A.   Yes.

21   Q.   And your address at the time was 1737 Culbertson

22   Avenue, New Albany, Indiana, am I right?

23   A.   Yes.

24   Q.   The same address, correct?

25   A.   Yes.

1    Q.  Are you aware that there were multiple separate tax

2    warrants outstanding in the State of Indiana for

3    Benjamin Brodfuehrer of 1737 --

4            MS. SEDKY:  Objection.

5            THE COURT:  Sustained as to form.  The jury is

6    not going to hear any evidence except his testimony as

7    to whether there were or there weren't.

8    Q.  While you were working at Wraith Computer Systems,

9    were you in tax arrears?  Were you in tax arrears on a

10   payment of taxes on that business?

11   A.  No.

12   Q.  Um, was it a corporation?

13   A.  No.

14   Q.  In fact, you never filed articles of incorporation

15   for it, did you?

16   A.  Correct.

17   Q.  So if I try to find you articles of incorporation

18   for Wraith, I'm not going to find it, is that right?

19   A.  That's correct.

20   Q.  Did you file a doing-business certificate for

21   Wraith?

22   A.  Not that I recall.

23   Q.  So if I tried to get a fingerprint of Wraith to find

24   out what it was doing during that time, I can't find it,

25   is that true?

1            MS. SEDKY:  Objection.

2            THE COURT:  Sustained.

3   Q.  Now, did you ever receive notice from the State of

4   Indiana that there are 59 active warrants for Benjamin

5   C. Brodfuehrer?

6            MS. SEDKY:  Objection.

7            THE COURT:  All right.  This is the last

8   question.  You can answer that "yes" or "no."

9   A.  No, I'm not aware of that.

10            MR. McGINTY:  I have no further questions of

11   this witness.

12            (Pause.)

13            MS. SEDKY:  Nothing further, your Honor.

14            THE COURT:  Okay.  Thank you.

15   Mr. Brodfuehrer, your testimony is complete and you're

16   excused.

17            (Witness steps down.)

18            MR. BOOKBINDER:  Your Honor, the United States

19   calls William Madeira.

20            (WILLIAM MADEIRA, sworn.)

21

22            * * * * * * * * * * * * * * *

23            WILLIAM MADEIRA

24            * * * * * * * * * * * * * * *

25

1    DIRECT EXAMINATION BY MR. BOOKBINDER:

2    Q.  Would you state your name and spell your last name

3    for the record, please.

4    A.  It's William Madeira, M-A-D-E-I-R-A.

5    Q.  Where do you live, Mr. Madeira, what city or town?

6    A.  Um, Everett, Mass.

7    Q.  Did you live there in 2008 as well?

8    A.  Um, yes.

9    Q.  What do you do for a living?

10   A.  Um, I work with computers.  I'm a program manager.

11   Q.  Have you heard of a company called TCNISO?

12   A.  Yes.

13   Q.  Have you been to the website TCNISO.net?

14   A.  Yes.

15   Q.  And did you buy something from that website?

16   A.  Yes, I did.

17   Q.  What did you buy?

18   A.  I bought a modem, a cable modem.

19   Q.  Approximately when, if you remember, did you buy

20   that?

21   A.  Um, the summer of '09, I believe.

22   Q.  At the time that you bought that modem, um, how were

23   you getting internet service?

24   A.  Through Comcast.

25   Q.  And did you already have a Comcast modem for that

1    service?

2    A.   Yes, I did.

3    Q.   So why did you buy a modem from TCNISO?

4    A.   I was looking into uncapping my internet so I could

5    get faster speeds.

6    Q.   What speed were you hoping to get with that uncapped

7    modem?

8    A.   Um, at least double of what I was getting.

9    Q.   And do you recall what you were getting from Comcast

10   at the time?

11   A.   Um, I believe it was 7 or 8, around there.

12   Q.   That's 8 megabits per second?

13   A.   Yeah.

14   Q.   When you first ordered the modem from the website,

15   did you get any kind of a confirmation of that order?

16   A.   Yes, I did.

17   Q.   And do you remember what form that was in?

18   A.   Um, I didn't understand the question?

19   Q.   Was it something you got in the mail, was it an

20   e-mail?

21   A.   It was an e-mail.

22   Q.   And was there information on that confirmation that

23   you needed to use?

24   A.   Yeah, there was, I believe, an activation code.

25   Q.   When you say an "activation code," what's that, or

1    what did you use that for?

2    A.   Um, I needed to download a piece of software from

3    their website to program the modem and for me to log

4    into their website I needed this code.

5    Q.   Did you get the modem that you ordered?

6    A.   Yes, I did.

7    Q.   And did you use that code to download the software?

8    A.   Yes, I did.

9    Q.   Now, did you use the website for anything other

10   than, um, the actual purchase and the download of

11   software, did you get any information off of it that was

12   useful to you?

13   A.   Um, yeah, there were instructions on how to run the

14   software in there.

15   Q.   So that was some kind of like a manual or a tutorial

16   or something?

17   A.   Yes.

18   Q.   Did you use that as well?

19   A.   Yes.

20   Q.   So this modem that you got, um, when you, um, first

21   took it out of the package and plugged it in, did it

22   work?

23   A.   It did not.

24   Q.   Were you ultimately able to get it working?

25   A.   Yes.

1   Q.  How did you manage that?

2   A.  I -- with this piece of software that I had

3   downloaded I plugged in the modem on my computer through

4   a little, um, I believe it was a Black Cat, it was a

5   little piece of hardware that came with the modem.

6   Q.  Did you say a "Black Cat"?

7   A.  Yes.

8   Q.  That is what it was called?

9   A.  Yes.

10  Q.  All right.  And so you plugged that in and what did

11  you do?

12  A.  Um, I ran the software that I downloaded from their

13  website and, um, I guess, reprogrammed the modem.

14  Q.  And after you did that, um, then did the modem work?

15  A.  Yes, it did.

16  Q.  Now, did you go in and -- are you familiar with what

17  a MAC address is?

18  A.  Yes, I am.

19  Q.  Did you do anything to the MAC address on that modem

20  that you bought?

21  A.  I did not.

22  Q.  You didn't change it at all?

23  A.  No, I did not.

24  Q.  But the modem worked anyway?

25  A.  Yes, I did.

1  Q.  Did you, um, register the MAC address for that modem

2  with Comcast?

3  A.  I did not.

4  Q.  So, um -- okay.  When you got this new modem, you

5  set it up and started working, what about your Comcast

6  modem, were you using that as well?

7  A.  Yes, I was.

8  Q.  So they were both working at the same time?

9  A.  Correct.

10  Q.  On how many different computers?

11  A.  Um, the modems I plugged into a router and I was

12  using on my laptop.

13  Q.  So you were using both modems connected to one

14  router at the same time?

15  A.  Yes.

16  Q.  Okay.  And, um, when you used your TCNISO modem, um,

17  did you do anything, did you report to Comcast or tell

18  Comcast that you had this second one?

19  A.  No, I did not.

20  Q.  Okay.  Did you do anything to your configuration

21  file on that?

22  A.  No, I did not.

23  Q.  So you didn't change -- you do know what a

24  configuration file is?

25  A.  Um, I know what it is, but I didn't touch it.

1   Q.  So you were hoping to have uncapped service on this

2   modem?

3           MR. McGINTY:  Objection.

4           MR. BOOKBINDER:  Well, that's fine.  I'll

5   rephrase.

6           THE COURT:  Well, as to the form of the

7   question.

8           MR. BOOKBINDER:  I'll rephrase it.

9           THE COURT:  Go ahead.

10  Q.  So did you get faster service from this new TCNISO

11  modem?

12  A.  I did not.

13  Q.  How fast was that particular modem running?

14  A.  I was getting about the same as what I was getting

15  with Comcast.

16  Q.  About 7 or 8?

17  A.  7 or 8.

18  Q.  Megabits per second?

19  A.  Yes.

20  Q.  So now, just so I understand, you had two modems

21  running?

22          MR. McGINTY:  Objection.

23          THE COURT:  Did you have two modems running?

24          THE WITNESS:  Yes, I did.

25  Q.  Okay.  And how much bandwidth was each of them

1    getting at that time?

2    A.   I believe it was 8 at the time.

3    Q.   So between the two, how much bandwidth?

4    A.   16.

5    Q.   And did you pay Comcast anything more than you were

6    paying them when --

7    A.   I did not.

8    Q.   -- when you were just having the one modem?

9    A.   Correct.

10   Q.   How long did you have the TCNISO modem working for

11   you?

12   A.   About a month and a half.

13   Q.   What happened then?

14   A.   It just stopped working.

15   Q.   Do you know why?

16   A.   It just stopped working, and then I tried to rerun

17   the software again and it didn't do anything.  It just

18   stopped.

19   Q.   So after a month, the thing just wouldn't work?

20   A.   Yes.

21   Q.   So what did you do with it?

22   A.   Um, a friend of mine was heading to Brazil and he

23   took it with him there.

24   Q.   Right.  Um, have you been given immunity in this

25   case?

1    A.   Yes, I have.

2    Q.   What's -- what do you understand that to mean?

3    A.   Um, that I can't be prosecuted for my testimony.

4    Q.   And what's your obligation under that immunity

5    agreement?

6    A.   To tell the truth.

7              MR. BOOKBINDER:   No further questions, your

8    Honor.

9

10   CROSS-EXAMINATION BY MR. McGINTY:

11   Q.   Mr. Madeira, good afternoon.

12   A.   Good afternoon.

13   Q.   So as I understand your testimony, you got a modem,

14   do I understand that right?

15   A.   Yes.

16   Q.   You didn't do anything with the MAC address?

17   A.   I didn't.

18   Q.   You didn't do anything with the config file?

19   A.   Correct.

20   Q.   You didn't notice any faster speed?

21   A.   Correct.

22   Q.   But the government gave you immunity?

23   A.   Yes.

24   Q.   Um, you have a LinkedIn page on the internet, do you

25   not?

1    A.   I do.

2    Q.   And on the LinkedIn page, it mentions that you're a

3    co-founder of TRS, Incorporated, right?

4    A.   Correct.

5    Q.   It doesn't mention that you were employed at TAC,

6    does it?

7    A.   At TAC?

8    Q.   TAC, International.

9    A.   Um, that's --

10   Q.   -- temporary employment.  Do you remember that?

11   A.   TAC?

12   Q.   TAC, International.

13        Do you remember working for TAC, International

14   while you were working as a temporary employee at John

15   Hancock Financial Services?

16   A.   Correct.

17   Q.   Now, you were fired from John Hancock Financial

18   Services, weren't you?

19   A.   Yes.

20   Q.   And when you were fired from John Hancock Financial

21   Services, it was for pretty significant financial

22   impropriety, am I right?

23   A.   Um, what are you -- I don't --

24   Q.   Do you want to tell the jury what you did?

25   A.   Um, I ran reports and I copied records.

1   Q.   You were an employee at John Hancock, am I right?

2   A.   Yes.

3   Q.   And as an employee of John Hancock, um, you were

4   given access to confidential information, am I right?

5   A.   Yes.

6   Q.   And the confidential information included names,

7   income, Social Security numbers, and date of birth of

8   employees at John Hancock, right?

9   A.   Yes.

10  Q.   And while you were working at John Hancock, you had

11  taken that information, did you not?

12  A.   Yes.

13  Q.   And what you did with it is you used some of the

14  information to complete NEXT card applications, credit

15  card applications --

16  A.   Uh-huh.

17  Q.   -- for people whose names you had stolen from John

18  Hancock, isn't that true?

19  A.   Uh-huh.

20          THE COURT:  You have to say "yes" or "no."

21  A.   Yes.

22  Q.   They found on the computer, on your hard drive, 54

23  completed credit card applications for people that you

24  submitted, am I right?

25  A.   That's correct.

1   Q.  And on those applications you affirmed that you were

2   that person and that you were making application for

3   credit, am I right?

4   A.  Yes, I made a mistake.

5   Q.  A mistake.  Okay.  Let's talk about that word for a

6   second.

7        Do you think a crime is a mistake?

8   A.  I do not.

9   Q.  Did you understand that you were taking people's

10  personal financial information and using it for your

11  personal benefit, did you understand you were doing

12  that?

13  A.  I did not.  I did not use any of those credit cards

14  or any of that information.

15  Q.  Did you understand that you were using people's

16  personal confidential information for your benefit?

17  A.  I did.

18  Q.  You did.  Did you understand that making a credit

19  card application, affirming yourself to be that person,

20  was more than a mistake, it was a crime.  Did you

21  understand that?

22  A.  Yes.

23  Q.  You and another fellow, who was working for you,

24  e-mailed six John Hancock spreadsheets, e-mailed six

25  John Hancock spreadsheets with names on it.  Do you

1   remember that?

2   A.  He was not working for me.  There was nobody working

3   for me.

4   Q.  Mr. Madeira, working for you in the sense that both

5   of you were in this rip-off game that you were playing,

6   right?

7   A.  Uh-huh.

8   Q.  And on the six spreadsheets were personal

9   information on 75,000 John Hancock agents and brokers,

10  is that right?

11  A.  Uh-huh.  Yes.

12  Q.  And on those spreadsheets there was the information

13  about their names, right?

14  A.  Yes.

15  Q.  Their social Security numbers, dates of birth, and

16  addresses, am I right?

17  A.  That's correct.

18  Q.  Now, one thing you were investigated for was your

19  actual use of some of that information to get credit

20  card applications?

21  A.  Correct.

22  Q.  So one piece of your game was to get a finder's fee

23  for causing somebody to get a credit card that they

24  didn't apply for?

25  A.  Correct.

1    Q.  But that doesn't explain the 75,000 names, does it?

2    A.  It does not.

3    Q.  It does not.  And one of the things that's

4    interesting about you, Mr. Madeira, is what were you

5    going to do with the other 75,000?  Oh, let me back up.

6    Let me withdraw the question.

7         As we speak, you are the subject of an agreement

8    with the United States for immunity for what you say on

9    the stand, isn't that right?

10   A.  Correct.

11   Q.  And the immunity you got was on January 23rd, 2012?

12   A.  Correct.

13   Q.  Which would have been just a short time ago?

14   A.  Correct.

15   Q.  So basically one month ago you get, from the United

16   States, an immunity letter, am I right?

17   A.  Correct.

18   Q.  So long as you testify against him, right, so long

19   as you come in here and you make the accusation about a

20   cable modem, um, everything you say will be off the

21   record, you're not accountable for it, right?

22   A.  I believe so.  I'm not a lawyer, so I wouldn't be

23   able to know that.

24   Q.  But that's your understanding of what the immunity

25   letter is, am I right?

1    A.   Correct.

2    Q.   And the United States government had gone into your

3    computer, after this came to light, and found out about

4    these 75,000 names and the personal information about

5    these 75,000 people, am I right?

6    A.   Um --

7    Q.   That you had that information, right?

8    A.   I was -- I never heard it, if they found the

9    information or not.

10   Q.   You know that on your computer was personal

11   information, personal identifiers regarding 75,000

12   people, right?

13   A.   I mean, I don't recall that number.

14   Q.   Okay.  Do you remember that there was a world of

15   names and a world of information about a world of people

16   on your computer about their financial world, you knew

17   that?

18   A.   I know there was a lot of names.  I don't remember

19   the rest of the information.  It's been a while.

20   Q.   Right.  And of those 54 were the subject of NEXT

21   card applications, right?

22   A.   I don't recall the number.  I guess.  It's your

23   statement.

24   Q.   You are now under an immunity order, okay, so you

25   can say anything now and you can't be charged for it,

1  right?

2       What were you going to do with the -- I'm sorry,

3  what did you do with the 75,000 names, about who you got

4  information, what did you do with them?

5  A.  Nothing.

6  Q.  Nothing.  So you took them, right?  You went to the

7  trouble of downloading them, right?  Right?

8  A.  No, Ricardo did.

9  Q.  Oh, Ricardo did.  At your instruction, right?

10  A.  I did not instruct him, no.

11  Q.  Okay.  Did you know he was doing it?

12  A.  I knew he was doing it.

13  Q.  And did Ricardo work at John Hancock?

14  A.  Yes, he did.

15  Q.  So both of you together are doing this as a scam

16  together, correct?

17  A.  Yes.

18  Q.  So when he gets the 75,000 names, you didn't know

19  that he was doing it, right?

20  A.  I'm not sure about the count, the 75.  I don't know

21  where you're getting the 75,000 from.

22  Q.  You know where I'm getting it from?  I'm getting it

23  from --

24            THE COURT:  Excuse me.  Excuse me.  Look, you

25  ask the questions, he answers the questions, but as you

1    know, we're not going to have more than the answers

2    under Rule 608(b).

3    Q.  So what have you done with the pool of names that

4    you had?

5    A.  Nothing.

6              MR. BOOKBINDER:  Objection.  Asked and

7    answered.

8              THE COURT:  All right.  Sustained.

9    Q.  And when it came out that this had happened, you

10   were fired from John Hancock?

11   A.  That's correct.  You already asked me that question.

12   Q.  I did ask you that.  And when you submit a resume,

13   you don't put that on there, do you?

14   A.  I don't need to submit a resume, I've been on the

15   same job for a while.

16   Q.  Well, I have a copy of your resume on the internet.

17   That's your resume, isn't it?

18   A.  It could be.

19   Q.  It's a way of communicating with people about your

20   personal information?

21   A.  That's correct.

22   Q.  And you don't put that on there, do you?

23   A.  I don't need to.  It's not part of my job.  It was a

24   temporary job.  Why would I need that information

25   there?

1    Q.  Do you think it's important for people to know that

2    you're the kind of guy who would do this, do you think

3    that's important?

4              MR. BOOKBINDER:  Objection, your Honor.

5              THE COURT:  All right.  Sustained.

6              MR. McGINTY:  I have no further questions of

7    this witness.

8              THE COURT:  Is there any redirect?

9              MR. BOOKBINDER:  Two questions, your Honor.

10

11   REDIRECT EXAMINATION BY MR. BOOKBINDER:

12   Q.  You were fired from John Hancock in 2002, is that

13   right?

14   A.  Yes.

15   Q.  Does your immunity agreement with the government,

16   for your testimony today, have anything to do with that?

17   A.  I'm not sure.

18              MR. BOOKBINDER:  No further questions.

19              THE COURT:  Do you have any?

20              MR. McGINTY:  At this time, your Honor, I

21   would be submitting his immunity agreement, his letter

22   agreement.

23              THE COURT:  What do you mean by submitting

24   it?

25              MR. McGINTY:  I would ask it to be admitted

1    into evidence and I will assure that it's properly

2    submitted to --

3              THE COURT:  You're offering his immunity

4    agreement?

5              MR. McGINTY:  I am.

6              THE COURT:  Is there any objection to it being

7    an exhibit?

8              MR. BOOKBINDER:  Um, no, your Honor.

9              THE COURT:  All right.  Do you want to show it

10   to him to verify it?

11             MR. McGINTY:  Yes, your Honor.

12             THE COURT:  On the machine.  On the machine.

13        I know that some of us are of a certain age that

14   we learn to do this before there were machines, but

15   we're all educable or at least lawyers are educable.

16             MR. McGINTY:  It's more of a challenge for

17   some of us.

18             (Laughter.)

19             THE COURT:  Well, lawyers are generally

20   educable.  Judges have law clerks.

21   Q.  Mr. Madeira, do you --

22             THE COURT:  And this is without the jury for

23   the moment.

24        What's our next number?

25             THE CLERK:  33.

1   Q.  Do you recognize this document?  I'm showing you

2   Page 1 and then Page 2.

3   A.  Correct.

4   Q.  And do you recognize that as your signature dated

5   2-8-2012?

6   A.  Correct.

7                MR. McGINTY:  Now I move to admit it.

8                THE COURT:  Is that your agreement that

9   provides immunity with the government?

10               THE WITNESS:  Correct.

11               THE COURT:  All right.  It's admitted as

12  Exhibit 33.

13               (Exhibit 33, marked.)

14               MR. McGINTY:  I have no further questions,

15  your Honor.

16               THE COURT:  Okay.  Mr. Madeira, your testimony

17  is complete.  You're excused.

18               (Witness steps down.)

19               THE COURT:  All right.  It's 25 of 1:00.  Is

20  the next witness Mr. Larosa?

21               MS. SEDKY:  He is.  He'll be very short, your

22  Honor.

23               THE COURT:  Do you think you can get it done

24  in about --

25               MS. SEDKY:  Yes, your Honor.

```
 1                    THE COURT:  Okay.  You may call the next
 2   witness.
 3                    MS. SEDKY:  The government calls Jose Larosa.
 4                    (JOSE LAROSA, sworn.)
 5
 6                    * * * * * * * * * * *
 7                    JOSE LAROSA
 8                    * * * * * * * * * * *
 9
10   DIRECT EXAMINATION BY MS. SEDKY:
11   Q.  Hello, Mr. Larosa.  Could you please state your name
12   and spell it for the record, please.
13   A.  Jose Larosa, J-O-S-E, L-A-R-O-S-A.
14   Q.  And what city do you live in?
15   A.  Um, Mattapan.
16   Q.  How long have you lived in Mattapan?
17   A.  Um, since 2008.
18   Q.  Okay.  Have you ever heard of a company called
19   TCNISO?
20   A.  Yes.
21   Q.  Have you ever been to their website?
22   A.  Yes.
23   Q.  And if you can remember going to the website the
24   first time, what internet service were you using at the
25   time?
```

1    A.  Um, Comcast.

2    Q.  And could you describe the internet service you were

3    getting, what was the arrangement?

4    A.  It was a WIFI that I got from a neighbor.

5    Q.  So it was with the neighbor's permission?

6    A.  Yeah.

7    Q.  So you go to the website -- and this is from your

8    home in Mattapan?

9    A.  Yeah.

10   Q.  Did you ever buy anything from TCNISO?

11   A.  Yes, I did.

12   Q.  Did you buy it from the website?

13   A.  Yes.

14   Q.  All right.  Do you remember approximately when you

15   made your first purchase?

16   A.  In 2008.

17   Q.  Okay.  And do you remember what you bought the first

18   time?

19   A.  A modem.

20   Q.  What kind of modem?

21   A.  Um, a SB-4100 modem.

22   Q.  Okay.  And what happened?  You ordered it from the

23   website and did it come in the mail?  How did you get

24   it?

25   A.  Yeah, they send it by UPS.

1   Q.  Did anything else come?  What came, actually, in the

2   mail, if you can remember?

3   A.  It was a package, it come with a modem and CD.

4           MS. SEDKY:  Excuse me.  One second.

5           (Pause.)

6   Q.  Did you give a copy of that disk to the government

7   ever?

8   A.  Yes.

9   Q.  Okay.

10          MS. SEDKY:  May I approach the witness, your

11  Honor?  Or actually maybe it's easier if I just put it

12  on the screen.

13          THE COURT:  That's what you should do.

14          MS. SEDKY:  Okay.  May I put it on the

15  screen?

16          THE COURT:  Yes.

17  Q.  Do you see anything in front of you right now?

18  A.  Yes, I see the thing.

19  Q.  What is that?

20  A.  That is the CD that I got from the company.

21          MS. SEDKY:  Your Honor, the government moves

22  Exhibit 15 into evidence.

23          THE COURT:  It is admitted.

24          MS. SEDKY:  Okay.  And may we publish this to

25  the jury?

1                  THE COURT:  Yeah.

2                  (Exhibit 15, marked.)

3     Q.  Okay.  So this is the disk.  And what does it say on

4     it?

5                  MS. SEDKY:  Is this right side up for the

6     jurors?

7                  THE COURT:  No, it looks like it's upside

8     down.

9                  MS. SEDKY:  Should I turn it this way or is

10    that the wrong way?

11                 THE JUROR:  That's good.

12                 THE COURT:  Okay.  Stop.

13    Q.  Can you read it now, too, Mr. Larosa?

14    A.  Yes.

15    Q.  It's the same way that it looks for me.

16        And, let's see, it says "Black Cat."  What's that

17    number on top of the "TCNISO"?

18    A.  That's the code that I'm supposed to use it with the

19    disk.

20    Q.  Okay.  So you get the modem, you get the disk, and

21    then what do you do next?

22    A.  I got the modem, I got the CD and the kit.

23    Q.  A kit?

24    A.  A Black Cat kit.

25    Q.  Okay.  And what did you -- did you need to do

1   anything with this number?

2   A.   Yeah, in order for the program to work, you have to

3   enter that number.

4   Q.   Okay.   You go to the website?

5   A.   Yeah.

6   Q.   And you put in that number?

7   A.   Yeah.

8   Q.   And, um, while you're there, did you have to get

9   something else to get the modem to work?

10  A.   No, with that and the kit, you know, you -- you need

11  the number, they call it a special number, but I forget

12  the name.

13  Q.   Do you know the word "MAC address"?

14  A.   Yeah, "MAC address," that's the name.   Yeah, you

15  need a number in order to make it work.

16  Q.   Okay.   And did you -- were you able to get a MAC

17  address?

18  A.   Yeah, you --

19  Q.   How did you do that?

20  A.   I sniff on the internet and you get the number, you

21  know.   You have to get it from someplace else, because

22  it doesn't work in your house.

23  Q.   Okay, so let's step back.

24       Was there was a sniffer program that you used from

25  TCNISO?

```
1    A.   Yeah.

2    Q.   And did you try to sniff at your own house or did

3    you go somewhere else?

4    A.   I used it in my own house, but the number doesn't

5    work, okay?

6    Q.   Okay.  But when you sniffed, were you able to get

7    some MAC addresses, whether they worked or not?

8    A.   Yeah, yeah, I went to a friend of mine and he get

9    the data and I get some numbers.

10   Q.   Where did that friend live?

11   A.   He live in Roxbury.

12   Q.   Roxbury, is that far away?

13   A.   Separate from Mattapan, yeah, a different town.

14            THE COURT:  Well, hold it.  Let's slow this

15   down just a bit.  You've got to -- here, you want to

16   make sure she finishes her question before you answer

17   it.  Okay?  Because otherwise the jury's not going to be

18   able to hear your answer.  Okay?

19            THE WITNESS:  Okay.

20            THE COURT:  Here, so go over that again,

21   because you were talking --

22   Q.   Let's go back to --

23            THE COURT:  Now you're doing it to me.  You're

24   talking over each other.  Ask the question, answer the

25   question, and then she'll ask you another question.
```

1    Q.   So you sniffed from your own house and you were able

2    to obtain MAC addresses, but -- is that correct?

3    A.   Yeah, but those did not work.

4    Q.   They did not work.  So then you took the same

5    sniffer over to a neighborhood in Roxbury?

6    A.   A friend of mine, yeah.

7    Q.   And you sniffed in Roxbury?

8    A.   Yes.

9    Q.   And what happened then?

10   A.   Then it was working.

11   Q.   You got new MAC addresses that were from Roxbury?

12   A.   Yeah.

13   Q.   And then did you bring those back to your house?

14   A.   Yeah.

15   Q.   And what did you do with the MAC addresses that you

16   got?

17   A.   I put them on the -- I have a number, you know, when

18   I opened the modem, and I put the number in, the MAC

19   address inside the program, and it worked.  But I

20   didn't --

21   Q.   And do you know whose MAC address you were using?

22   A.   No.  No.

23   Q.   Why did you change your MAC address to the MAC

24   address from Roxbury, what did it get you?

25   A.   Um, because when I got it from the other node, then

1    the modem worked.

2    Q.  So when you say the modem worked --

3    A.  You can get the internet.

4    Q.  You got the internet.  And did you have to pay

5    subscription fees to get that?

6    A.  No.  No.

7              THE COURT:  Excuse me.  You're not letting her

8    finish.  You're going to be here longer than you want to

9    be if you don't let her finish.

10             THE WITNESS:  Sorry.

11             THE COURT:  Okay.  So go back again.

12   Q.  So you plugged in your first MAC address from

13   Roxbury, let's say, and you turned on the modem that you

14   got from TCNISO, and the internet came on, is that

15   correct?

16   A.  Yes.

17   Q.  And during the course of this time, did you need to

18   pay Comcast any fees to get the internet?

19   A.  No.

20   Q.  So the internet was free?

21   A.  Yes.

22   Q.  And did you ever need to replace the MAC address

23   that first time you turned that on using the one MAC --

24   the Roxbury MAC address, did it work for as long as you

25   had this?

1    A.   No, once in a while you have to change the number.

2    Q.   About how often would you say you need to replace

3    the MAC address?

4    A.   Sometimes take more than another, you know, like

5    three months, four months, six months, you know.

6    Q.   And what would you do, go back to your friend's

7    house?

8    A.   No, because when I go to him, the first time, I got

9    a bunch of numbers.

10   Q.   Okay.  So you just go through them?

11   A.   Yeah, I tried.

12               THE COURT:  I'm sorry.  Are you saying that a

13   MAC address would work for three to six months and then

14   you'd have to change it?

15               THE WITNESS:  It worked for a period of three

16   months, four months, depend, you know.  Then when I put

17   the number in the program, it worked, you know, the

18   modem is working.

19   Q.   And from your own personal use of the TCNISO

20   products, how long were you able to successfully use

21   these products to get internet service without paying?

22   A.   I got it about a year, like almost a year or

23   something like that.

24   Q.   And were you using the very same product you first

25   purchased or did you have to go back and buy new ones?

1    A.   They got a picture in the kit for different programs

2    or products, you know.

3    Q.   So let's go through some of these.  Did you make

4    some more purchases from this TCNISO website?

5    A.   Yes.  Yes.

6    Q.   And of those purchases, did you use any of them for

7    yourself?

8    A.   Yes.

9    Q.   And could you tell us which ones, if you remember?

10   A.   When I buy the first one, it was a SB-4100, and the

11   second was an SB-4200 and 52 -- SB-5100.

12   Q.   And do you know whether they worked -- so that was

13   part of the products that you used in the year period?

14   A.   Yeah, the reason that I buy it is because the 5100

15   was better and faster.

16   Q.   I see.  So you were getting better service each --

17   you were sort of upgrading yourself?

18   A.   Yes.

19   Q.   Okay.  And did you buy products from TCNISO that you

20   didn't use yourself?

21   A.   What do you mean?

22   Q.   Did you make any other purchases other than the

23   products that you told us about, the one that you used

24   for yourself?  Did you make other purchases?

25   A.   I buy kits, different kits, and I buy different

1    modems.

2    Q.   Okay.  And what did you do with those?

3    A.   Um, I sell it.

4    Q.   Sell it to whom?

5    A.   To friends.

6    Q.   To friends.  Okay.  And if you have a rough

7    estimate, about how many times did you go back to the

8    website and make a purchase?

9    A.   Um, I went to the website many times, but I buy like

10   20 or 25 modems.

11   Q.   At a time you were buying 20 or 25 of these?

12   A.   Yeah.

13   Q.   And then you were reselling them?

14   A.   Yeah.

15   Q.   Okay.  And during the course of this, do you have

16   any sense of how many modems total you might have bought

17   over this time period, approximately?

18   A.   Um, I buy 1, 2, 3 -- I make it four different orders

19   for one, then I buy like, a 3 or 4 times, a case of 10,

20   10 modems come in the box.  I make like a four.  I don't

21   remember exactly.

22   Q.   Okay.  You don't remember.  But you made about 20

23   different times you went?

24   A.   25, something like that.

25   Q.   Okay.  And during the course of this year period

```
1    where you're buying products for yourself and you're
2    buying products to resell to your friends, did you ever
3    have any communication with the company, TCNISO?
4    A.  No, not by telephone, only one time I changed
5    e-mails.
6    Q.  A couple back and forth e-mails?  About how many
7    e-mails back and forth?
8    A.  Like five or six, something like that.
9    Q.  What were the e-mails about, if you can remember?
10   A.  I got a call that only five work and five doesn't
11   work.  So I send an e-mail, you know, how can the person
12   -- permission to send them back, the modems that doesn't
13   work?  And I got an e-mail to say, you know, that I
14   don't have to send them back, and they just explain to
15   me how to, you know, fix it, you know, the problem.
16   Q.  Through the e-mails, this back and forth?
17   A.  Right.  Right.  Right.
18   Q.  And was the e-mail from TCNISO?
19   A.  Yeah.
20   Q.  And did they eventually solve your problem?
21   A.  Yes, they did.  Yes.
22   Q.  Okay.  Have you been provided with immunity to
23   testify today?
24   A.  Yes.
25   Q.  And what is your understanding of what that means?
```

1    A.   That the things that I -- I have to say the truth.

2    The government tell me to say the truth.

3    Q.   Did you ask the government for immunity or did the

4    government give it to you on its own?

5    A.   The government give it to me.

6    Q.   And what do you have to do today to be protected by

7    that immunity?

8    A.   Say the truth.

9    Q.   And what is the protection that you get if you tell

10   the truth?

11   A.   Not to, um -- I don't know how to say it, not to

12   prosecute, or something like that.

13   Q.   Okay.

14            MS. SEDKY:  Excuse me one moment, your Honor.

15            (Pause.)

16            MS. SEDKY:  We have nothing further.

17

18   CROSS-EXAMINATION BY MR. McGINTY:

19   Q.   You're Mr. Larosa?

20   A.   Yeah.

21            MR. McGINTY:  Um, I'm going to put a document

22   on the console, which I assume is not going to get

23   transmitted.

24            (On screen.)

25            THE COURT:  It's on there and the juror's

```
1   monitors are off.

2             MR. McGINTY:  Thank you.

3   Q.  Mr. Larosa, do you recognize that picture?

4   A.  Yeah, that's me.

5   Q.  Well, I can't tell that that's you.

6   A.  Yeah, that's me.

7   Q.  Okay.  So that's you, right?

8   A.  Yeah.

9   Q.  Now, I'm going to put a different document here and

10  ask you if you recognize it?

11  A.  Yeah, that's me.

12  Q.  So that's you.  And I would ask you to look at the

13  particulars on it, and please don't --

14            THE COURT:  Well, let me ask you this.  About

15  how long do you think you're going to be with

16  Mr. Larosa?

17            MR. McGINTY:  Probably about 10 minutes or so.

18            THE COURT:  Or so.  Well, this is actually a

19  problem.  I probably shouldn't have put him on the stand

20  to begin with, given what we need to discuss, and given

21  the fact that we're going to stop no later than 1:00 and

22  I have matters to discuss with you for Monday.  But go

23  ahead.  And I don't mean to curtail you, the question is

24  whether he can come back on Monday.

25            MR. McGINTY:  I'll be as succinct as I can.
```

1              THE COURT:  No, don't worry about it, though.

2     He'll come back if necessary.

3     Q.  Now, do you recognize the picture here?

4     A.  Yeah.

5     Q.  And I want you to look at it, but I don't want you

6     to comment on it.

7          Does this reflect your date of birth and your

8     Social Security number?

9     A.  (Looks.)  Yes.

10    Q.  Okay.  Now, what I'm going to do is put yet another

11    document on --

12             THE COURT:  Maybe we ought to give these

13    letters so the record will reflect it.  The first one

14    will be "E".

15         Are you going to be offering these in evidence?

16             MR. McGINTY:  I will.

17             THE COURT:  All right.  Go ahead.  Go ahead.

18    Q.  Now, I place on the screen another document.

19         Now, is this the same photograph that you had said

20    was you?

21    A.  Yeah.

22    Q.  Okay.  Now, I want you to look at the Social

23    Security number.  Do you notice it's not the same Social

24    Security number?

25    A.  Yeah.  No.

1  Q.  Do you also notice that the name is not Jose Larosa,

2  it's Jose Dellarosa?

3          MS. SEDKY:  Your Honor, we object.  This is a

4  document that's not in evidence.

5          MR. McGINTY:  I apologize.  This is a --

6          THE COURT:  Here -- here's what we're going to

7  do.  I'll see you at sidebar.

8

9          AT THE SIDEBAR

10          THE COURT:  Here, we're going to stop and

11  Mr. Larosa is going to have to come back, because I want

12  to talk to you about Monday and I have other obligations

13  in the next five minutes on other matters of importance

14  this afternoon.

15      So you'll finish Mr. Larosa.  And what's the

16  essence of this, these different Social Security

17  numbers?

18          MR. McGINTY:  Um, different variants on the

19  name.  So it's "Jose Larosa" and "Jose Dellarosa."

20          THE COURT:  You know, I think this is again

21  analyzed under 608(b), you can ask him -- I mean, that's

22  going to be extrinsic evidence.  You can ask him --

23          MR. McGINTY:  Oh, I'm sorry.

24          THE COURT:  No, no, I think you can ask him,

25  you know, "Have you used different names and given

1    different Social Security numbers to get a license?"  If

2    he says, "I don't remember," then maybe I'll let you

3    refresh his recollection, but I don't think those will

4    come into evidence.

5              MR. McGINTY:  Well, this is not -- my plans

6    were not that ambitious, but just to ask, "Who is this

7    guy?"  So this is not -- this doesn't go to whether you

8    have some kind of minor infirmity in the past, the

9    question is, "Who is he?" and at the moment we don't

10   know and I'm not sure the government knows.

11             MS. SEDKY:  We know it's somebody who used

12   this to get --

13             MR. McGINTY:  I'm sorry?

14             MS. SEDKY:  We know it's somebody who used

15   this.

16             THE COURT:  You know, some of these things are

17   sort of double-edged, but let me have this, E and F.

18        Which was the first one you showed him?

19             MR. McGINTY:  This was the picture I showed

20   him when he said, "It's me."

21             THE COURT:  Okay, this is Exhibit E.  It's the

22   first one with the dark hair.  And Exhibit F has him

23   looking older to me.  Um, you know, you can --

24             MR. McGINTY:  Well, your Honor --

25             THE COURT:  Um --

1      MR. McGINTY:  Your Honor, not that I'm

2  sensitive about this, but --

3      THE COURT:  But you are.

4      All right.  But we're going to stop, you'll think

5  about it, I'll think about it under 608(b) or for some

6  other purpose, and you also want to -- it's entirely up

7  to you, um, how much you want to impeach these people,

8  because he's telling me, as I think was predicted, that

9  he got the MAC addresses and he didn't get them from

10  TCNISO, and the other guy, um, he doesn't clone any MAC

11  addresses, which is one of the allegations, and that may

12  be essential.  So --

13      MR. McGINTY:  I'm sensitive to that, your

14  Honor.

15      THE COURT:  And, you know, just get ready, I

16  think we're in a very serious discussion about whether

17  the conspiracy charge is going to be permitted to

18  survive because these two, at least, are not

19  interdependent on each other.  I haven't heard any

20  testimony yet about any alleged co-conspirator who says,

21  "I got MAC addresses out of the website."

22      MR. BOOKBINDER:  Craig Phillips did.

23      THE COURT:  Yeah, Phillips did, but he's not

24  going to be sufficient, to have a prosecution in

25  Massachusetts, to get -- to show a conspiracy with

```
 1   Phillips --

 2              MR. BOOKBINDER:  We understand the issue, your

 3   Honor.

 4

 5              (In open court.)

 6              THE COURT:  All right.  Ladies and gentlemen,

 7   I'm going to excuse you for today.  We're not going to

 8   be able to finish Mr. Larosa by 1:00, but I have been

 9   talking to the lawyers.  I think we're basically on the

10   schedule that I predicted when you were selected Tuesday

11   and I expect that we'll finish the evidence Tuesday or

12   no later than Wednesday at the pace we're proceeding.  I

13   would say, at the moment, based on what I know, and I'll

14   give you an update on Monday, that you won't need to be

15   here Tuesday afternoon, but you should be thinking that

16   you'll hear final arguments, my instructions, and begin

17   deliberating on Wednesday.  So you will -- you should,

18   for present purposes, assume you'll need to be here

19   Wednesday afternoon and then however long the

20   deliberations take, it will run into the afternoon.

21         All right.  So we're making progress, but you

22   haven't heard everything, so it's important that you

23   continue to keep an open mind.  Don't discuss the case

24   among yourselves or with anybody else.  Don't read,

25   watch or listen to anything about the case.  Don't
```

1  communicate through social media or in any other way

2  about the case.  Have a nice weekend.

3      It's going to take you longer to get here on

4  Monday, school vacation week is over, but as far as I

5  can tell, we're the only ones working this week.  So,

6  you know, maybe you'll want to leave a little earlier.

7  But whatever it is, um, we'll see you on Monday morning

8  at 9:00.  So the Court is in recess for the jury.

9      Mr. Larosa, you're going to have to come back at

10  9:00 on Monday morning.

11          THE WITNESS:  Okay.

12          THE COURT:  Thank you very much.  You can go,

13  too.

14          (Jury leaves, 1:00 p.m.)

15          THE COURT:  Mr. Larosa, you can go.

16          (Witness leaves.)

17          THE COURT:  So we'll finish Mr. Larosa and

18  then have Mr. Hanshaw.

19      Is it still going to be necessary for the Go Daddy

20  recordkeeper to come in?

21          MR. BOOKBINDER:  No, your Honor.

22          THE COURT:  Okay.  And then Timothy Russell,

23  is that right?

24          MR. BOOKBINDER:  Yes.

25          THE COURT:  And Mr. Russell will be seeking to

1    admit some of the objected-to chats.  I don't know if

2    there's any surviving objected-to posts, are there?

3              MR. BOOKBINDER:  Well, um, first of all, there

4    are -- there are some posts by Mr. Harris and I don't

5    know if there's an objection to those, honestly.  But

6    those are --

7              THE COURT:  Well, Mr. Harris's posts are going

8    to come in if you offer them.

9              MR. BOOKBINDER:  All right.

10        Okay.  Then on the MAC trading posts, there are

11   two that are people who were purchasers that we

12   discussed.

13             THE COURT:  Is that Spear and -- the two we

14   were discussing?

15             MR. BOOKBINDER:  Yes.  Exactly.

16             THE COURT:  We'll discuss them again on Monday

17   morning.

18             MR. BOOKBINDER:  And so there are those two.

19             THE COURT:  And I told you that I thought if I

20   had a basis to conditionally admit one and not the other

21   --

22             MR. BOOKBINDER:  Right, there's a person who

23   bought the modem and then there was the person who

24   bought the connectors, I think was the distinction the

25   Court was making.

1          THE COURT:  Well, we'll talk further about

2     that.

3          MR. BOOKBINDER:  Okay.  And the other issue,

4     your Honor, are the, um, the subtopic headings, the

5     thread headings on the index to the website.  And one

6     thing I know the Court had raised was that some of them

7     -- well, many of them simply say the name of an ISP

8     Comcast Charter, some of them have questions, "Looking

9     for MACs," and then a few of them said something like,

10    "Looking for MACs, I have these to trade," and the Court

11    then raised the issue that the, "I have these to trade,"

12    is the same and could be offered for the truth.  And one

13    thing that we could do to address that concern is we can

14    redact those parts out where anyone makes some assertion

15    --

16         THE COURT:  Well, here's why I wanted to spend

17    a little time with you.  You heard me, a couple of days

18    ago, tell you what were my tentative thoughts and

19    concerns even if I didn't find or rule.  Prepare the

20    redacted copies.  Get them to Mr. McGinty.  It would be

21    helpful if you to sent them to me, too.  And, you know,

22    I will --

23         You know, should I proceed on the assumption that

24    you're willing to go with the redacted copies and you're

25    not acting --

 1                    MR. BOOKBINDER:  Yes, we'll submit something.

 2                    THE COURT:  All right.  And then we'll address

 3     this Monday.

 4                    MR. BOOKBINDER:  That's fine.  I doubt that

 5     we're going to be able to have them done before Monday

 6     morning, but we will have something then.

 7                    THE COURT:  All right.

 8                    MR. BOOKBINDER:  We'll get them to Mr. McGinty

 9     before Monday morning, but we may not have them to the

10     Court, although if --

11                    THE COURT:  No if you e-mail them --

12                    MR. BOOKBINDER:  Oh, that's fine.

13                    THE COURT:  All right.  Well, you think we

14     won't get to them?  Well, how many of the agents are

15     going to testify, one or both?

16                    MR. BOOKBINDER:  Both.

17                    THE COURT:  So Mr. Russell is first?

18                    MR. BOOKBINDER:  Right.

19                    THE COURT:  And then the last witness is?

20                    MR. BOOKBINDER:  IRS -- Special Agent Jason

21     Ryan of the IRS.

22                    THE COURT:  And he's going to do what?

23                    MR. McGINTY:  We ask that they be excused

24     while we talk about what they're going to do.

25                    THE COURT:  Well, they have a right to be

```
 1    here, so go ahead.
 2              MR. BOOKBINDER:  Special Agent Ryan is the one
 3    who's going to provide essentially the financial
 4    summary, what came in, what went out, a couple of, you
 5    know, the summary documents, which there is no
 6    objection, about the PayPal records and the --
 7              THE COURT:  Do I have those summaries now?
 8              MR. BOOKBINDER:  Oh, yes, your Honor, they're
 9    exhibits.  I can tell you which they are.
10              THE COURT:  I'll find them.
11              MR. BOOKBINDER:  They're the same exhibits on
12    your list, your Honor.  There's nothing new.
13              THE COURT:  I'll find it.
14              MR. BOOKBINDER:  And he, Special Agent Ryan,
15    is going to be very brief, he's probably about 15, 20
16    minutes.  Special Agent Russell is a little longer
17    because we'll be going through, um, a few excerpts from
18    the book for him, the posts or the chats that we've
19    agreed on, those things.
20              THE COURT:  All right.  But it sounds as if
21    we've got a good prospect of finishing on Tuesday?
22              MR. BOOKBINDER:  I think we're definitely
23    going to finish on Tuesday.  There is some chance, I
24    think, we'll finish on Monday.
25              THE COURT:  All right.
```

1          MR. BOOKBINDER:  Your Honor, there's one

2     matter I wanted to raise about the timing.  I don't know

3     if the defendant has yet decided whether he's going to

4     testify, and I understand the defendant has a right to

5     make that decision at the end, but obviously it will be

6     helpful for us to have at least 24 hours notice whether

7     we need to prepare a cross-examination for him.

8          THE COURT:  Mr. McGinty, what's your current

9     thinking on that?

10         MR. McGINTY:  I would be prepared to make that

11    representation 24 hours before -- we can certainly do

12    that by mid Saturday or early Sunday.

13         THE COURT:  All right.

14         MR. McGINTY:  I can do that.

15         THE COURT:  All right.  And can you let -- you

16    send Mr. Hohler an e-mail and he'll let me know, too.

17    Okay?

18         MR. McGINTY:  Certainly.

19         THE COURT:  It would be helpful for planning

20    purposes because I have to be out of the courthouse on

21    Monday afternoon.  It's possible, if we finish on

22    Monday, that you might not argue the case until

23    Wednesday anyway.

24         MR. BOOKBINDER:  Understood.

25         THE COURT:  There's a lot to go through.

1        And I mentioned to the two of you that if you want

2    to look at the standards I'll apply in addressing the

3    Rule 29 motion, you'll find them in *DiMasi*, 810 F. Supp.

4    2d 347.  Okay?

5             MR. McGINTY:  I'm a little bit at a loss to

6    know what it is that Agent Russell is going to testify

7    to.  I'm sorry.  Agent Russell is -- that part of this

8    -- well, part of what he was projected to talk about is

9    how the internet works and --

10            THE COURT:  Well, why don't you talk to the

11   prosecutors about that.  As you said, you've been

12   collaborating, so I expect they'll explain it to you.

13            MR. BOOKBINDER:  Yes, your Honor.

14            THE COURT:  All right.

15       The Court is in recess until 9:00 on Monday

16   morning.

17            (Adjourned, 1:10 p.m.)

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5    hereby certify that the forgoing transcript of the

 6    record is a true and accurate transcription of my

 7    stenographic notes, before Chief Judge Mark L. Wolf, on

 8    Friday, February 24, 2012, to the best of my skill and

 9    ability.

10

11

12

13    /s/ Richard H. Romanow 11-07-12
      _____
14    RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25
```